**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan, Esq.
Michael R. Dal Lago, Esq.

Proposed Attorneys for Spa Chakra, Inc. et al.
Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SPA CHAKRA, INC. , et. al.,**[1] | : | |
| | : | **Case No. 09-17260 (SMB)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------- x

**MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§
105(A), 363, 365, 503, AND 1146(A) AND FED. R. BANKR. P. 2002, 6004, 6006,
9008, AND 9014: (i) APPROVING THE ASSET PURCHASE AGREEMENT;
(ii) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (iii)
AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND LEASES; (iv) APPROVING AUCTION PROCEDURES
<u>RELATED THERETO; AND (iv) GRANTING RELATED RELIEF</u>**

**TO THE HONORABLE STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

Spa Chakra, Inc. ("***Parent***"); Spa Chakra, LLC ("***LLC***"); Spa Chakra Indiana LLC

("***Indiana***"); Spa Chakra Fifth Avenue, LLC ("***Fifth Avenue***"); and Spa Chakra Fifth Avenue

Indiana LLC ("***Fifth Avenue Indiana***"), the above-captioned debtors and debtors-in-possession

---

[1] The Debtors are the following entities:  Spa Chakra, Inc., a Delaware corporation; Spa Chakra, LLC, a Delaware
limited liability company; Spa Chakra Indiana, LLC, an Indiana limited liability company; Spa Chakra Fifth
Avenue, LLC, a Delaware limited liability company; and Spa Chakra Fifth Avenue Indiana, LLC, an Indiana limited
liability company.

herein (each a "***Debtor***" and, collectively, "***Debtors,***" "***Company,***" or "***Sellers***") by their undersigned proposed attorneys, Morrison Cohen LLP, hereby files this motion ("***Motion***") pursuant to sections 105(a), 363, 365, 503, and 1146(a) of chapter 11, title 11 of the United States Code ("***Bankruptcy Code***") and Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure ("***Bankruptcy Rules***"), and Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("***Local Rules***") for an order authorizing and approving a sale of certain of the Debtors' assets ("***Assets***"[2]) free and clear of liens, claims, and encumbrances and the assumption and assignment of certain executory contracts and leases upon the terms and conditions set forth in the Asset Purchase Agreement ("***APA***"), annexed to this Motion as Exhibit "A,"[3] between the Debtors, on the one hand, and Hercules Technology II, L.P., a Delaware limited partnership, or an affiliate thereof ("***Buyer***" or "***Hercules***"), on the other hand. In order to facilitate an orderly sale of the Assets, the Debtors further request that this Court establish various bidding procedures and guidelines related thereto. In support of this Motion, the Debtors respectfully represent:

1.     This Motion seeks to establish the procedures for the auction of certain of the Debtors' assets and the approval of the proposed sale to Buyer, or such other purchaser that submits a higher or better offer. The Motion contemplates the entry of two orders, the first order establishing the Bid Procedures, and scheduling an Auction and a Sale Hearing, and the second order approving the proposed sale.

- **The Bidding Procedures Order***:* The Debtors request that the Court enter an order ("***Bidding Procedures Order***") approving (i) the auction bidding procedures annexed hereto as Exhibit "B" ("***Auction Procedures***") in connection with the proposed sale of the Assets to the Buyer or a qualified bidder submitting a higher or otherwise better offer, (ii) notice of the auction

---

[2]   The Assets are comprised of the "Assets" and the "Additional Assets" under the APA.
[3]   All terms not expressly defined in this Motion shall have the meanings provided in the APA.

("**_Auction_**") and the sale hearing ("**_Sale Hearing_**"), in the form annexed hereto as Exhibit "C"("**_Auction and Hearing Notice_**"), and (iii) establishing the dates, time, and place of the Auction and the Sale Hearing. The Debtors further request that the Court authorize the Debtors to pay a **_Break-up Fee_** and **Expense Reimbursement** to the Buyer as provided for in the APA in the event the Buyer is outbid at the Auction.

- **The Sale Order**: The Debtors further request that the Court enter an order ("**_Sale Order_**") following the Auction for the approval of (i) the sale of the Assets free and clear of liens, claims, and encumbrances and (ii) the exemption of the sale of the Assets from stamp or similar taxes. The Proposed Order is annexed hereto as Exhibit D.

2.     This Sale Motion is divided into two parts. Part I constitutes the Debtors' request for approval of the Bidding Procedures Order. Part II constitutes the Debtors' request for approval of the sale of the Assets, as well as other related relief.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 503, and 1146(a) of the Code and Rules 2002, 6004, 6006, 9008, and 9014, and Local Rules 6004-1 and 6006-1.

## INTRODUCTION

4.     On December 1, 2009, an involuntary petition ("**_Involuntary Petition_**") was filed against Fifth Avenue for relief under chapter 7 of the Bankruptcy Code with this Court. On December 9, 2009, Indiana filed an emergency voluntary petition for relief under Chapter 11. On December 10, 2009, Parent, LLC, and Fifth Avenue Indiana each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On December 22, 2009, this Court, on consent of Fifth Avenue, converted the involuntary case to a voluntary case under Chapter 11 and entered

an order for relief under Chapter 11. (For convenience "***Petition Date***" shall collectively mean the date on which each Debtor case was commenced.)

5.       The Debtors continue to operate their businesses and manage their properties as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

6.       An order for joint administration of these cases was entered on December 11, 2009. ECF #11.

7.       On December 22, 2009 the United States Trustee appointed a creditors' committee ("***Committee***") in this case. ECF #36. No trustee, or examiner has been appointed in these cases.

8.       This Motion is supported by, and the Debtors incorporate by reference, the Rule 1007 Affirmation of Michael Canizales, the Chief Executive Officer of Parent, the Sole Member of the other Debtors, which is also in support of First Day Motions and Applications ("***Canizales Affirmation***"), which has been filed on the Court ECF system at docket entry 6.

## The Debtors' Business and Operations

9.       The Debtors are part of the Spa Chakra enterprise that manages several luxury health and wellness spas in the United States, Europe, and Asia in the following cities: Guerlain Spa in the Regent Bal Harbour Hotel, Bal Harbour, Florida; Guerlain Spa in the Waldorf Astoria Hotel, New York, New York; Spa Chakra on Fifth, New York, New York; Spa Chakra in the Conrad Indianapolis Hotel, Indianapolis, Indiana; Spa Chakra in the Hilton Short Hills, Short Hills, New Jersey; Spa Chakra in the Palmer House Hilton Hotel, Chicago, Illinois; Spa Chakra Marina Del Ray, Marina Del Ray, California; Nourish Spa in the Avalon Hotel & Spa, Portland, Oregon; Nourish Spa in the Hilton San Francisco, San Francisco, California; [Spa Chakra Call Center, Tampa, Florida]; Guerlain Spa, Residence Bel-Air, Island South, Hong Kong; Guerlain

Spa, Shilla Seoul, Seoul, Korea; Guerlain Spa, Shilla Jeju, Jeju-Do, Korea; Guerlain Spa, 68 Champs-Elysees, Paris, France; Guerlain Spa, Trianon Palace, Versailles, France; Spa Chakra Grand Hotel Park, Gstaad, Switzerland; Acqua di Parma Blu Mediterraneo, Yacht Club Costa Smeralda, Porto Cervo, Italy; Spa Chakra Alfarden Towers, Doha, Qatar. The Debtors currently employ approximately 170 full-time regular employees, including senior management, and 145 part-time employees. In order to facilitate the successful expansion of the Spa Chakra business, the Debtors consummated various equity financings beginning in 2005 through 2007, whereby both common and preferred shares were issued to qualified investors. The Debtors continued to expand domestically and internationally from 2001 through 2009, at one point in time having a total of twenty two (22) locations, with an opening cost for each location varying from a de minimis amount (for takeovers of other spa locations) to between $500,000 and $1,000,000 for "new builds."

10.     In 2007, the Company entered into a strategic relationship with Hilton Hotels Corporation ("***Hilton Deal***") in order to fuel substantial growth in revenue and profits. The Company assumed additional overhead and opened additional offices in order to accommodate the Hilton deal and a pipeline of similar openings.

11.     In April 2008, the Company hired Piper Jaffray ("***Piper***"), a well know investment bank, to source and coordinate a $15,000,000 equity raise ("***Piper Equity Raise***"). At that time, the Company expected to raise the aforementioned capital with a very strong valuation in a time frame for closing such transaction between ninety (90) and one hundred and twenty (120) days.

12.     In order to ensure adequate operating capital during the Piper Equity Raise period, on June 13, 2008 the Company obtained secured financing from Hercules. The Company intended to pay off the debt owed to Hercules with the proceeds from the Piper Equity Deal.

13.     One week into the "road show" for the Piper Equity Raise, one of the current shareholders of Parent attempted to acquire a controlling interest in Parent. After consideration, the Board of Directors of Parent determined that the acquisition of such controlling interests was not in the best interests of the Company. Unfortunately, as a result of the time taken by this process, the Piper Equity Raise was delayed and did not resume until September of 2008. By that time the country had begun to sink into a recession, leading to the closure of the capital markets, making it virtually impossible to consummate a transaction such as that contemplated by the Piper Equity Raise.

14.     The hotel industry was a casualty of the recession because there was a significant lack of funding for hotel construction finance. As a result, many of the anticipated hotel deals pursuant to the Hilton Deal were not consummated, causing a substantial decrease in anticipated revenue for the Company. In addition, the Company opened four significant locations in the third and fourth quarters of 2008, the Waldorf-Astoria in New York, New York, the Hilton Short Hills in Short Hills, New Jersey, the Palmer House Hilton in Chicago, Illinois, and Hilton Grand Vacations Club Spa in Las Vegas, Nevada. The ability for these locations to transition and begin generating revenue for the Company was significantly prolonged due to the effects of the economy and the changes in the hotel "mix" related thereto. Further, with many Company locations offering fitness facilities for use by its members, fitness revenue decreased twenty-five percent (25%) due to the across the board domestic decrease in discretionary spending during the recession.

15.     The effects on the Hilton Deal and ancillary repercussions of the recession ultimately contributed to the Company's default in the payments owed to Hercules in addition to resulting in capital shortfalls and shortfalls with respect to the projections. The Company had to write off more than $5,000,000 worth of consulting revenue and was off by over $10,000,000 in cash due to the demise of the Hilton deal alone.

16.     In order to compensate for this decrease in available capital, the Company streamlined its operations, negotiated eight (8) amendments to the Hercules financing and closed all of its non-performing spa locations. As a result, the Company posted strong results in 2009 on an EBITDA basis, allowing it to remarket the Piper Equity Raise to a larger and broader audience. With Piper's knowledge and consent, the Company also retained Wedbush Securities ("***Wedbush***"), an investment bank, to assist in the equity raise process. Notwithstanding the Company's efforts, it remained in a tight cash situation, forcing it to acquire bridge financing from executives, shareholders, and Hercules in order to allow the Company to survive until the consummation of the Piper Equity Raise.

17.     Additionally during this time, the Company consummated the strategic acquisition of Cornelia Day Spa in New York, New York ("***Cornelia Transaction***"), pursuant to which it acquired substantially all of the assets and assumed certain specified liabilities of New York limited liability company Cornelia Fifth Avenue, LLC and rebranded all the operations as Spa Chakra on Fifth. Immediately following the closing of the Cornelia Transaction, the Company discovered that the sellers made a significant number of material breaches of representations and warranties, the most significant of which was related to the materially false disclosure and understatement of then-outstanding gift card liabilities. As a result, Spa Chakra Fifth Avenue, LLC (the buyer in the Cornelia Transaction and subsidiary of Spa Chakra, Inc.),

was forced to redeem hundreds of thousands of dollars of gift cards that had been issued prior to the consummation of the Cornelia Transaction, but not disclosed to the buyer prior to the closing. Due to the economic damage caused from such material breach and numerous other breaches of representations, warranties and covenants, the Company, in accordance with the Cornelia Transaction documents, demanded payment of a $2,400,000 promissory note ("***Cornelia Note***") issued to it by the sellers in the Cornelia Transaction. Because of the sellers' default in paying the Cornelia Note, the Company was forced to commence litigation, which is currently pending against the sellers in order to recoup such amounts and cover the liabilities that were caused by the sellers' breaches of the representations, warranties, and covenants in the Cornelia Transaction. The litigation costs and the repercussions related to the breaches further compromised the Company's cash position.

18.     In addition to the problems related to the gift card redemptions and the other material breaches of representations and warranties that caused significant financial harm to the Company, the revenue from the salon located on Fifth Avenue decreased by sixty percent (60%) due to the departure of celebrity hairstylist David Evangelista and his salon team. The performance and revenue generation of such salon team was a material inducement to Spa Chakra's consummation of the Cornelia Transaction.

### The Pre-Petition Marketing Effort

19.     In April 2008, the Board of Directors of Parent hired Piper to conduct the Piper Equity Raise. Pursuant thereto, Piper prepared an extensive private placement memorandum, pitch kits and financial and legal due diligence materials for distribution to interested parties. Piper contacted seventy-six potential investors in 2008 which resulted in twenty-one (21) meetings, eight (8) due diligence processes and two (2) term sheets.

20.    When the economic recession hit the United States in the fall of 2008, management requested Piper put the Piper Equity Raise on hold and wait for the financing market to reinvigorate before marketing the potential investment to additional parties. In the interim, management renegotiated the loan agreement with Hercules to reflect a slower expansion plan and modify the requirements to raise a certain amount in additional capital through the financing process. Following extremely strong "same store" sales results, Parent and Piper re-engaged in the financing process in April of 2009 and Piper contacted an additional sixty nine (69) potential investors. To supplement the Piper process, Parent engaged Wedbush which contacted twenty-one (21) non-traditional consumer funds to gauge their interest in investing in Parent. In total, an additional seventeen (17) meetings were conducted by Piper in 2009 which yielded one (1) additional term sheet. Eight (8) meetings were conducted by Wedbush (all eight signed non-disclosure agreements), which resulted in three (3) term sheets. The Company was unsuccessful in closing any of the transactions due to the economic climate in the United States.

21.    In addition to the aforementioned investment procedures managed by Piper and Wedbush, Company management consistently reached out to then-current shareholders and business associates in order to attempt to secure financing for the Parent. One such contact yielded a term sheet but such transaction was not consummated, again due to the economic climate.

**The Debtors' Existing Secured Debt**

22.    Prior to the Petition Date, in connection with an Cornelia Transaction, Fifth Avenue became indebted to Sterling National Bank, N.A. ("***Sterling***") for approximately $610,000.00 under that certain Loan and Security Agreement dated as of July 15, 2009, by and

between Fifth Avenue and Sterling ("***Sterling Loan Agreement***"), which indebtedness is secured by a first-priority Lien in Fifth Avenue's assets ("***Fifth Avenue Collateral***"). The obligations to Sterling that remain outstanding as of immediately prior to the Closing, as defined in the APA, under the Sterling Loan Agreement (including, without limitation, all principal, interest, costs, fees and expenses thereunder) shall hereafter be referred to as the "***Sterling Obligations***."

23.      Prior to the Petition Date, Buyer provided secured financing to Debtors pursuant to that certain Loan and Security Agreement dated as of June 13, 2008, by and between Buyer as lender and Parent as borrower (as amended, restated, and otherwise modified, from time to time, the "***Prepetition Loan Agreement***") and certain related joinder agreement by and between Buyer and each of the other Sellers. In addition, immediately before the Petition Date, Buyer provided a secured loan to Parent, LLC, and Fifth Avenue Indiana pursuant to that certain Secured Promissory Note dated December 10, 2009 ("***Prepetition Note***"). The Prepetition Loan Agreement, the Prepetition Note, and all other agreements, documents, financing statements, or instruments executed in connection therewith shall be referred to collectively as the "***Prepetition Credit Documents***." The obligations to Buyer that remain outstanding as of immediately prior to the Closing under the Prepetition Credit Documents (including, without limitation, all principal, interest, costs, fees and expenses thereunder) shall hereafter be referred to as the "***Prepetition Senior Obligations***."

24.      As of the Petition Date, (i) the outstanding payment obligations owed to Buyer under the Prepetition Loan Agreement was $13,764,081.55 in principal and accrued and unpaid interest, exclusive of attorneys fees and other charges, and the outstanding payment obligations owed under the Prepetition Note was $57,034.83 in principal and accrued and unpaid interest, exclusive of attorneys fees and other charges; and (ii) in indebtedness and obligations owing to

Buyer under the Prepetition Credit Documents are secured by (x) in the case of the Prepetition Credit Documents other than the Prepetition Note, a valid, enforceable, and duly perfected Lien in all or substantially all of Sellers' assets and proceeds thereof, subject and subordinate only to the Liens securing the Sterling Obligations with respect to the Fifth Avenue Collateral and (y) in the case of the Prepetition Note, a valid, enforceable, and duly perfected Lien in all or substantially all of the assets of Parent, LLC, and Fifth Avenue Indiana and proceeds thereof, subject and subordinate only to the Liens securing Prepetition Senior Obligations with respect thereto.

25.     Because the Company had insufficient funds to operate pending consummation of the Sale to Hercules, or an "***Alternative Buyer***," as defined in the APA, and an immediate and critical need existed for the Debtors to obtain funds in order to continue the operation of their businesses and to preserve and maximize the value of the Debtors' assets, Hercules agreed to allow the Debtors to use it s cash collateral and to provide post-petition financing under certain terms and conditions.

26.     On December 15, 2009, this Court entered an order ("***First Interim Order***") authorizing the Debtors pursuant to Section 364 of title 11 of the United States Code ("Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York ("Local Rules") to use the cash collateral of, and to obtain post-petition financing in the form of a secured loan up to $800,000 ("***DIP Facility***") from Hercules pursuant to that certain Secured Debtor-in-Possession Credit Agreement dated as of December 15, 2009 ("***DIP Credit Agreement***") and to grant security interests, superpriority claims, and adequate protection to Hercules in connection therewith, all as more fully set forth in the First Interim Order. ECF # 20.

On December 29, 2009, this Court entered a **Second Interim Order** and on January 14, 2010 this Court entered a third interim order (**"Third Interim Order"**) (and collectively with the First Interim Order, "**Interim Orders**") authorizing the continued used of cash collateral and debtor-in-possession financing from Hercules on the same terms and conditions as the First Interim Order, except as modified in the Second Interim Order and the Third Interim Order. The obligations that remain outstanding as of immediately prior to the Closing under the DIP Facility (including, without limitation, all principal, interest, costs, fees and expenses thereunder, the "**DIP Obligations**."

### The Proposed Transaction

27.     By the last quarter of 2009, it became clearer to the Company that it needed to effect drastic changes in its operations to achieve liquidity and that it needed additional financing for continued operations. It also began considering, and ultimately concluded, that it might need to commence voluntary bankruptcy proceedings some time after the New Year for some or all of the Debtors.

28.     The Company also engaged in a continuing dialog with Hercules about a possible acquisition by Hercules of the Company or its assets. Hercules is a public Company with a focus on the healthcare industry. Founded in 2003, Hercules is experienced in offering growth capital to companies in various stages of development. It has eleven managing directors and principals who have significant and long term venture capital, lending, and investing experience. In November 2009, the Company and Hercules explored the potential synergies of the two companies and concluded that a transaction would be in both parties' best interests.

29.     Consequently, the parties began working on an orderly process that would result in a pre-negotiated bankruptcy filings with Hercules acting both as the stalking horse in a 363 process and the debtor-in-possession lender.

30.     Unfortunately, on November 30, 2009, the Involuntary Petition was filed against Spa Chakra Fifth Avenue, LLC for relief under chapter 7 of the Bankruptcy Code with this Court. the damage caused by the Involuntary Petition was immediate – the filing was picked up by Crains and both Hercules and the Company recognized that the impact on sales and consumer confidence especially during the holiday season, made an immediate filing to preserve asset value.

31.     On January 15, 2010, the Company and Hercules entered the APA pursuant to which (i) certain of the assets ("*Assets*") the Company will be sold to Hercules in a sale and auction process subject to higher or better offers pursuant to Section 363 of the Bankruptcy Code.

32.     The Debtors believe, in their reasonable business judgment that it is in the best interests of their estates and creditors to sell the Assets through an auction with Hercules acting as a stalking horse. As may be required by the Debtors' fiduciary obligations, the Debtors will consider all qualified bids for Assets submitted in accordance with the Bidding Procedures Order. Further, it is critical that the Debtors effect a sale of the Assets as quickly as possible before its funding as provided in the Interim Orders is exhausted and in order to comply with the terms of the ***DIP Financing Documents*** (as defined in the Interim Orders).  Moreover, with each passing day, there is a risk that the Debtors' customers will take their business elsewhere. Accordingly, the value of the Assets is rapidly deteriorating and an expedited auction and sale is

necessary to preserve maximum realizable asset values for the benefit of the Debtors' estates and creditors.

**SUMMARY OF THE PROPOSED TRANSACTION**

33.     The material terms of the business deal is that the Buyer has agreed, if not outbid at the Auction, to purchase certain of the Debtors' Assets which Assets shall be transferred free and clear of liens (if any), claims, encumbrances, and interests, with such Encumbrances to attach to the proceeds of the Sale. The consideration to be received by the Debtors will be (a) cash in an amount equal to Eight Million Dollars ($8,000,000.00) (or such other greater amount as may be established at the Auction pursuant to the Bidding Procedures Order) ("Cash Consideration") minus (i) an amount equal to the Final Cure Costs; and (ii) an amount, if any, equal to (x) the DIP Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code and (y), upon the exhaustion of the DIP Obligations, the Prepetition Senior Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code; and (b) the assumption of the Assumed Obligations by Buyer.

34.     The APA contains, *inter alia*, the following pertinent terms:[4]

"2.01    __Acquired Assets__.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, free and clear of all Liens (other than Liens securing the Sterling Obligations) and Claims, and Buyer shall purchase, acquire and take assignment and delivery of all properties, assets, rights, titles and interests of every kind and nature,

---

[4]   This description of the APA is intended only as a summary. Parties should review the APA for a complete understanding of the transaction. All capitalized terms not defined herein shall have the meaning ascribed to them in the APA. The "Schedules" referred to in this description are Schedules to the APA.

owned, licensed or leased by Sellers, as the same shall exist at the Closing, whether tangible or intangible, real or personal and wherever located and by whomever possessed (collectively the "Acquired Assets", but exclusive, in all cases, of the Excluded Assets). Except as provided in the representations and warranties of Sellers in this Agreement (none of which representations and warranties will survive the Closing), the Acquired Assets are being purchased hereunder on an "as is" basis and with all faults. Notwithstanding anything to the contrary in any other provision of this Agreement or any document or instrument executed pursuant hereto but without limiting the covenants of the Parties hereunder, to the extent that any of the Acquired Assets are leased, licensed or otherwise held by Sellers pursuant to an agreement with a third party, Buyer shall only acquire the right to use and possession, as applicable, of such Acquired Assets if the corresponding lease, license or other agreement is assigned to and assumed by Buyer pursuant to the Sale Order at the Closing. The Acquired Assets shall include, without limitation, all of the following assets:

(i) **Cash and Cash Equivalents**. All cash and cash equivalents (including marketable securities and short-term investments), other than cash advanced by Buyer to Sellers under the DIP Facility and held by Sellers immediately prior to the Closing, which advanced amounts will be repaid to Buyer pursuant to the terms of the DIP Facility or credited against the Purchase Price payable by Buyer for the Acquired Assets pursuant to Section 2.07(a);

(ii) **Receivables**. All accounts, payment intangibles, general intangibles, chattel paper, letters of credit, notes receivable, checks, and instruments (the "Receivables");

(iii) **Inventory**. All inventory and its components, wherever located and whether held by Sellers, their Affiliates, or any third party, including all raw materials, work in process, samples, packaging, supplies, service parts, purchased parts and goods, any and all rights to market and sell all such inventory and all warehouse receipts, bills of lading and similar documents;

(iv) **Machinery and Equipment**. All machinery and equipment (including manufacturing assembly and test equipment), fixed assets, tools (including lab tools), spare and replacement parts, maintenance equipment, materials, networks, computers, printers, servers, or other equipment, wherever located and whether held by Sellers, their Affiliates, or third parties;

(v) **Personal Property**. All office furnishings and furniture, display racks, shelves, decorations, fixtures, supplies and other tangible personal property;

(vi) **Intellectual Property Assets**. Sellers' Intellectual Property Assets;

(vii) **Software**. Any computer software or system owned by any Seller or collectively by Sellers;

(viii) **Deposits and Advances**. All performance and other bonds, letters of credit, security and other deposits, advances, advance payments, prepaid credits and deferred charges to the extent related to the Acquired Assets (the "Deposits and Advances");

(ix) **Assumed Executory Contracts**. All rights and claims in, to and under the contracts or unexpired leases to which one of the Sellers is a party, as set forth on Schedule 2.01(a)(ix) (collectively, as may be revised pursuant to the terms of this Agreement, the "Assumed Executory Contracts"); provided, however, that such Schedule may be revised in accordance with Section 2.01(b);

(x) **Assumed Real Property Leases**. All rights in, to, and under the real property non-residential leases to which one of the Sellers is a party, as set forth on Schedule 2.01(a)(x) (collectively, as may be revised pursuant to the terms of this Agreement, the "Assumed Real Property Leases"); provided, however, that such Schedule may be revised in accordance with Section 2.01(b);

(xi) **Books and Records**. All books, files, papers, agreements, correspondence, databases, information systems, programs, software, documents, records and documentation thereof related to any of the Acquired Assets or the Assumed Obligations, or used in the conduct of the Business, in whatever medium, including paper, electronic and otherwise, whether held by Sellers or by any third party unless transfer of such records is prohibited by Law (the "Books and Records");

(xii) **Permits**. To the extent transferable under applicable Law, all rights of Sellers in any Permit (and pending applications therefor) listed on Schedule 2.01(a)(xii);

(xiii) **Claims**. All commercial torts and other claims, choses-in-action, rights in action, rights to tender claims or demands to Sellers' insurance companies, rights to any insurance proceeds, rights under any policy of insurance or tail under which any Seller is the insured, rights to any damages, and other similar claims (including, without limitation, Sellers' right and claims under that certain Promissory Note, dated as of February 6, 2009, by Richard Aidekman and Ellen Sackoff in favor of Spa Chakra Fifth Avenue, LLC the "Cornelia Note"), other than any and all claims and causes of action under Chapter 5 of the Bankruptcy Code (collectively, the "Chapter 5 Claims") or certain other claims that relate solely to the Excluded Assets (collectively, the "Sellers Claims");

(xiv) **Goodwill**. All goodwill generated by or associated with the Business;

(xv) **Subsidiaries**. All issued and outstanding stock, membership interests, or other equity interests in the Subsidiaries listed on Schedule 2.01(a)(xv); and

(xvi) **Other Assets**. All other assets, properties, rights and claims related to the operations or conduct of the Business or which arise in or from the conduct thereof, including, without limitation, Sellers' rights to corporate telephone numbers and email addresses.

(b) Notwithstanding anything to the contrary in this Agreement, Sellers shall not reject (or make any motion to reject) any Assumed Executory Contract or Assumed Real Property Lease identified in the exhibits to be filed pursuant to Section 5.04(b) hereof, without the prior written consent of Buyer.

2.02 **Intentionally Omitted**.

2.03 **Excluded Assets**. Notwithstanding anything to the contrary in Section 2.01, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Buyer hereunder (collectively, the "Excluded Assets").

(a) **Cash Advanced under the DIP Facility**. Cash advanced by Buyer to Sellers under the DIP Facility and held by Sellers immediately prior to the Closing, which advanced amounts will be repaid to Buyer pursuant to the terms of the DIP Facility or credited against the Purchase Price payable by Buyer for the Acquired Assets pursuant to Section 2.07(a);

(b) **Certain Claims**. Any Chapter 5 Claims and any Sellers Claims;

(c) **Corporate Documents**. Corporate seals, certificates of incorporation, minute books, stock transfer records, or other records related to the corporate organizations of Sellers;

(d) **Employee Benefit Contracts**. Sellers employee benefit plans and contracts of insurance for employee group medical, dental and life insurance plans;

(e) **Deposits**. Any Deposits and Advances solely related to any of the Excluded Liabilities;

(f) **Rights under Transaction Documents**. All rights of Sellers under the Transaction Documents;

(g) **Director and Officer Claims**. Any claims against any Seller's directors and officers; and

(h) **Other Excluded Assets**. The contracts and leases not assumed by Buyer hereby, and other assets of Sellers not transferred to Buyer as set forth on Schedule 2.03(h).

2.04 **Assumed Obligations**.

(a)     Upon the terms and subject to the conditions of this Agreement, effective at the Closing Date, Buyer shall only assume from Sellers and thereafter only be responsible for the payment, performance or discharge of the following liabilities (collectively, the "Assumed Obligations"):

(i)     the liabilities and obligations of Sellers arising on or after the Closing Date under the Assumed Executory Contracts and Assumed Real Property Leases;

(ii)     the costs of cure required to be satisfied in order for Sellers to assume and assign each Assumed Executory Contract and Assumed Real Property Lease under Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court at the Sale Hearing (collectively, the "Final Cure Costs");

(iii)     the liabilities and obligations of Sellers under the Permits to the extent such Permits are transferable to Buyer and are included in the Acquired Assets;

(iv)     the gift card liabilities and obligations of Sellers as set forth on Schedule 2.04(a)(iv);

(v)     the liabilities and obligations of Sellers under the Sterling Loan Agreement (which are expected to be modified pursuant to agreements between Buyer and Sterling); and

(vi)     the liabilities and obligations of Sellers as set forth on Schedule 2.04(a)(vi).

2.05     **No Other Liabilities Assumed**.  Notwithstanding anything to the contrary in this Agreement, except for the Assumed Obligations, Buyer shall not assume and shall not be in any way liable or responsible for (whether directly, indirectly, contingently or otherwise), any Liability of Sellers or any other Person, whether relating to or arising out of the Business, the Excluded Assets or the Acquired Assets or otherwise (collectively, the "Excluded Liabilities")."

35.     The Purchase price payable by Buyer to the Debtors at Closing consists of the following:

"2.07     **Purchase Price**.  The purchase price payable at the Closing by Buyer to Sellers for the Acquired Assets shall consist of the following (the "Purchase Price"):

(a)     cash in an amount equal to Eight Million Dollars ($8,000,000.00) (or such other greater amount as may be established at the Auction pursuant to the Bidding Procedures Order) ("Cash Consideration") minus (i) an amount equal to the Final Cure Costs; and (ii) an amount, if any, equal to (x) the DIP Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code and (y), upon the exhaustion of the

DIP Obligations, the Prepetition Senior Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code; and

(b)     the assumption of the Assumed Obligations by Buyer."

36.     **Break-Up Fee and Expense Reimbursement**.  Other provisions in the APA are that the Buyer shall be entitled to a ***Break-Up Fee***  equal to three percent (3%) of the Purchase Price payable to Buyer in cash, plus a reimbursement of Buyer in cash in an amount equal to all reasonable and actual out-of-pocket and third-party costs and expenses (including expenses of counsel and other outside consultants) incurred and documented by Buyer (or its designated Affiliate(s)) in connection with Buyer's due diligence investigation of Sellers and the Business and the negotiation, execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated by this Agreement ("***Expense Reimbursement***"),] upon the first to occur of any of the events set forth in Section 8.02(a)(i) or Section 8.02(a)(ii); *provided, however*, that the Expense Reimbursement shall in no event be greater than Two Hundred Thousand Dollars ($200,000.00).

37.     The Debtors have evaluated the terms of Buyer's offer with the assistance of their professionals and, in their reasoned business judgment, concluded that Buyer's proposal offered the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of purchase price and in terms of terminating operational losses). The Debtors have marketed and will continue marketing the Assets in an effort to solicit further interest from both strategic acquirers and financial buyers and investors prior to the Auction. The APA is subject to higher or better offers.

**RELIEF REQUESTED**

38.     The Debtors respectfully request, pursuant to sections 105, 363, 365 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, (a) entry of the Bidding Procedures Order approving (i) the Auction Procedures and (ii) the Auction and Hearing Notice, and (b) entry of the Sale Order approving (i) the sale of the Assets free and clear of liens, claims and encumbrances to the Buyer, or a qualified bidder submitting a higher or otherwise better offer  and (ii) the exemption of the sale of the Assets from stamp or similar taxes.

39.     The Debtors expressly reserves the right to modify the relief requested in the Sale Motion prior to or at the applicable hearings, including the proposed Auction Procedures.

**PART I**

40.     In Part I of this Sale Motion, the Debtors seek approval of the Bidding Procedures Order which contain specific Auction Procedures, including the manner in which the Auction and Hearing Notice is to be provided, as well as the approval of certain Bidding Protections (defined below) to be provided to the Buyer in the event that the Court approves a Competing Bid (as defined in the APA).

41.     The APA was the subject of intense and extensive, arms' length negotiations between the parties. Among the provisions most heavily negotiated was the Bidding Protections. Notably, as a condition of Buyer's willingness to enter into the APA, continuing with its due diligence, foregoing other investment opportunities, committing its resources to pursuing the sale and, importantly, acting as the "stalking horse" for other potential bidders, Buyer has <u>required</u> that the Debtors agree, and seek an order of the Court determining, that the Bidding Protections, if earned by Buyer, shall be paid in accordance with the APA. The Bidding Protections, including the Break-Up Fee, are meant to recognize Buyer's value added as a stalking horse

bidder and to reimburse Buyer for its costs and expenses incurred in the event Buyer is not approved by the Court as the Buyer of the Assets. As noted, Buyer would not enter into the APA without the inclusion of these Bidding Protections.

## A.     The Auction Procedures

42.     In an effort to insure that maximum value is obtained for the Assets, the Debtors request that the Court approve the following Auction Procedures. The Debtors believe it is in the best interests of their estates, creditors, and clients to commence a bidding process immediately, as the Debtors have limited funding and resources and the value of the Assets is rapidly diminishing. The Debtors believe that an auction of the Assets conducted in accordance with the Auction Procedures will maximize value of the Assets.

43.     The Debtors seeks approval of the Bid Procedures in connection with the Auction in an effort to maximize the likelihood of higher and better bids being made for the Debtors' assets. The Debtors believes that the Bid Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Debtors' assets that is higher or better than the APA entered into by the Debtors and the Buyer.

44.     Under Bankruptcy Rule 6004(f)(1), the Debtors may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtors believe that an auction will expose the Assets to a broad and diverse market and ensure a sale to the highest or best offer. The Debtors propose to conduct the Auction on or before February 24, 2010.

45.     The Debtors desire to receive the greatest value for the Assets. Although the Debtors believe the APA with the Buyer is fair and reasonable and reflects the highest and best

value for the Assets as of the date of this Motion, and although extensive efforts were made to market the Assets, the Debtors nevertheless desires to place the APA to the test of the broader public marketplace in the hope that higher and better offers are generated for the Assets.

46.     If the Bid Procedures are approved, the Debtors will solicit competing bids for the Assets. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt, negotiation and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

47.     While **all interested bidders should read the Auction Procedures in their entirety**, a summary of the Auction Procedures follows. The descriptions of the Bid Procedures herein are qualified in their entirety by reference to the Bid Procedures attached to the Bid Procedures Order:

a.      **<u>Auction and Hearing Notice</u>**.  On or before January [29,] 2010, the Debtors shall mail the notice of sale of the Assets ("***Auction and Hearing Notice***") by first class mail, postage prepaid, to (a) all potential purchasers identified by the Debtors, (b) the Office of the United States Trustee, (c) John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, counsel for Buyer, (d) Michael S. Amato, Esq., Ruskiin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556-1425, counsel for the Committee, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, (g) all non-debtor parties to each of Debtors' leases or executory contracts, and (h) all government agencies required to receive notice of proceedings under the Bankruptcy Rules. The Debtors shall also publish a copy of the Auction and Hearing Notice in the national edition of either USA Today or the Wall Street Journal, New York Edition. Any other party in interest that wishes to receive a copy of the Auction and Hearing Notice shall make such request in writing to Debtors' counsel, Morrison Cohen, LLP, 909 Third Avenue, New York, NY 10022, Attn: Joseph T. Moldovan, Esq., Tel. 212-735-8600, Fax: 917-522-3103.

b. **Single Sale under the APA.** It is the Debtors' strong preference that the Assets be sold to a single bidder, in a single sale. All bidders shall have signed an agreement no less favorable than the APA, as determined in the Debtors' discretion, in consultation with the Creditors' Committee. The Break-Up Fee and/or Expense Reimbursement section of the APA will not be applicable to any bidders other than Buyer.

c. **Filing of Exhibits Listing Assumed Executory Contracts and Leases.** At least five (5) business days before the Sale Hearing (defined below), the Debtor shall serve by mail (a) a list of the potential assumption and assignment of executory contracts and unexpired leases and their proposed cure amounts on the following persons: (i) all non-debtor parties to each lease or executory contract proposed to be included in the sale to Buyer (collectively, the "*Lease and Contract Parties*"); (ii) all parties known to possess or allege a lien, security interest, or other interest in any of the assets to be sold at such sale(s); (iii) the Office of the United States Trustee; and (iv) counsel for the Committee; and (v) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

d. **Qualified Bids.** The bid must be in writing and submitted using a form substantially the same as the APA. The bid shall be made upon terms and conditions substantially similar to or better than those contained in the APA (excluding the Break-Up Fee) (as determined by the Debtors in their reasonable business judgment after consultation with the Committee), and must be accompanied by a "clean" version of the revised agreement, together with a blackline to reflect any proposed changes to the terms and conditions of the APA. A bid for the Assets must be in a net amount, after all adjustments, of at least the sum of the consideration potentially payable under the APA and the ancillary agreements to be entered into in connection therewith, which the Debtors values at approximately $8 million in the aggregate, plus an additional $540,000 (an amount equal to the Break-Up Fee, Expense Reimbursement, and Purchase Price Protection approved by the Court), plus assumed liabilities of at least $2.7 million.

e. Any bidder shall be required to provide evidence of its financial ability to close and to fund the purchase price.

f. Any bidder shall be required to provide evidence of its ability to receive all necessary regulatory or any other third party approvals.

g. The bid must not be conditioned on the outcome of unperformed due diligence by the bidder, the receipt of financing or any further bidding approval, including from any board of directors, shareholders or otherwise. Bids shall not be shared among Qualified Bidders (other than Buyer). None of the conditions in the bid shall be materially more

burdensome or unfavorable to the Debtors than those set forth in the APA and the proposed Sale Order.

h.    The bid must be accompanied by an earnest money deposit to Debtors' counsel equal to ten percent (10%) of the total proposed purchase price, but not less than 800,000 ("***Deposit***") in the form of a certified check or wire transfer payable to the trust account of Debtors' counsel by the Bid Deadline (defined below). The Deposit should only be sent to the Debtors (and not the other parties to receive copies of the bids). Such Deposits shall be held by the Debtors, in a non-interest bearing account, until they are returned as, and to the extent, provided for herein.

i.    At the conclusion of the Auction, the Debtors will announce the highest and best bid ("***Successful Bidder***") and the second highest and best bid ("***Back-Up Bidder***"). The Successful Bidder and Back-Up Bidder shall supplement their respective deposits by wire transfer or other immediately available funds within one (1) business day so that, to the extent necessary, such deposit equals ten percent (10%) of the aggregate purchase price payable by the Successful Bidder; provided that Buyer may decline to be the Back-Up Bidder. If, for any reason, the Successful Bidder fails to consummate the purchase of the Assets, (i) the Back-Up Bidder will be deemed to have submitted the highest and best bid, and (ii) the Debtors shall be authorized to effect the sale of the Assets to the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court. The Debtors' counsel shall transfer the Back-Up Bidder's deposit to a non-interest bearing trust account until the sale to the Successful Bidder closes, provided that the Back-Up Bidder provides Debtors' counsel with its federal tax ID number, at which time the deposit shall be returned to the Back-Up Bidder.

j.    The bidder shall forfeit the Deposit if (i) the bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is the Successful Bidder and (A) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (B) breaches the bid. The Deposit shall be promptly returned to the bidder if the bidder is not determined to be a Qualified Bidder.

k.    Bids must be accompanied by a letter affirmatively setting forth (i) the identity of the bidder (including the authorized representative to attend the Auction), the contact information for such bidder (including e-mail addresses, if available), the identity of the bidder's counsel, and contact information for such bidder's counsel (including e-mail addresses, if available); (ii) the aggregate value of the consideration the bidder proposes to pay under the bid (which statement of value shall not be binding on the

Debtors or the Bankruptcy Court), (iii) the form of the Deposit (i.e., cashier's check or wire transfer) made by the bidder, and (iv) its acknowledgement that such bid shall be irrevocable until the earlier to occur of (a) 48 hours after the Assets have been sold by the Debtors pursuant to the Bidding Procedures Order or withdrawn from the Auction by the Debtors, or (b) 5:00 p.m. on the thirtieth (30th) day after the entry of an order by the Bankruptcy Court approving another bidder as the Successful Bidder.

l.    Notwithstanding the forgoing, the Buyer shall be for all purposes a Qualified Bidder and shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code some or all of the amount outstanding under the prepetition and postpetition financing facilities provided by the Buyer to the Debtors, and its Bid pursuant to the APA shall be a Qualified Bid.

m.    **Deposit Forfeit**.  The Deposit will be forfeited as liquidated damages and the Successful Bidder (defined below) held liable for compensatory damages if the Successful Bidder fails to close by reason of its breach of the contract of sale to be signed by the Debtors and the Successful Bidder ("Contract") subject to the terms of the APA.

n.    **No Contingencies.**  Bids must not be subject to financing, due diligence, environmental, engineering or any other contingencies not expressly approved by the Debtors.

o.    **Time for Submission of Bids**. Any Qualified Bidder that desires to make a bid and to become an Actual Bidder (as defined below) shall deliver a copy of its bid and Adequate Assurance Package, including an executed asset purchase agreement, to (a) Morrison Cohen, LLP, 909 Third Avenue, New York, NY 10022, Attn: Joseph T. Moldovan. Esq., Tel. 212-735-8757, facsimile: 917-522-3103, and (b) counsel to Hercules, John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, so as to be actually received no later than 12:00 noon New York City Time on February 22, 2010 ("***Initial Bid Deadline***")

p.    **Auction.**  If a Qualified Bid is received, the auction ("***Auction***") shall commence at 10 a.m. New York City Time on February 24, 2010 at the offices of Morrison Cohen, LLP, 909 Third Avenue, New York, NY 10022 (or such other location as may be announced by the Debtors). Only Qualified Bidders who submit Qualified Bids ("***Actual Bidders***") as well as Buyer will be permitted to participate in the Auction, and they shall appear in person, or through a duly authorized representative, at the Auction. If no Qualified Bid is received, the Debtors will not hold the

Auction and will immediately proceed to a Sale Hearing for approval of the APA with Buyer.

q. **Bid Increments**. Actual Bidders who have complied with the Bidding Procedures may improve their bids at the Auction ("*Increased Bids*"), in increments of at least $100,000 (as such bidding increment may be modified by the Debtors at the Auction). Should overbidding occur, the Buyer shall have the right, but not the obligation, to participate in the bidding and to be approved as the Successful Bidder at the Sale Hearing based on any such subsequent overbid. If Buyer exercises its right to participate in the overbidding, the Buyer shall receive a credit against its overbidding in an amount equal to the Break-Up Fee.

r. **Selection of Successful Bidder.** After the completion of the Auction, the Debtors shall review and consider each of the Qualified Bids, including that of Buyer, and any Increased Bids. The Debtors shall determine, in consultation with the Committee, which of the Qualified Bids or Increased Bids constitutes the highest and best bid for the Assets. At the conclusion of the Auction, the Debtors shall inform each of the Actual Bidders of the decision regarding who is the Successful Bidder.

s. **Objections.** Any party objecting to the proposed sale (including, without limitation, any Lease and Contract Party objecting to the proposed assumption and assignment of its lease or executory contract on any ground) shall file and serve a written statement of its objection, accompanied by any declaration or memorandum of law in support of its objection, on the following persons: (a) Debtors' counsel, Morrison Cohen, LLP, 909 Third Avenue, New York, NY 10022, Attn: Joseph T. Moldovan. Esq., Tel. 212-735-8757, Facsimile: 917-522-3103; (b) counsel to the Buyer, John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, Tel. 415-591-1000, Facsimile: 415-591-1400; (c) counsel to the Creditors Committee, Michael S. Amato, Esq., Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556-1425; and (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, so as to be actually received by 4:00 p.m. New York City Time on February 22, 2010 ("*Objection Deadline*").

t. **Sale Hearing.** A hearing on any objections to the sale and transfer of the Assets to the Successful Bidder or the Back-Up Bidder, as applicable, and to confirm the results of the Auction as it relates to the sale of the Assets, shall be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-

1408 on February 25, 2010 at 10:00 a.m. New York City Time ("***Sale Hearing***").

u.    **Escrow of Bid Deposits**.  Within ten (10) business days after the entry by the Bankruptcy Court of the Sale Order, the Deposit submitted by all Qualified Bidders, except (i) the Successful Bidder; (ii) the Back-Up Bidder; and (iii) any bidders that forfeit their Deposit under Section F above, shall be returned.

v.    **Reservation of Rights to Change Terms of Sale.**  The Debtors reserves the right (a) to determine in the reasonable exercise of their business judgment after consultation with the Committee whether the amendments and changes contained in each bid are acceptable as terms and conditions to sell; (b) to determine, in the reasonable exercise of their business judgment after consultation with the Committee, which Qualified Bid, if any, is the highest and best offer; (c) to determine in their reasonable business judgment after consultation with the Committee the value that should be ascribed to any Qualified Bid relative to any other Qualified Bid; and (d) to reject at any time prior to entry of an order of the Bankruptcy Court approving the Successful Bidder, any bid (other than Buyer's bid) that the Debtors, in the reasonable exercise of their business judgment after consultation with the Committee, deem to be (i) inadequate or insufficient, or (ii) not to conform with the requirements of the Bankruptcy Code or the Auction Procedures.

48.    The Debtors believes that establishing the Auction Procedures described above will allow the Debtors to promptly review, analyze and compare all bids received and to determine which bid or bids are in the best interest of the Debtors' estate.  Therefore, the Debtors respectfully request that the Court approve the Auction Procedures.

**B.    The Auction and Hearing Notice and Notice of Sale Motion**

49.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify its creditors of the proposed sale of Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the sale and the deadline for filing any objections. The Auction and Hearing Notice complies with Bankruptcy Rule 2002(c) and includes information on the Auction Procedures necessary to enable interested parties to participate in the Auction and the Sale Hearing.

50.     The Debtors propose to serve the Auction and Hearing Notice within three (3) business days of the entry of the Bidding Procedures Order, by first class mail, postage prepaid, to (a) all potential Buyers identified by the Debtors, (b) the Office of the United States Trustee, (c) John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, counsel for Buyer, (d) Michael S. Amato, Esq., Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556-1425, proposed counsel for the Committee, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, and (g) all government agencies required to receive notice of proceedings under the Bankruptcy Rules. The Auction and Hearing Notice shall also be published in the national edition of the USA Today or the Wall Street Journal.

51.     Within three (3) business days of the entry of the Bidding Procedures Order, the Debtors will also serve a copy of this Sale Motion, including all exhibits, by first class mail, postage prepaid, upon (i) all known entities holding or asserting a security interest in or lien against any of the Assets, (ii) all taxing authorities whose rights may be affected by the sale of the Assets and (iii) all parties that have requested notice pursuant to Bankruptcy Rule 2002 (collectively, "*Service List*"). The Auction and Hearing Notice provides that any party not on the Service List that wishes to obtain a copy of this Sale Motion, including all exhibits, may make such a request in writing to Morrison Cohen LLP, 909 Third Avenue, New York, New York 10022, Attn: Mariola Wiatrak, Telephone: (212) 735-8839, Facsimile: (212) 735-8758, Email: mwiatrak@morrisoncohen.com.

52.     In addition, the Debtors will file with the Court a supplement to the Sale Motion ("*Supplement*") which shall report to the Court the results of the Auction and the highest or

otherwise best offer for the Assets. The Supplement shall identify, among other things, (i) the proposed Buyer of the Assets, (ii) the Assets to be acquired, (iii) the consideration to be paid by such Buyer of the Assets, and (iv) the material terms upon which such purchase is based. In addition, the Debtors will annex to the Supplement, as exhibits, copies of the asset purchase agreement entered into by the Debtors and the Buyer of the Assets.

53.     The Debtors will file the Supplement by no later than three (3) business days following the conclusion of the Auction. The Debtors propose to serve the Supplement, including any exhibits thereto, on the Service List and upon any party that previously requested a copy of the Sale Motion. The Debtors submit that the notice to be provided through the Auction and Hearing Notice, the Sale Motion, and the Supplement and the method of service proposed herein constitutes good and adequate notice of the sale of the Assets and the proceedings to be held with respect thereto. Therefore, the Debtors respectfully request that the Court approve the foregoing notice procedures.

**C.      Break-Up Fee, Expense Reimbursement and Overbid Protection**

54.     The Debtors request approval of the payment to Buyer of (i) a break-up fee ("***Break-Up Fee***") equal to three percent of the purchase price under the APA in the event that the Court approves a Competing Bid, plus (ii) reimbursement of Buyer's reasonable fees and expenses (including, without limitation, expenses of counsel incurred in connection with the APA) in an amount not to exceed $200,000 ("***Expense Reimbursement***", which shall be referred to collectively with the Break-Up Fee as, the "***Bidding Protections***").

55.     As discussed above, the inclusion of the Bidding Protections was an express condition precedent to Buyer's execution of the APA and are meant to compensate Buyer for the value it adds as a stalking horse bidder and to reimburse Buyer for its costs and expenses

incurred in the event Buyer is not approved as the Buyer of the Assets. Approval of break-up fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. Under the circumstances of this case, the proposed Bidding Protections are necessary to enable the Debtors to enter into the stalking horse APA and thereby (i) induce one or more potential Buyers to submit a higher or otherwise better bid that might not otherwise be forthcoming and (ii) increase the likelihood that the Debtors will receive the highest or otherwise best offer for the Assets to the benefit of the Debtors, their estates, and creditors.

56. Ample support exists for the Debtors' request for approval of the Bidding Protections. Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Il. 1995); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

57. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

58.     The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re *Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

59.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

60.     As additional support, Bankruptcy Code section 105(a) provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

61.     The Break-Up Fee and Expense Reimbursement are reasonable because they (i) are not excessive compared to fees and reimbursements approved in other cases (ii) will not diminish the Debtors' estate. Break-up fees and expense reimbursements, such as those proposed

herein, enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. The Bidding Protections are reasonable, will promote competitive bidding, will not "chill" the bidding process, and their availability will increase the likelihood that the price at which the Assets are sold will reflect their true worth. Further, absent the approval of the Bidding Protections, the Buyer would not enter into the APA. Therefore, the Debtors respectfully submit that the Bidding Protections should be approved. *See, e.g., In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Magellan Health Services, Inc.*, Case No. 03-40515 (PCB) (Bankr. S.D.N.Y. 2003) (approving termination fee, commitment fee and reimbursement of expenses); *In re Adelphia Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving termination fee and reimbursement of expenses); *In re Bradlees Stores, Inc*., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. 2000) (approving termination fee and reimbursement of expenses); *Integrated Resources*, 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); *995 Fifth Ave. Assocs.*, 96 RR. at 28 (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"); *In re Kupp Acquisition Corp*., Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); *In re Kmart,* Case No. 02-B-02474 (SPS) (Bankr. N.D. Il. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the Debtor's estate, of substantial benefit to the Debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's

entry into the purchase agreement); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

**PART II**

62.      In Part II of this Sale Motion, the Debtors seek approval of (i) the sale of the Assets free and clear of liens, claims and encumbrances and (ii) the exemption of the sale of the Assets from stamp or similar taxes.

**A.      The Sale of the Debtors' Assets Should Be Approved**

63.      The Debtors submit that ample authority exists for the approval of the proposed sale of the Assets. Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances. *See* 11 U.S.C. § 363(b)(1), (f); *see* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

64.      Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts routinely approve a debtor's decision to sell assets outside the ordinary course of business based upon the sound business judgment of the debtor. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992). *See also In re Abbots Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that

the transaction is in good faith); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrig. & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

65.     The "sound business purpose" test requires that a debtor establish four elements to sell property outside the ordinary course of business, namely (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith. *See Abbots Dairies, infra; Titusville,* 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel,* 82 B.R. at 335-36; *Industry Valley,* 77 B.R. at 21. Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive, but, rather, a debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

66.     Consideration of the above factors in this case unequivocally establishes that the proposed sale should be approved. Prior to the Petition Date, the Debtors worked diligently to effect a sale their assets and after an extensive process during which they were beset by a number of business reverses, it was able to enter into the APA and position itself for sale. The Debtors' decision to sell the Assets is based upon its sound business judgment in consideration of their ongoing liquidity crisis and duty to maximize the value of the Assets for the benefit of their estates and creditors.

67.     The APA represents the best offer received to date for the proposed acquisition of the Assets. To ensure that the value of the Assets is maximized, however, the APA is expressly subject to higher or otherwise better offers. The Debtors believe there is no better evidence of value than what the market will ultimately bear. The Auction Procedures described herein will ensure that the Debtors receive the maximum value for the Assets and that the purchase price ultimately realized by the estate will be fair and reasonable. Accordingly, the Debtors submit that consideration of the business reasons articulated herein leads to the inescapable conclusion that the Debtors should be authorized to sell the Assets.

**B.      Sale Free and Clear of Liens, Claims and Encumbrances**

68.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f); *In re Elliot,* 94 B.R. 343, 354 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met). The Debtors expect that they can satisfy both the second and fifth of these requirements. *See Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written

in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

69.     The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. *See In re Trans World Airlines. Inc.*, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11").

70.     Here, the Debtors' sole secured creditors with liens on the Assets, Sterling and Hercules have consented to the proposed sale of the Assets in accordance with the Auction Procedures. In any event, all liens on the Assets will be satisfied or will attach to the proceeds of a sale of the Assets with the same force, effect and priority as such liens have on the Assets, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto. Accordingly, the Debtors submit that the sale of the Assets free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

71.     In order to facilitate the sale of the Assets, the Debtors requires authorization to sell them free and clear of any and all liens or interests that may be asserted, with such liens to

attach to the sale proceeds, except to the extent a Buyer agrees to purchase and take title to the Assets subject to such liens.

**C.    The APA Was Negotiated at Arms Length and In Good Faith**

72.    The terms of the APA were negotiated at arm's length, without collusion, and in good faith. Accordingly, the Debtors request that the Court determine the Buyer to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code and that the APA does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

73.    Furthermore, the Debtors submit that the APA represents substantial value to the Debtors' estate inasmuch as it provides favorable terms for the disposition of the Assets for fair and reasonable consideration. *See Mellon Bank, N.A. v. Metro Communications, Inc*., 945 F.2d 635 (3d Cir.1991) (reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992); *see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.I., Inc.),* 92 F.3d 139 (3d Cir. 1996) (same); *Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir.), *cert. denied.* 510 U.S. 821 (1993) and *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (N.D. Tex. 1992)); *In re China Resource Prod. Ltd. v. Favda Intern., Inc*., 856 F. Supp. 856, 866 (D. Del. 1994) (fair consideration under Delaware law) (quoting *Gever v. Ingersoll Publications Co*., 621 A.2d 784, 792 (Del. Ch. 1992)).

**D.    The Debtors Should Be Permitted to Enter the APA**

74.    Courts routinely approve entry into asset purchase agreements. *See, e.g., In re Enron Corp*., 2002 WL 32154269, at *4 (Bankr. S.D.N.Y. Apr. 24, 2002). Such agreements are

approved if they are an exercise of the debtor's sound business judgment.  *See, e.g., In re Decora Indus., Inc.*, 2002 WL 32332377, at *5 (Bankr. D. Del. May 17, 2002); *In re Arlco, Inc.*, 239 B.R. 261, 265 (Bankr. S.D.N.Y. 1999).  In this case, the APA was the subject of intense arm's-length negotiations between the Debtors and Buyer, and the Debtors submit that the terms and conditions of the APA are the best that could be obtained under the Debtors' circumstances, and that entry into the APA is a sound exercise of the Debtors' business judgment.

**E.**     **Exemption of Sale from Stamp or Similar Taxes and Bulk Sale Statutes**

75.     Pursuant to section 1146(c) of the Bankruptcy Code, the "transfer . . . or the making or delivery of an instrument under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  *See* 11 U.S.C. § 1146(c). This provision has broadly construed to include sales and transfers that occur outside of a chapter 11 plan of reorganization and before or after confirmation of that chapter 11 plan.  *See In re Jacoby-Bender, Inc.,* 40 B.R. 10 (Bankr. E.D.N.Y. 1984), *aff'd* 758 F.2d 840 (2d Cir. 1985); *In re 995 Fifth Avenue Assocs., L.L.P.*, 116 B.R. 384 (Bankr. S.D.N.Y. 1990), *aff'd* 127 B.R. 533 (S.D.N.Y. 1991), *aff'd in part, rev'd in part (on other grounds)*, 963 F.2d 503 (2d Cir. 1992).  In so holding, the courts have focused on whether the sale and transfer is "necessary to the consummation of the plan."  *Jacoby-Bender*, 758 F.2d at 842. *Accord Director of Revenue State of Delaware v. CCA Partnership (In re CCA Partnership),* 70 B.R. 696 (Bankr. D. Del. 1987), *aff'd* 72 B.R. 765 (D. Del. 1987), *aff'd* 833 F.2d 304 (3d Cir. 1987); *In re Cantrup,* 53 B.R. 104 (Bankr. D. Colo. 1985); *City of New York v. Smoss Enter. Corp. (In re Smoss Enter. Corp.)*, 54 B.R. 950, 951 (E.D.N.Y. 1985).  It is equally well settled that even a preconfirmation sale of a debtor's assets, if the sale is essential to confirmation of the plan, is "under a plan" for purposes of Bankruptcy Code Section 1146(a).  *See In re Smoss Enter. Corp.*, 54 B.R. at 951 (sale taking

place three months before confirmation was under plan, and therefore tax exempt, when transfer of property was essential to confirmation of plan).

76.     In this case, the Debtors' sale of the Assets is essential to the consummation of a plan and, therefore, should be deemed to be "under a plan." The Debtors propose to distribute the net proceeds of the sale of the Assets to creditors in connection with the sale or pursuant to a confirmed chapter 11 plan.  Consequently, the Debtors submit that the sale of the Assets and distribution of the net proceeds pursuant to a chapter 11 plan facilitates and is indeed essential to confirmation of a chapter 11 plan for the Debtors, and thus falls within the scope of the exemption provided for under section 1146(c) of the Bankruptcy Code. *See In re Permar Provisions, Inc.*, 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987) (sale of property one year prior to plan confirmation was exempt under section 1146(c) where sale proceeds were distributed to secured and unsecured creditors).

77.     Certain states and localities in which the Assets of the Debtors are located have or may have statutes or regulations requiring creditor notification before bulk transfers are conducted or other restrictions concerning the sale (or liquidation) of the Assets. The Debtors have not conducted a comprehensive study of such requirements for every state, city and town in which the Assets are located.  However, certain of the statutes and regulations may provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with such statutes or regulations. Moreover, in the context of bankruptcy cases such as these, where creditors are given notice of the proposed sale in advance, as well as an opportunity to be heard before this Court, the application of such statutes and regulations would be redundant and unnecessary. Accordingly, the Debtors seek the authorization to consummate the sale of the

Assets without the necessity of complying with any state or local bulk transfer law or other requirements.

**F.**     **The Proposed Asset Sale is Not a Sub Rosa Plan of Reorganization**

78.     The proposed Sale is not a sub rosa plan of reorganization as contemplated by *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939 40 (5th Cir. 1983). The Sale simply proposes to sell certain of the Debtors' assets without altering the rights of the Debtors' creditors. The Sale does not specify the terms under which a reorganization plan is to be adopted and does not bind any parties or creditors constituencies under any future plan of reorganization professed by the Debtors. As the Court in *In re Naron & Wagner, Chartered,* 88 B.R. 85, 88 (Bankr. D. Md. 1988), stated, "[t]he sale proposed here is not a sub rosa plan because it seeks only to liquidate assets, and the sale will not restructure rights of creditors, as in the *Braniff* case." *See also Eastern Airlines, Inc. v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654 n.6 (S.D.N.Y. 1995) (distinguishing *Braniff*).

79.     Furthermore, the relevant case law has clearly established that a sale of substantially all of the assets of a debtor prior to confirmation, or even prior to filing, of a plan of reorganization is permissible. *See In re Ionosphere Clubs, Inc.*, 184 B.R. at 653 ("[C]ourts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan."); *see also In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (proceeds of a sale placed in escrow pending distribution through plan); *Patent Cereals v. Finn,* 149 F.2d 711 (2nd Cir. 1945) (under corresponding predecessor Bankruptcy Act provisions, a sale of all of the debtor's assets may precede a plan of reorganization); *In re Naron Wagner Chartered,* 88 B.R. at 87 ("[A section 363 sale] may even be made, as here, prior to filing a plan of reorganization."); *In re WHET, Inc.*, 12 B.R. 743, 750 (Bankr. D. Mass. 1981) ("[T]he case law

again is clear that there is nothing objectionable about a sale of all the assets outside of a chapter 11 plan . . . . A trustee may, in appropriate circumstances, first liquidate the assets of a debtor and then propose a plan for distributing the proceeds to creditors").

## WAIVER OF MEMORANDUM OF LAW

80.  The Debtors request that the Court waive and dispense with the requirement set forth in Rule 9013-1(b) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York that any motion filed shall have an accompanying memorandum of law.  No novel issue of law is raised by this Motion and the authorities relied upon are cited herein.  Accordingly, the Debtors submit that a waiver of the Rule 9013-1(b) requirement is appropriate in these circumstances.

## NOTICE

81.  Any party in interest objecting to the Part I relief sought herein, the Bidding Procedures Order, shall file written objections with the United States Bankruptcy Court Clerk for the Southern District of New York no later than 12:00 p.m. New York City Time on January 25, 2010, which objections shall be served so that the same are actually received on or before such date by (a) Joseph T. Moldovan, Esq., Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York 10022, proposed counsel for the Debtors; (b) John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, counsel for Lender; (c) Michael S. Amato, Esq., Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556-1425, proposed counsel for the Committee, and (d) Office of the United States Trustee, 33 Whitehall Street, New York, N.Y. 10004.

82.  Any written objections must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as modified by any administrative

orders entered in this case, and be filed with the Bankruptcy Court electronically in accordance with General Order #462, by registered users of the Bankruptcy Court's case filing system or otherwise as permitted by the Clerk of the Court (g) the Internal Revenue Service; and (h) all state and local governmental taxing authorities concerning the Debtors.

83. Objection declines to the Part II relief shall be established at the hearing on January 26, 2010.

## NO PRIOR REQUEST

84. No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request entry of an order substantially in the form filed concurrently herewith granting the relief requested in this Sale Motion and for such other and further relief as may be just and proper.

Date: January 15, 2010

> **MORRISON COHEN LLP**
> Proposed Attorneys for Debtors and Debtors-in-Possession
>
> By: _/s/ Joseph T. Moldovan_
>       Joseph T. Moldovan (JM-0232)
>       Michael R. Dal Lago (MD-8034)
>       909 Third Avenue
>       New York, New York 10022
>       (212) 735-8600