# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of January 15, 2010, is entered into by and among Spa Chakra, Inc., a Delaware corporation ("Parent"), Spa Chakra, LLC, a Delaware limited liability company ("LLC"), Spa Chakra Indiana, LLC, an Indiana limited liability company ("Indiana"), Spa Chakra Fifth Avenue, LLC, a Delaware limited liability company ("Fifth Avenue"), and Spa Chakra Fifth Avenue Indiana, LLC, an Indiana limited liability company ("Fifth Avenue Indiana" and, together with Parent, LLC, Indiana, Fifth Avenue, collectively as "Sellers"), and Hercules Technology II, L.P., a Delaware limited partnership, or its designated Affiliate(s) ("Buyer").

## RECITALS

A.       On November 30, 2009, an involuntary petition was filed against Fifth Avenue under Chapter 7 of the Bankruptcy Code.  On December 10, 2009 (the "Petition Date"), Fifth Avenue consented to the involuntary relief, but converted the case to a case under Chapter 11 of the Bankruptcy Code.  Concurrently therewith, the remaining Sellers filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code except for Fifth Avenue, which filed a voluntary petition on December 9, 2009.  Sellers' Chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases") are jointly administered under case number 09-17260 (SMB).

B.       Sellers operate several luxury health and wellness spa (the "Business") in the United States, Europe, and Asia.  Since the Petition Date, Sellers have continued to operate their Business and manage their properties as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

C.       Prior to the Petition Date, in connection with an asset acquisition, Fifth Avenue became indebted to Sterling National Bank, N.A. ("Sterling") for approximately $610,000.00 under that certain Loan and Security Agreement dated as of July 15, 2009, by and between Fifth Avenue and Sterling ("Sterling Loan Agreement"), which indebtedness is secured by a first-priority Lien in Fifth Avenue's assets ("Fifth Avenue Collateral").  The obligations to Sterling that remain outstanding as of immediately prior to the Closing under the Sterling Loan Agreement (including, without limitation, all principal, interest, costs, fees and expenses thereunder) shall hereafter be referred to as the "Sterling Obligations."

D.       Prior to the Petition Date, Buyer provided secured financing to Sellers pursuant to that certain Loan and Security Agreement dated as of June 13, 2008, by and between Buyer as lender and Parent as borrower (as amended, restated, and otherwise modified, from time to time, the "Prepetition Loan Agreement") and certain related joinder agreements by and between Buyer and each of the other Sellers.  In addition, immediately before the Petition Date, Buyer provided a secured loan to Parent, LLC, and Fifth Avenue Indiana pursuant to that certain Secured Promissory Note dated December 10, 2009 (the "Prepetition Note").  The Prepetition Loan Agreement, the Prepetition Note, and all other agreements, documents, financing statements, or instruments executed in connection therewith shall be referred to collectively as the "Prepetition Credit Documents."  The obligations to Buyer that remain outstanding as of immediately prior to the Closing under the Prepetition Credit Documents (including, without limitation, all principal,

interest, costs, fees and expenses thereunder) shall hereafter be referred to as the "Prepetition Senior Obligations."

E.      As of the Petition Date, (i) the outstanding payment obligations owed to Buyer under the Prepetition Loan Agreement and the Prepetition Note was $13,764,081.55 in principal and accrued and unpaid interest, exclusive of attorneys fees and other charges; and (ii) indebtedness and obligations owing to Buyer under the Prepetition Credit Documents are secured by (x) in the case of the Prepetition Credit Documents other than the Prepetition Note, a valid, enforceable, and duly perfected Lien in all or substantially all of Sellers' assets and proceeds thereof, subject and subordinate only to the Liens securing the Sterling Obligations with respect to the Fifth Avenue Collateral and (y) in the case of the Prepetition Note, a valid, enforceable, and duly perfected Lien in all or substantially all of the assets of Parent, LLC, and Fifth Avenue Indiana and proceeds thereof, subject and subordinate only to the Liens securing Prepetition Senior Obligations with respect thereto.

F.      Since the Petition Date, Buyer has provided debtor-in-possession financing up to $800,000.00 (the "DIP Facility") to Sellers pursuant to that certain Secured Debtor-in-Possession Credit Agreement dated as of December 15, 2009 (the "DIP Credit Agreement"), which indebtedness and obligations are secured by a priming, first-priority, enforceable, perfected lien and security interest pursuant to sections 364(c)(2), (3), and 364(d) of the Bankruptcy Code in all assets of Sellers, but excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code, subject and subordinate only to the Liens securing the Sterling Obligations and certain carve-out amount as provided in those certain interim orders of the Bankruptcy Court entered on or about December 14, 2009, December 28, 2009, and January 14, 2010. The obligations that remain outstanding as of immediately prior to the Closing under the DIP Facility (including, without limitation, all principal, interest, costs, fees and expenses thereunder) shall hereafter be referred to as the "DIP Obligations."

G.      Sellers, as debtors in possession in the Chapter 11 Cases, wish to sell substantially all of their assets pursuant to Sections 363 and 365 of the Bankruptcy Code, and have determined that the final purchase price of the assets to be established through an auction could be enhanced by entering into an agreement for the sale of certain assets with Buyer as the "stalking horse" bidder.

H.      Buyer, under the terms and conditions specified in this Agreement, has agreed to serve as the "stalking horse" bidder for the auction. Accordingly, subject to overbids at the Auction, Buyer and Sellers desire that the Acquired Assets be sold pursuant to the terms of this Agreement, and an order entered by the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code, as provided in a sale order substantially in the form set forth on Exhibit A (the "Sale Order"), and the assumption and assignment of the Assumed Executory Contracts and Assumed Real Property Leases under Section 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual representations, warranties, covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

# ARTICLE 1

## DEFINITIONS

1.01 <u>Definitions</u>. Any capitalized term used but not otherwise defined in this Agreement has the meaning ascribed to such term in <u>Appendix A</u> to this Agreement.

1.02 <u>Interpretation</u>. The definitions set forth or referred to in <u>Appendix A</u> shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The headings to the Articles and Sections are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". All references herein to Articles, Sections, Exhibits, Appendices, and Schedules shall be deemed to be references to Articles and Sections of, and Exhibits, Appendices, and Schedules to, this Agreement unless the context shall otherwise require. Unless the context shall otherwise require, any reference to any contract, instrument, statute, rule or regulation is a reference to it as amended and supplemented from time to time (and, in the case of a statute, rule or regulation, to any successor provision). Any reference in this Agreement to a "day" or a number of "days" (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. The Exhibits, Appendices, and Schedules hereto are hereby incorporated by reference into, and shall be deemed a part of, this Agreement; <u>provided</u>, <u>however</u>, that no Exhibit consisting of a form of agreement or instrument shall be deemed to become effective until executed and delivered by the appropriate parties.

## ARTICLE 2

## PURCHASE AND SALE OF ASSETS

2.01 <u>Acquired Assets</u>.

(a) Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, free and clear of all Liens (other than Liens securing the Sterling Obligations) and Claims, and Buyer shall purchase, acquire and take assignment and delivery of all properties, assets, rights, titles and interests of every kind and nature, owned, licensed or leased by Sellers, as the same shall exist at the Closing, whether tangible or intangible, real or personal and wherever located and by whomever possessed (collectively the "<u>Acquired Assets</u>", but exclusive, in all cases, of the Excluded Assets). Except as provided in the representations and warranties of Sellers in this Agreement (none of which representations and warranties will survive the Closing), the Acquired Assets are being purchased hereunder on an "as is" basis and with all faults. Notwithstanding anything to the contrary in any other provision of this Agreement or any document or instrument executed pursuant hereto but without limiting the covenants of the Parties hereunder, to the extent that any of the Acquired Assets are leased, licensed or otherwise held by Sellers pursuant to an agreement with a third party, Buyer shall only acquire the right to use and possession, as applicable, of such Acquired Assets if the corresponding lease, license or

other agreement is assigned to and assumed by Buyer pursuant to the Sale Order at the Closing. The Acquired Assets shall include, without limitation, all of the following assets:

(i)　　Cash and Cash Equivalents.　All cash and cash equivalents (including marketable securities and short-term investments), other than cash advanced by Buyer to Sellers under the DIP Facility and held by Sellers immediately prior to the Closing, which advanced amounts will be repaid to Buyer pursuant to the terms of the DIP Facility or credited against the Purchase Price payable by Buyer for the Acquired Assets pursuant to Section 2.07(a);

(ii)　　Receivables.　All accounts, payment intangibles, general intangibles, chattel paper, letters of credit, notes receivable, checks, and instruments (the "Receivables");

(iii)　　Inventory.　All inventory and its components, wherever located and whether held by Sellers, their Affiliates, or any third party, including all raw materials, work in process, samples, packaging, supplies, service parts, purchased parts and goods, any and all rights to market and sell all such inventory and all warehouse receipts, bills of lading and similar documents;

(iv)　　Machinery and Equipment.　All machinery and equipment (including manufacturing assembly and test equipment), fixed assets, tools (including lab tools), spare and replacement parts, maintenance equipment, materials, networks, computers, printers, servers, or other equipment, wherever located and whether held by Sellers, their Affiliates, or third parties;

(v)　　Personal Property.　All office furnishings and furniture, display racks, shelves, decorations, fixtures, supplies and other tangible personal property;

(vi)　　Intellectual Property Assets.　Sellers' Intellectual Property Assets;

(vii)　　Software.　Any computer software or system owned by any Seller or collectively by Sellers;

(viii)　　Deposits and Advances.　All performance and other bonds, letters of credit, security and other deposits, advances, advance payments, prepaid credits and deferred charges to the extent related to the Acquired Assets (the "Deposits and Advances");

(ix)　　Assumed Executory Contracts.　All rights and claims in, to and under the contracts or unexpired leases to which one of the Sellers is a party, as set forth on Schedule 2.01(a)(ix) (collectively, as may be revised pursuant to the terms of this Agreement, the "Assumed Executory Contracts"); provided, however, that such Schedule may be revised in accordance with Section 2.01(b);

(x)　　Assumed Real Property Leases.　All rights in, to, and under the real property non-residential leases to which one of the Sellers is a party, as set forth on Schedule 2.01(a)(x) (collectively, as may be revised pursuant to the terms of this Agreement, the "Assumed Real Property Leases"); provided, however, that such Schedule may be revised in accordance with Section 2.01(b);

(xi)   <u>Books and Records</u>.   All books, files, papers, agreements, correspondence, databases, information systems, programs, software, documents, records and documentation thereof related to any of the Acquired Assets or the Assumed Obligations, or used in the conduct of the Business, in whatever medium, including paper, electronic and otherwise, whether held by Sellers or by any third party unless transfer of such records is prohibited by Law (the "<u>Books and Records</u>");

(xii)   <u>Permits</u>.  To the extent transferable under applicable Law, all rights of Sellers in any Permit (and pending applications therefor) listed on <u>Schedule 2.01(a)(xii)</u>;

(xiii)   <u>Claims</u>.  All commercial torts and other claims, choses-in-action, rights in action, rights to tender claims or demands to Sellers' insurance companies, rights to any insurance proceeds, rights under any policy of insurance or tail under which any Seller is the insured, rights to any damages, and other similar claims (including, without limitation, Sellers' right and claims under that certain Promissory Note, dated as of February 6, 2009, by Richard Aidekman and Ellen Sackoff in favor of Spa Chakra Fifth Avenue, LLC the "<u>Cornelia Note</u>"), other than any and all claims and causes of action under Chapter 5 of the Bankruptcy Code (collectively, the "<u>Chapter 5 Claims</u>") or certain other claims that relate solely to the Excluded Assets (collectively, the "<u>Sellers Claims</u>");

(xiv)   <u>Goodwill</u>.  All goodwill generated by or associated with the Business;

(xv)   <u>Subsidiaries</u>.  All issued and outstanding stock, membership interests, or other equity interests in the Subsidiaries listed on <u>Schedule 2.01(a)(xv)</u>; and

(xvi)   <u>Other Assets</u>. All other assets, properties, rights and claims related to the operations or conduct of the Business or which arise in or from the conduct thereof, including, without limitation, Sellers' rights to corporate telephone numbers and email addresses.

(b)   Notwithstanding anything to the contrary in this Agreement, Sellers shall not reject (or make any motion to reject) any Assumed Executory Contract or Assumed Real Property Lease identified in the exhibits to be filed pursuant to Section 5.04(b) hereof, without the prior written consent of Buyer.

2.02   <u>Intentionally Omitted</u>.

2.03   <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in <u>Section 2.01</u>, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Buyer hereunder (collectively, the "<u>Excluded Assets</u>").

(a)   <u>Cash Advanced under the DIP Facility</u>.  Cash advanced by Buyer to Sellers under the DIP Facility and held by Sellers immediately prior to the Closing, which advanced amounts will be repaid to Buyer pursuant to the terms of the DIP Facility or credited against the Purchase Price payable by Buyer for the Acquired Assets pursuant to <u>Section 2.07(a)</u>;

(b)   <u>Certain Claims</u>.  Any Chapter 5 Claims and any Sellers Claims;

(c) <u>Corporate Documents</u>. Corporate seals, certificates of incorporation, minute books, stock transfer records, or other records related to the corporate organizations of Sellers;

(d) <u>Employee Benefit Contracts</u>. Sellers employee benefit plans and contracts of insurance for employee group medical, dental and life insurance plans;

(e) <u>Deposits</u>. Any Deposits and Advances solely related to any of the Excluded Liabilities;

(f) <u>Rights under Transaction Documents</u>. All rights of Sellers under the Transaction Documents;

(g) <u>Director and Officer Claims</u>. Any claims against any Seller's directors and officers; and

(h) <u>Other Excluded Assets</u>. The contracts and leases not assumed by Buyer hereby, and other assets of Sellers not transferred to Buyer as set forth on <u>Schedule 2.03(h)</u>.

2.04 <u>Assumed Obligations</u>.

(a) Upon the terms and subject to the conditions of this Agreement, effective at the Closing Date, Buyer shall only assume from Sellers and thereafter only be responsible for the payment, performance or discharge of the following liabilities (collectively, the "<u>Assumed Obligations</u>"):

(i) the liabilities and obligations of Sellers arising on or after the Closing Date under the Assumed Executory Contracts and Assumed Real Property Leases;

(ii) the costs of cure required to be satisfied in order for Sellers to assume and assign each Assumed Executory Contract and Assumed Real Property Lease under Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court at the Sale Hearing (collectively, the "<u>Final Cure Costs</u>");

(iii) the liabilities and obligations of Sellers under the Permits to the extent such Permits are transferable to Buyer and are included in the Acquired Assets;

(iv) the gift card liabilities and obligations of Sellers as set forth on <u>Schedule 2.04(a)(iv)</u>;

(v) the liabilities and obligations of Sellers under the Sterling Loan Agreement (which are expected to be modified pursuant to agreements between Buyer and Sterling); and

(vi) the liabilities and obligations of Sellers as set forth on <u>Schedule 2.04(a)(vi)</u>.

2.05    No Other Liabilities Assumed.  Notwithstanding anything to the contrary in this Agreement, except for the Assumed Obligations, Buyer shall not assume and shall not be in any way liable or responsible for (whether directly, indirectly, contingently or otherwise), any Liability of Sellers or any other Person, whether relating to or arising out of the Business, the Excluded Assets or the Acquired Assets or otherwise (collectively, the "Excluded Liabilities").

2.06    Non-Assignable Assets.

(a)    Notwithstanding anything to the contrary in this Agreement, if pursuant to Section 365 or any other provision of the Bankruptcy Code any of the Assumed Executory Contracts and Assumed Real Property Leases or other Acquired Assets are held by the Bankruptcy Court, despite application of Section 365 of the Bankruptcy Code for Buyer's benefit, to be non-assignable or transferable (each, a "Non-Assignable Asset") without the consent of, or waiver by, a third party (each, an "Assignment Consent"), either as a result of the provisions thereof or applicable Law, and any of such Assignment Consents are not obtained by Sellers on or prior to the Closing Date, Buyer may elect, in its sole discretion, to have Sellers retain the Non-Assignable Asset and all Liabilities relating thereto to the extent provided for in the Sales Order and have Sellers continue after the Closing to use their reasonable best efforts to obtain such Assignment Consents (provided that such efforts shall not require Sellers to pay any out-of-pocket costs to any third party), to the extent reasonably requested by Buyer, and, in such case, this Agreement and the other Transaction Documents shall not constitute an assignment or transfer of such Non-Assignable Assets, and Buyer shall not assume Sellers' rights or obligations under such Non-Assignable Asset (and such Non-Assignable Asset shall not be included in the Acquired Assets).  Sellers shall use its reasonable best efforts (provided that such efforts shall not require Sellers to pay any out-of-pocket costs to any third party) to obtain all such Assignment Consents as soon as reasonably practicable after the Closing Date and thereafter assign to Buyer such Non-Assignable Assets.  Following any such assignment, such assets shall be deemed Acquired Assets for purposes of this Agreement.

(b)    After the Closing, Sellers shall cooperate with Buyer (provided that such cooperation shall not require Sellers to pay any out-of-pocket costs to any third party) to provide Buyer with all of the benefits of the Non-Assignable Assets as if the appropriate Assignment Consents had been obtained, including by granting subleases, sublicenses or other rights as appropriate and establishing arrangements whereby Buyer shall undertake the work necessary to perform under the Assumed Executory Contracts or Assumed Real Property Leases.

2.07    Purchase Price.  The purchase price payable at the Closing by Buyer to Sellers for the Acquired Assets shall consist of the following (the "Purchase Price"):

(a)    cash in an amount equal to Eight Million Dollars ($8,000,000.00) (or such other greater amount as may be established at the Auction pursuant to the Bidding Procedures Order) ("Cash Consideration") minus (i) an amount equal to the Final Cure Costs; and (ii) an amount, if any, equal to (x) the DIP Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code and (y), upon the exhaustion of the DIP Obligations, the Prepetition Senior Obligations that have not been credited against the Cash Consideration by Buyer to Sellers for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code; and

(b)     the assumption of the Assumed Obligations by Buyer.

2.08     Closing.  Upon the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the date upon which all of the conditions set forth in ARTICLE 7 have been satisfied or waived in accordance with this Agreement, or upon such other date as Buyer and Sellers may mutually agree; provided, however, that, absent an order from the Bankruptcy Court that rescinds the automatic ten (10) day stay following the entry of the Sale Order, Buyer may elect, in its sole discretion, to delay the Closing until a date not later than the eleventh (11th) calendar day following the date upon which all of the conditions set forth in ARTICLE 7 have been satisfied or waived in accordance with this Agreement (the "Closing Date").

2.09     Closing Deliveries by Sellers.  At the Closing Sellers shall deliver or cause to be delivered the following items, all of which shall be in form and substance acceptable to Buyer and its counsel, to Buyer:

(a)     General Assignment and Bill of Sale.  General Assignment and Bill of Sale, substantially in the form set forth on Exhibit B, covering all of the applicable Acquired Assets of Sellers (the "General Assignment and Bill of Sale");

(b)     Assignment and Assumption Agreement.  Assignment and Assumption Agreement, substantially in the form set forth on Exhibit C, covering all of the Assumed Obligations (the "Assignment and Assumption");

(c)     Intellectual Property Confirmatory Assignments.  Any and all documents necessary to properly record the assignment to Buyer of all of Sellers' right, title and interest in and to the Sellers Intellectual Property Assets, including a trademark assignment substantially in the form set forth on Exhibit D, and a domain name assignment agreement substantially in the form set forth on Exhibit E;

(d)     Other Conveyance Instruments.  Such other specific instruments of sale, transfer, conveyance and assignment as Buyer may reasonably request;

(e)     FIRPTA Certificate.  A FIRPTA certificate, dated as of the Closing Date, substantially in the form set forth on Exhibit F;

(f)     Assumed Executory Contracts and Leases.  Originals (or, to the extent originals are not available, true and complete executed copies) of all Assumed Executory Contracts and Assumed Real Property Leases (together with all amendments, supplements or modifications thereto);

(g)     Books and Records.  The Books and Records of Sellers;

(h)     Officer's Certificate.  A certificate duly executed by an officer of each Seller, dated as of the Closing Date (in form and substance reasonably satisfactory to Buyer) certifying on behalf of such Seller the matters in Section 7.01(a) and Section 7.01(b);

(i)     Subsidiaries.  Delivery by Sellers of the certificates representing the equity interests in the Subsidiaries listed in Schedule 2.01(a)(xvi), either duly endorsed or accompanied by a stock power duly endorsed;

(j)     Cornelia Note.  Delivery by Sellers of the original Cornelia Note endorsed through an allonge executed by Sellers or in such other form of endorsement as Buyer may designate;

(k)     Copy of Sale Order.  A copy of the Sale Order; and

(l)     Ventures Equity Interest.  Delivery of (i) the certificate representing all units of issued and outstanding membership interest of Chakra Ventures I, LLC (the "Ventures Equity Interest"), endorsed through a transfer notice executed by all members in favor of Buyer or, if uncertificated, transfer documents reasonable acceptable to Buyer conveying the Ventures Equity Interest to Buyer.

2.10   Closing Deliveries by Buyer.  At the Closing, Buyer shall (a) deliver to Sellers the Assignment and Assumption and any other instruments required pursuant to Sections 2.09(b) and (c), duly executed by Buyer and (b) pay the Cash Consideration (if any) by wire transfer of immediately available funds to the account designated in writing by Sellers.

2.11   Closing Deliveries by All Parties.  At the Closing, Buyer and Sellers shall deliver such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise necessary or appropriate to transfer the Acquired Assets and Assumed Obligations in accordance with the terms of this Agreement and consummate the transactions contemplated by this Agreement, and to vest in Buyer and its successors and assigns full, complete, absolute, legal and equitable title to the Acquired Assets, free and clear of all Liens and Claims.   For the avoidance of doubt, notwithstanding anything in the certificates, instruments or documents to be delivered in accordance with this Agreement, none of the representations and warranties in ARTICLE 3 and ARTICLE 4 shall survive the Closing.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections of the disclosure schedules prepared by Sellers and delivered to Buyer in connection with the execution and delivery of this Agreement (the "Sellers Disclosure Schedule"), Sellers hereby represent and warrant to Buyer as of the date of this Agreement as follows:

3.01   Organization and Corporate Power.  Each entity comprising Sellers is a debtor in possession under Chapter 11 of the Bankruptcy Code and is empowered to sell and assign the Acquired Assets to Buyer, subject to the entry of the Sale Order, following any required notice to creditors as required by the Bankruptcy Rules and the Bidding Procedures Order.  The individual executing this Agreement for Sellers have the requisite authority to enter into this Agreement or other Transaction Documents on behalf of Sellers.

3.02    Authority; Enforceability.  Subject to the entry of the Sale Order, Sellers have all necessary corporate power and authority to execute and deliver this Agreement and the other Transaction Documents, to perform their obligations hereunder and thereunder, and to consummate the transactions contemplated by this Agreement and the other Transaction Documents.  The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by Sellers of the transactions contemplated by this Agreement and the other Transaction Document have been duly and validly authorized by all requisite corporate action and no other corporate proceedings on the part of Sellers are necessary to authorize this Agreement or the other Transaction Documents or to consummate the transactions contemplated hereby or thereby.  This Agreement has been, and at the Closing the other Transaction Documents will be, duly and validly executed and delivered by Sellers.  Subject to the entry of the Sale Order, this Agreement constitutes, and at the Closing the other Transaction Documents will constitute, the legal, valid and binding obligation of Sellers, enforceable against Sellers, jointly and severally, in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles related to or limiting creditors' rights generally and by the availability of equitable remedies and defenses, but giving effect to the Sale Order.

3.03    Intentionally Omitted.

3.04    Litigation.  Except as listed on Section 3.04 of the Sellers Disclosure Schedule, there are no actions, suits, proceedings, or order pending or, to the Knowledge of Sellers, threatened against or affecting Sellers at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, which would prevent Sellers' performance under this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.  Sellers further represent that they have no litigation pending or threatened in any jurisdiction relating to personal injury claims or compliance with Environmental Laws.

3.05    Title; Sufficiency; Condition of Assets.

(a)    Sellers have good and marketable title to (or in the case of any leased or licensed Acquired Asset, has a valid leasehold interest in or valid rights to use), are the exclusive legal and equitable owners of (or in the case of any leased or licensed Acquired Asset, are the licensee or lessee of), and have (or subject to entry of the Sale Order will have) the unrestricted power and right to sell, assign and deliver, the Acquired Assets.  The Acquired Assets are free and clear of all Liens and Claims, except for: (i) restrictions imposed in any Permit; and (ii) Liens disclosed on Section 3.05 of the Sellers Disclosure Schedule.  Upon the Closing and subject to entry of the Sale Order, Buyer will acquire exclusive, good and marketable title (or in the case of any leased or licensed Acquired Asset, a valid leasehold interest in or valid rights to use) the Acquired Assets and no restrictions will exist on the right of Buyer to resell, license or sublicense any of the Acquired Assets or Assumed Obligations or engage in the Business.

(b)    All personal property included in the Acquired Assets are (i) in good operating condition and repair, ordinary wear and tear excepted, and (ii) suitable and adequate for continued use in the manner in which they are presently being used.

3.06  Intentionally Omitted.

3.07  Employee Matters. Other than with respect to the unionized employees at Sellers' Short Hills, New Jersey location, (i) there is no organized labor strike, dispute, slowdown, lockout, work stoppage or labor strike or unfair labor practice claim pending against Sellers or reasonably anticipated, or, to the Knowledge of Sellers, threatened with respect to Sellers' employees, (ii) to the Knowledge of Sellers, there are no activities or proceedings of any labor union or organization to organize any of Sellers' employees, and (iii) there are no actions, suits, claims, labor disputes or grievances pending, or, to the Knowledge of Sellers, threatened or reasonably anticipated relating to any labor, safety, wage and hour, contract, tort, retaliation, discrimination or other labor and employment matters involving any of Sellers' employees, including charges of unfair labor practices, discrimination complaints, or matters arising under the Worker Adjustment and Retraining Notification Act, as amended, or any similar state or foreign plant closing or mass layoff laws.

3.08  Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

3.09  Estimated Cure Costs. Section 3.09 of the Sellers Disclosure Schedule (to be filed with the Bankruptcy Court at least five (5) Business Days before the Sale Hearing pursuant to Section 5.04(b) hereof) sets forth a true and complete list of the Estimated Cure Cost for each Assumed Executory Contract or Assumed Real Property Lease.

# ARTICLE 4

# REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the corresponding sections of the disclosure schedules prepared by Buyer and delivered to Sellers in connection with the execution and delivery of this Agreement (the "Buyer Disclosure Schedule"), Buyer hereby represents and warrants to Sellers as of the date of this Agreement as follows:

4.01  Organization and Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

4.02  Authority. Buyer has all necessary corporate power and authority to execute and deliver this Agreement and the other Transaction Documents, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated by this Agreement and the other Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by Buyer of the transactions contemplated by this Agreement and the other Transaction Documents have been duly and validly authorized by all requisite corporate action and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement or the other Transaction Documents or to consummate the transactions contemplated hereby or thereby. This Agreement

has been, and at the Closing the other Transaction Documents will be, duly and validly executed and delivered by Buyer. This Agreement constitutes, and at the Closing the other Transaction Documents will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles related to or limiting creditors' rights generally and by the availability of equitable remedies and defenses.

4.03    Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.04    Investor Qualifications.  Buyer has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the equity interests of the Subsidiaries listed on Schedules 2.01(a)(xii), and Buyer is capable of bearing the economic risks of such investment, including a complete loss of its investment, and Buyer acknowledges that information about the Subsidiaries sufficient to make an informed investment decision is available to Buyer.

## ARTICLE 5

## PRE-CLOSING COVENANTS

5.01    Sellers' Conduct of the Business Prior to the Closing.  From the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Closing Date, Sellers covenant and agree to use their reasonable best efforts to ensure that the Business shall be conducted only in, and Sellers shall not take any action except in, the Ordinary Course of Business, except for any such action required by the Bankruptcy Court Orders, and Sellers shall use their reasonable best efforts to preserve substantially intact the business organization of Sellers, to keep available the services of the current officers, employees, independent contractors and consultants of Sellers and to preserve the current relationships of Sellers with customers, suppliers and other Persons with which Sellers have significant business relations. Without limiting the generality of the foregoing, from the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Closing Date, except as specifically contemplated by this Agreement, Sellers shall not, directly or indirectly, do or propose to do any of the following without the prior written consent of Buyer:

(a)    Enter into any commitment or transaction not in the Ordinary Course of Business, except for any such commitment or transaction required by the Bankruptcy Court Orders;

(b)    Terminate any employees, independent contractors or other service providers of Sellers or grant severance or termination pay to any director, officer, employee, independent contractor or consultant;

(c)    Enter into any transaction with its officers, directors or stockholders or their Affiliates except reimbursement of reasonable travel expenses related to work performed for Sellers incurred in the Ordinary Course of Business by officers and directors to the extent

such expenses are permitted, and the amounts thereof do not exceed the amounts contemplated, by the DIP Budget;

(d)     Amend or otherwise modify the material terms of any Assumed Executory Contract , Assumed Real Property Lease, or Permit without prior approval of Buyer;

(e)     Transfer to any Person any rights with respect to any Sellers Intellectual Property Assets other than nonexclusive licenses entered into in the Ordinary Course of Business;

(f)     Sell, lease, license or otherwise dispose of any of the Acquired Assets outside of the Ordinary Course of Business except for any such sale, lease, license or other disposition required by the Bankruptcy Court Orders;

(g)     Commence a Proceeding other than (i) Proceedings for the routine collection of Receivables, (ii) Proceedings required by the Bankruptcy Court Orders or (iii) Proceedings (including the filing of motions) before the Bankruptcy Court that are customary in a Chapter 11 bankruptcy case and that would not be reasonably expected to delay the Closing or otherwise have a material adverse effect on Buyer's rights hereunder;

(h)     Other than the DIP Facility, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others;

(i)     Pay, discharge or satisfy any Liability, other than the payment, discharge or satisfaction of obligations in the Ordinary Course of Business except for any such payment, discharge or satisfaction required by the Bankruptcy Court Orders;

(j)     Cancel, materially amend or renew any insurance policy other than in the Ordinary Course of Business;

(k)     Take any action or fail to take any action that would reasonably be expected to have a Material Adverse Effect; and

(l)     Enter into any contract or agree, in writing or otherwise, to take any of the actions described above in this Section 5.01, or any action that would make any of its representations or warranties contained in this Agreement untrue or incorrect in any material respect or prevent it from performing or cause it not to perform its covenants hereunder except as required by the Bankruptcy Court Orders.

5.02    Access to Information and Facilities.  From the date of this Agreement until the Closing, Sellers shall: (a) permit Buyer and its representatives to have free and complete access at all reasonable times, and in a manner so as not to unreasonably interfere with the normal business operations of Sellers, to all premises, properties, employees, independent contractors, personnel, Persons having business relationships with Sellers (including suppliers, licensees, customers and distributors), books, records (including Tax records), contracts, and documents of or pertaining to Sellers; (b) furnish Buyer with all financial, operating and other data and information related to the Business (including copies thereof), as Buyer may reasonably request;

and (c) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of Sellers, the Business, the Acquired Assets and the Assumed Obligations. No information or knowledge obtained in any investigation pursuant to this Section 5.02 shall affect or be deemed to modify any representation or warranty contained herein or the conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement.

5.03  Certain Notifications.  From the date of this Agreement until the Closing, upon Sellers' Knowledge of such an event occurring, Sellers shall promptly notify Buyer in writing regarding any: (a) action taken by Sellers not in the Ordinary Course of Business and any circumstance or event that would reasonably be expected to have a Material Adverse Effect; (b) fact, circumstance, event, or action by Sellers (i) which, if known on the date of this Agreement, would have been required to be disclosed in or pursuant to this Agreement; or (ii) the existence, occurrence, or taking of which would result in any of the representations and warranties of Sellers contained in this Agreement or in any Transaction Document not being true and correct in any material respect when made or at the Closing; (c) breach of any covenant or obligation of Sellers hereunder; and (d) circumstance or event which will result in, or would reasonably be expected to result in, the failure of Sellers to timely satisfy any of the closing conditions specified in ARTICLE 7.

5.04  Bankruptcy Actions.

(a)  Sellers shall file and serve a motion (together with supporting papers and with proper notice thereof on interested parties as required by the Bankruptcy Code and the Rules) seeking entry of the bidding procedures order of the Bankruptcy Court, substantially in the form set forth on Exhibit G (the "Bidding Procedures Order") or otherwise in form and substance reasonably satisfactory to Buyer and Sellers, on the Bankruptcy Court's docket, which order will set February 24, 2010 for the Auction on such notice so as to allow third parties a meaningful opportunity to present an overbid. Sellers shall use reasonable best efforts to obtain, through the entry of the Bidding Procedures Order, prompt Bankruptcy Court approval of a fee in an amount equal to three percent (3%) of the Purchase Price payable to Buyer in cash (the "Breakup Fee"), plus a reimbursement of Buyer in cash in an amount equal to all reasonable and actual out-of-pocket and third-party costs and expenses (including expenses of counsel and other outside consultants) incurred and documented by Buyer in connection with Buyer's due diligence investigation of Sellers and the Business and the negotiation, execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated by this Agreement (the "Expense Reimbursement"), upon the first to occur of any of the events set forth in Section 8.02(a)(i) or Section 8.02(a)(ii); provided, however, that the Expense Reimbursement shall in no event be greater than Two Hundred Thousand Dollars ($200,000.00).

(b)  Sellers shall file with the Bankruptcy Court one or more motions seeking to approve the transactions contemplated by this Agreement (collectively, the "Sale Motion"), which motion shall seek the entry of the Sale Order, substantially in the form set forth on Exhibit A or otherwise in form and substance reasonably satisfactory to Buyer and Sellers. As promptly as practicable after the filing of the Sale Motion, Sellers and Buyer shall use reasonable efforts to obtain the entry of the Sale Order. Sellers shall promptly provide Buyer with copies of any objections to the Sale Order. Buyer shall take such actions as are reasonably requested by Sellers to assist Sellers in obtaining a finding by the Bankruptcy Court that Buyer is deemed to

have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code and shall be responsible for providing evidence necessary to establish to the Bankruptcy Court that it has the necessary qualifications to provide adequate assurance of future performance with respect to the Assumed Executory Contracts and Assumed Real Property Leases as required by Section 365 of the Bankruptcy Code. A list of the Assumed Executory Contracts and Assumed Real Property Leases and the proposed Estimated Cure Costs associated with such contracts and leases shall be filed with the Bankruptcy Court and served in accordance with the Bidding Procedures Order on or before five (5) Business Days prior to the Sale Hearing. In cases in which Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00. After the filing of exhibits listing the Assumed Executory Contracts and Assumed Real Estate Leases pursuant to this Section, Buyer may add any contract or lease only with the consent of the counterparty to such contract or lease, but shall have the right, in its sole discretion, to exclude any asset of Sellers from the Acquired Assets (including, without limitation, any contract or lease from the definition of Assumed Executory Contract or Assumed Real Property Lease) by providing written notice to Sellers at least one (1) Business Day before the Auction.

(c)     In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from the Sale Order, and Buyer has not also been served with papers related to such appeal, stay or reconsideration, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer within one (1) Business Day a copy of the related notice of appeal or order of stay or application for reconsideration. Sellers shall also provide Buyer with written notice (and copies) of, any other or further notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration of, either of such orders and any related briefs if Buyer is not also included on such additional documents and communications.

(d)     Sellers shall promptly notify Buyer in writing and, as is required by the Bankruptcy Code, all parties entitled to notice pursuant to the Bankruptcy Code, the Rules and orders of the Bankruptcy Court, of all motions, notices and orders required to consummate the transactions contemplated by this Agreement, including the Sale Order, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court. From the date of this Agreement, prior to filing any papers or pleadings in the Bankruptcy Case that relate primarily to this Agreement or Buyer, Sellers shall provide Buyer with a copy of such papers or pleadings.

5.05    Reasonable Efforts. From the date of this Agreement until the Closing, except as specifically contemplated by this Agreement and subject to the order of the Bankruptcy Court and any other Governmental Authority, each of Sellers and Buyer shall use their respective reasonable efforts to cause to be fulfilled and satisfied all of the other Party's conditions to closing set forth in ARTICLE 7.

5.06    Limitations on Sellers' Obligations. Notwithstanding the provisions of this ARTICLE 5, none of Sellers' obligations under this ARTICLE 5 shall require Sellers to pay any out-of-pocket costs to any third party; provided, however, to the extent that any obligation of Sellers under this ARTICLE 5 is to be performed prior to the Closing and would otherwise require Sellers to pay out-of-pocket costs to a third party, Sellers shall promptly pay such costs to

the extent funding for such costs under the DIP Facility or other cash on hand is then available to Sellers.

5.07 <u>Consents and Permits</u>. To the extent that the need for the same will not be obviated by entry of the Sale Order and subject to <u>Section 5.06</u>, Sellers shall use reasonable best efforts: (a) to obtain, as requested by Buyer, all Consents with respect to the Assumed Executory Contracts, Assumed Real Property Leases, and Permits required or necessary to consummate the transactions contemplated by this Agreement (including any Consent with respect to any Assumed Executory Contract, Assumed Real Property Lease, or Permit as may be required to be obtained under any applicable antitrust or competition Laws), (b) to make, as requested by Buyer, all filings, applications, statements and reports to all Permits that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law (including any filing, application, statement or report as may be required pursuant to applicable antitrust or competition Laws) in connection with this Agreement and the transactions contemplated by this Agreement, and (c) to obtain, as requested by Buyer, all Consents with respect to the Assumed Executory Contracts and Assumed Real Property Leases required or necessary to assign and transfer Sellers' Permits included in the Acquired Assets to Buyer at the Closing and, to the extent that one or more of such Permits are not transferable, to assist Buyer in obtaining replacements therefor.

5.08 <u>Solicitation</u>. Sellers acknowledge that they have solicited other potential bids for the sale of the Business and the Acquired Assets. Pursuant to such efforts, and as consideration for substantial expenditures of time, effort and expense undertaken and continuing by Buyer in connection with the completion of its due diligence review of the Business and the preparation, negotiation, and execution of this Agreement, Sellers acknowledge and agree that (a) Buyer shall be the stalking horse bidder at the Auction and (b) no Person other than Buyer shall be proposed as the stalking horse bidder at the Auction, and except as may otherwise be required by Bankruptcy Court Order or compliance with its fiduciary duties as confirmed by debtor-in-possession counsel, Sellers shall not participate in any negotiations for the purpose of naming any Person other than Buyer as the stalking horse bidder in the Auction; <u>provided</u> that Sellers may solicit, encourage and negotiate higher or better offers for the Acquired Assets pursuant to the terms of the Bidding Procedures Order, and <u>provided</u> <u>further</u> that Sellers may, pursuant to the terms of the Bidding Procedures Order (i) in response to an acquisition proposal for some or all of the Acquired Assets, participate in negotiations or discussions with, request clarifications from, or furnish information to, any Person which makes such acquisition proposal, and (ii) continue discussions and negotiations and continue to provide information to any Person with which Sellers have been conducting such discussions or negotiations.

5.09    Intentionally Omitted.

5.10    Taxes.  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges due and which may be payable by Sellers by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Sellers, with no reimbursement by Buyer, and Sellers shall prepare and timely file all Tax Returns required to be filed in connection with such payments.

## ARTICLE 6

## EMPLOYEES AND INDEPENDENT CONTRACTORS

6.01    Transferred Employees and Transferred Contractors.  From the date of this Agreement, Buyer shall have the right, in its sole discretion, to negotiate employment or other arrangements with such employees or independent contractors of Sellers or any of their Affiliates as determined by Buyer.  Buyer may offer employment prior to the Closing (but contingent upon the occurrence of the Closing) to such employees or independent contractors as of the Closing Date as determined by Buyer in its sole discretion (such employees who accept such offer of employment, the "Transferred Employees" and such independent contractors who accept such offer of employment, the "Transferred Contractors") upon the terms and subject to the conditions as determined by Buyer in its sole discretion.

6.02    Records of Transferred Employees and Transferred Contractors.  Sellers shall provide promptly to Buyer (or cause to be provided promptly to Buyer), at Buyer's request, any information or copies of records (including, to the extent applicable, personnel records such as addresses, dates of birth, dates of hire and dependent information) relating to the Transferred Employees and the Transferred Contractors or relating to the service of the Transferred Employees and the Transferred Contractors or with Sellers (and predecessors of Sellers, as applicable) prior to the Closing Date to the extent that providing such records is not prohibited by Law.  Sellers and Buyer shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this ARTICLE 6.

6.03    No Benefit to Employees or Independent Contractors of Sellers Intended. Nothing contained in this Agreement shall confer upon any employee or independent contractor of Sellers prior to the Closing or any Transferred Employee or Transferred Contractor any right with respect to continuance of employment or other arrangement by Buyer or any of its Affiliates, nor shall anything herein interfere with the right of Buyer or any of its Affiliates to terminate the employment of any employee or independent contractor, including any Transferred Employee or Transferred Contractor, at any time, with or without notice and for any or no reason, or restrict Buyer or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Transferred Employee or Transferred Contractor, after the Closing.

6.04    COBRA.  Upon the Closing, to the extent required by applicable Law, Buyer shall provide COBRA coverage to the employees of Sellers who are "M&A Qualified Beneficiaries"

(as defined in the regulations issued pursuant to COBRA) at such employee's expense. Such coverage provided by Buyer shall be provided solely under Buyer's employee benefit plans, and only to those to whom Buyer is required to provide COBRA coverage under applicable Law. Buyer hereby agrees that all of the employees of Sellers at the Closing to whom Buyer does not make an offer of employment and who lose their group health coverage with Sellers are M&A Qualified Beneficiaries to whom Buyer is required to offer COBRA coverage in accordance with the COBRA rules.

## ARTICLE 7

## CONDITIONS TO CLOSING

7.01    <u>Conditions Precedent to Obligations of Buyer</u>.    The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to satisfaction of the following conditions, unless waived by Buyer in writing:

(a)    <u>Representations and Warranties</u>.    The representations and warranties of Sellers contained in this Agreement which are not qualified as to materiality shall be true and accurate in all material respects on and as of the date made and as of the Closing Date as if made at and as of such date and the representations and warranties of Sellers contained in this Agreement which are qualified as to materiality shall be true and accurate on and as of the date made and as of the Closing Date as if made at and as of such date (except those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and accurate (or true and accurate in all material respects, as applicable) as of such date or with respect to such period).

(b)    <u>Performance of Obligations</u>.    Sellers shall have performed in all material respects all obligations and covenants required to be performed by it under this Agreement and any other agreement or document entered into in connection herewith prior to the Closing Date.

(c)    <u>No Material Adverse Effect</u>.    No event has occurred that has had, or would reasonably be expected to have, a Material Adverse Effect, except for any event disclosed on the Sellers Disclosure Schedule.

(d)    <u>Bidding Procedures Order</u>.    The Bidding Procedures Order, substantially in the form set forth on <u>Exhibit G</u> or otherwise in form and substance satisfactory to Buyer, shall have been entered by the Bankruptcy Court.

(e)    <u>Sale Order</u>.    The Sale Order, substantially in the form set forth on <u>Exhibit A</u> or otherwise in form and substance satisfactory to Buyer, shall have been entered by the Bankruptcy Court and shall be a Final Order and such Order shall not have been stayed, modified, reversed or amended in any manner materially adverse to Buyer; and Sellers shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Acquired Assets free and clear of all Liens and Claims and to consummate the transactions contemplated by this Agreement, and Buyer shall have received evidence thereof satisfactory to Buyer and its counsel.

(f)     Litigation. No stay shall exist, and no Order shall have been entered that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(g)     Assignment Consents. Buyer shall have received the consents set forth on Schedule 2.08(i) with respect to the Assumed Executory Contracts and Leases in form and substance reasonably satisfactory to Buyer.

(h)     Acceptance of Offers of Employment.  Certain employees of Sellers named on Schedule 7.01(h) to whom Buyer has extended offers of employment shall have accepted such offers and shall have, in the case of each such employee, indicated acceptance of such offer by countersigning the offer letter from Buyer and returning a countersigned copy to Buyer.

(i)     Closing Deliveries.   Sellers shall have delivered (or caused to be delivered) to Buyer all of the closing deliveries set forth in Section 2.09 and Section 2.11.

7.02   Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to satisfaction of the following conditions, unless waived by Sellers in writing:

(a)     Representations and Warranties. The representations and warranties of Buyer contained in this Agreement which are not qualified as to materiality shall be true and accurate in all material respects on and as of the date made and as of the Closing Date as if made at and as of such date and the representations and warranties of Buyer contained in this Agreement which are qualified as to materiality shall be true and accurate on and as of the date made and as of the Closing Date as if made at and as of such date (except those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and accurate (or true and accurate in all material respects, as applicable) as of such date or with respect to such period).

(b)     Performance of Obligations. Buyer shall have performed in all material respects all obligations and covenants required to be performed by it under this Agreement and any other agreement or document entered into in connection herewith prior to the Closing Date.

(c)     Closing Deliveries. Buyer shall have delivered to Sellers all of the closing deliveries set forth in Section 2.10 and Section 2.11.

(d)     Bidding Procedures Order. The Bidding Procedures Order, substantially in the form set forth on Exhibit G or otherwise in form and substance satisfactory to Sellers, shall have been entered by the Bankruptcy Court.

(e)     Sale Order. The Sale Order, substantially in the form set forth on Exhibit A or otherwise in form and substance satisfactory to Sellers, shall have been entered by the Bankruptcy Court and shall be a Final Order and such Order shall not have been stayed, modified, reversed or amended in any manner materially adverse to Sellers.

## ARTICLE 8

## TERMINATION; TERMINATION PAYMENT

8.01 <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing as follows:

(a)     by mutual written agreement of Buyer and Sellers;

(b)     by either Buyer or Sellers if there shall be in effect a Final Order (other than a Final Order with respect to an Alternative Transaction) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(c)     by either Buyer or Sellers (provided that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or obligations set forth in this Agreement on the part of Sellers, on the one hand, or Buyer, on the other hand, which breach would give rise to the failure of the conditions set forth in <u>Section 7.01</u> or <u>Section 7.02</u>, as applicable, and such breach is not cured within ten (10) calendar days following written notice to the Party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d)     by Buyer or Sellers if Sellers (i) determine that an Alternative Transaction constitutes the "highest and best" bid at the Auction, takes any overt action to seek or support Bankruptcy Court approval of an Alternative Transaction, or takes any overt action to seek or support a plan under Chapter 11 of the Bankruptcy Code that contemplates the sale or retention of the Acquired Assets in a manner substantially inconsistent with the terms of this Agreement or (ii) execute and deliver an agreement or understanding of any kind with respect to an any of the items described in the foregoing clause (i); <u>provided</u>, <u>however</u> that, in the event Buyer is the Backup Bidder (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order), Buyer may not terminate this Agreement pursuant to this <u>Section 8.01(d)</u> until the earlier of (i) two (2) Business Days after the closing of the transaction(s) pursuant to which all of the Acquired Assets that were subject to such Backup Bid (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order) have been transferred to one or more Qualified Bidders (as such term is defined in the Bid Procedures attached to the Bidding Procedures Order) pursuant to the Bid Procedures attached to the Bidding Procedures Order, and (ii) eleven (11) calendar days after the date of the Auction; or

(e)     by Buyer if: (i) the Bidding Procedures Order, substantially in the form set forth on <u>Exhibit G</u> or otherwise in form and substance satisfactory to Buyer, is not entered within five (5) business days after January 22, 2010, or is stayed reversed, amended or vacated, (ii) the Sale Order, substantially in the form set forth on <u>Exhibit A</u> or otherwise in form and substance satisfactory to Buyer, has not been entered within five (5) business days after the Sale Hearing, or if after such entry, such Sale Order has not, within eleven (11) days after its entry, become a Final Order, (iii) if, prior to the Closing Date, any of the Chapter 11 Cases is converted to a case under Chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is

appointed in any of the Chapter 11 Cases, or if any of the Chapter 11 Cases is dismissed or if a motion is filed by Sellers seeking any of the foregoing, or (iv) any one or more "Events of Default" (as defined in the DIP Facility) occurs or exists.

8.02    Breakup Fee and Expense Reimbursement.

(a)    Sellers shall immediately have the obligation to pay Buyer the Breakup Fee and the Expense Reimbursement, upon the first to occur of the following:

(i)    Buyer terminates this Agreement pursuant to Section 8.01(c) (if the inability to satisfy the condition is a result of a material breach by Sellers) or Section 8.01(e)(iv); or

(ii)    Buyer or Sellers terminate this Agreement pursuant to Section 8.01(d) (provided that, subject to Section 8.02(b), the Breakup Fee and the Expense Reimbursement shall be payable upon consummation of an Alternative Transaction and satisfied out of the proceeds of such Alternative Transaction).

(b)    The Breakup Fee and the Expense Reimbursement payable pursuant to this Section 8.02 shall be a super-priority administrative expense claim senior to all other administrative expense claims of Sellers under Section 364(c)(1) of the Bankruptcy Code, other than the super-priority claims granted to Buyer in connection with the DIP Facility and any claims senior thereto.

8.03    Effect of Termination or Breach.  If this Agreement is terminated in accordance with Section 8.01, all obligations of the Parties hereunder shall terminate, except (i) for this Section 8.03 and (ii) for the provisions of Sections 8.02 (Breakup Fee and Expense Reimbursement), 10.01 (Survival), 10.02 (Expenses), 10.05 (Notices), 10.08 (SUBMISSION TO JURISDICTION), 10.09 (Governing Law), 10.10 (Binding Nature; Assignment), 10.11 (No Third Party Beneficiaries), 10.12 (No Strict Construction), 10.13 (Public Announcements), 10.14 (Entire Understanding) and 10.16 (Conflict Between Transaction Documents) and each of provisions set forth in (i) and (ii) above shall survive any termination of this Agreement; provided, however, that nothing herein shall relieve any Party from Liability for (i) any material breach by such Party that occurs prior to such termination of any of its representations, warranties, covenants or agreements set forth in this Agreement or (ii) any material breach by such Party of its covenants or agreements that survive the Closing in accordance with their respective terms.

**ARTICLE 9**

**POST-CLOSING COVENANTS**

9.01    Joint Post-Closing Covenants of Buyer and Sellers.  Subject to the occurrence of the Closing, Buyer and Sellers jointly covenant and agree that, from and after the Closing Date, Buyer and Sellers will each use reasonable efforts to cooperate with each other in connection with (a) any Proceeding involving the other Party relating to the preparation of an audit of any Tax Return of Sellers or Buyer for all periods prior to or including the Closing Date and relating to the Business or the Acquired Assets, (b) any audit of Buyer and/or any audit of Sellers with

respect to the sales, transfer and similar Taxes imposed by the Laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement and (c) the Bankruptcy Case and all Proceedings related thereto. In furtherance hereof, Buyer and Sellers further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith. In connection with the foregoing Section 9.01(c), Buyer shall permit Sellers' counsel and other advisers reasonable access during regular business hours to the financial and other books and records relating to the Business for all periods preceding the Closing Date to the extent that such books and records are transferred to Buyer at the Closing including the right to copy (or, at Buyer's election, have Buyer copy) such documents and records as they may request. All costs and expenses incurred in connection with this Section 9.01 referred to herein shall be borne by the Party who is subject to such action or requesting such assistance.

9.02    Limited Power of Attorney; Collections.    Subject to the occurrence of, and effective upon, the Closing, Sellers hereby irrevocably appoint, effective as of the Closing, Buyer and its successors, agents and assigns as Sellers' true and lawful attorney, in Sellers' name, place and stead, with power of substitution, to take any action and to execute any instrument which Buyer may deem necessary or advisable to fulfill Sellers' obligations or rights under, or to accomplish the purposes of, this Agreement, including, without limitation: (a) to demand and receive any and all Acquired Assets and to make endorsements and give receipts and releases for and in respect of the same; (b) to institute, prosecute, defend, compromise and/or settle any and all Proceedings with respect to the Acquired Assets and the Assumed Obligations; (c) to endorse and cash and/or deposit in an account of Buyer any and all checks or drafts received on account of any Receivables; (d) to make any filings required to transfer any Sellers Intellectual Property or any other Acquired Assets; (e) to receive and open all mail, packages and other communications addressed to Sellers and relating to the Business; and (f) in the name of Sellers or otherwise, to collect all Receivables for its own account. The foregoing power of attorney is a special power of attorney coupled with an interest and is irrevocable. Sellers shall promptly deliver to Buyer any cash, checks or other property that Sellers may receive after the Closing in respect of any accounts, notes and credit card receivables or other asset constituting part of the Acquired Assets.

9.03    Post-Closing Operation of Sellers; Name Changes.    Subject to the occurrence of the Closing, from and after the Closing Date, Sellers will cease their operations and will not engage in any competitive business whatsoever, except for matters required by the Bankruptcy Court, including collecting and selling Excluded Assets, notifying customers and suppliers that Sellers are going out of business, minor ministerial matters not related to the Business, or enforcing their rights and performing its obligations under this Agreement. Promptly after the Closing, Sellers shall take all necessary action to change their trade name to a name bearing no resemblance to their current trade names and will file such documents as are necessary to reflect such name change in their jurisdiction of incorporation or organization and the other jurisdictions where Sellers are qualified to do business as a foreign entity. Sellers agree to promptly notify Buyer of such name change and the name chosen by Sellers. Notwithstanding the foregoing, Sellers may refer to "Spa Chakra" as a former name for legal and noticing purposes in the Chapter 11 Cases and other legal documents.

9.04    Tax Matters.  Within ninety (90) days after the Closing Date, Buyer and Sellers shall agree upon a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the Acquired Assets in accordance with the requirements of Section 1060 of the IRC (such schedule, the "Purchase Price Allocation").  Buyer and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Purchase Price Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Authority or any other Proceeding).  Buyer and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the IRC) with respect to such Purchase Price Allocation.

## ARTICLE 10

## MISCELLANEOUS

10.01  Survival.  The representations and warranties contained in ARTICLE 3 and ARTICLE 4 of this Agreement and/or in any certificate or other document or instrument executed pursuant hereto (other than the FIRPTA Certificate) shall not survive the Closing and shall, upon the Closing, automatically lapse and cease to be of any further force or effect whatsoever, and neither Sellers nor Buyer nor any of their respective officers, directors, agents, representatives or affiliates shall have any liability to the other under this Agreement or any document or certificate delivered pursuant to this Agreement at any time after the Closing with respect to such representations and warranties, other than for intentional misrepresentation or fraud.  Notwithstanding the foregoing, each of the covenants and obligations of Buyer and Sellers in this Agreement and in the other Transaction Documents shall survive the Closing in accordance with their respective terms.

10.02  Expenses.  Except as provided in Section 8.02, each Party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated by this Agreement.

10.03  Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument duly executed by both Sellers and Buyer.

10.04  Further Assurances.  Buyer and Sellers each agrees (a) to furnish upon request to each other Party such further information, (b) to execute and deliver to each other Party such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement; provided, however, that, except as otherwise provided in this Agreement, all out-of-pocket costs arising from such acts or things done pursuant to this Section 10.04 shall be paid by the requesting Party.

10.05  Notices.  Any notice, request, instruction or other document to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, email or other wire transmission (with answer back confirmation of such transmission, and, if sent by email, provided that a copy of such notice, request or instruction or other document be sent by

overnight delivery), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

TO SELLERS:  Spa Chakra, Inc.
111 West 57th Street, Suite 1400
New York, New York 10019
Attn: Michael Canizales
Facsimile: 646-638-9821

with copies to:  Morrison Cohen LLP
909 Third Avenue
New York, New York 10022
Attn: Joseph T. Moldovan, Esq.
Facsimile: 917-522-3103

TO BUYER:  Hercules Technology II, L.P.
c/o Hercules Technology Growth Capital
400 Hamilton Avenue, Suite 310
Palo Alto, California 94301
Attn: K. Nicholas Martitsch
Facsimile: 650-473-9194

with copies to:  Winston & Strawn LLP
101 California Street, Suite 3900
San Francisco, California 94111
Attention: John D. Fredericks, Esq.
Facsimile: (415) 591-1400

or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

10.06 _Waivers_. The failure of a Party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Sellers in the case of a waiver by Sellers, or Buyer, in the case of any waiver by Buyer, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.07 _Counterparts and Execution_. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute

one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

10.08 <u>SUBMISSION TO JURISDICTION</u>. THE PARTIES HERETO HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS SHALL BE FILED AND MAINTAINED ONLY IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF SOUTHERN DISTRICT OF NEW YORK, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

10.09 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York.

10.10 <u>Binding Nature; Assignment</u>. Subject to approval of the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto without prior written consent of the other Party; except that (a) Buyer may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Buyer (whether wholly owned or otherwise) and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; (b) the rights and interests of Sellers hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to Sellers pursuant to a confirmed plan under Chapter 11 of the Bankruptcy Code; and (d) as otherwise provided in this Agreement. Sellers hereby agree that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

10.11 <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of Buyer and Sellers and nothing contained herein, express or implied, is intended to confer on any Person other than the Parties hereto or their successors and permitted assigns, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

10.12 <u>No Strict Construction</u>. Buyer and Sellers participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Sellers and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

10.13 <u>Public Announcements</u>. Except as required by this Agreement or Law or as required or appropriate in connection with the Bankruptcy Case, Sellers shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated by this Agreement without obtaining the prior written consent of Buyer relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law outside of Bankruptcy Court filings, Sellers shall give Buyer a copy of the proposed disclosure and reasonable opportunity to comment on the same and shall use its commercially

reasonable efforts to include Buyer's comments in such public disclosure. For purposes of clarity, the reference to "applicable Law" in the preceding sentence does not include filings in the Chapter 11 Cases.

10.14 <u>Entire Understanding</u>. This Agreement, the other Transaction Documents and the Exhibits, Appendices, and Schedules (a) set forth the entire agreement and understanding of the Parties hereto in respect to the transactions contemplated by this Agreement, (b) supersede all prior agreements, arrangements and understandings relating to the subject matter hereof, and (c) are not intended to confer upon any other Person any rights or remedies hereunder, except as expressly set forth in this Agreement.

10.15 <u>Closing Actions</u>. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the Party hereto entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

10.16 <u>Conflict Between Transaction Documents</u>. The Parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Document, this Agreement shall govern and control. In the event of any conflict between this Agreement and the Sale Order, the Sale Order shall govern.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be duly executed and delivered as of the date first above written.

**SELLERS:**

SPA CHAKRA, INC,
a Delaware corporation,

By: _____
Name: Michael Canizales
Title: CEO

SPA CHAKRA, LLC,
a Delaware limited liability company,
By: Spa Chakra, Inc., its sole member,

By: _____
Name: Michael Canizales
Title: CEO

SPA CHAKRA INDIANA LLC,
an Indiana limited liability company,
By: Spa Chakra, Inc., its sole member,

By: _____
Name: Michael Canizales
Title: CEO

SPA CHAKRA FIFTH AVENUE, LLC,
a Delaware limited liability company,
By: Spa Chakra, Inc., its sole member,

By: _____
Name: Michael Canizales
Title: CEO

[signature page continues]

SPA CHAKRA FIFTH AVENUE INDIANA, LLC,
an Indiana limited liability company,
By: Spa Chakra, Inc., it sole member,

By: _____
Name:   *Marvuel Cunizales*
Title:   *CEO*

**BUYER**:

HERCULES TECHNOLOGY II, L.P.,
a Delaware limited partnership,
By: Hercules Technology SBIC Management,
  LLC, its General Partner,

By: Hercules Technology Growth Capital, Inc., its
  Manager,

By: _____
Name:
Title:

SPA CHAKRA FIFTH AVENUE INDIANA, LLC,
an Indiana limited liability company,
By: Spa Chakra, Inc., it sole member,

By:_____
Name:
Title:


**BUYER:**

HERCULES TECHNOLOGY II, L.P.,
a Delaware limited partnership,
By: Hercules Technology SBIC Management, LLC,
    its General Partner,

By: Hercules Technology Growth Capital, Inc., its
    Manager,

By:_____
Name:    **K. Nicholas Martitsch**
Title:    **Associate General Counsel**

# APPENDIX A

"Acquired Assets" has the meaning set forth in Section 2.01(a) and Section 2.02.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Schedules, Exhibits and Appendices hereto, as the same may be amended, modified or waived from time to time in accordance with its terms.

"Alternative Transaction" means any transaction, sale, or plan of reorganization or liquidation (other than a liquidation of a portion of the Business that is immaterial in the aggregate to the Business) accepted by Sellers as being the highest and best offer pursuant to the Bidding Procedures Order, or otherwise, whereby all or a material portion of the Business is purchased by, or otherwise conveyed to, a Person other than Buyer and/or one or more of its Affiliates.

"Assignment and Assumption" has the meaning set forth in Section 2.09(b).

"Assignment Consent" has the meaning set forth in Section 2.06(a).

"Assumed Executory Contracts" has the meaning set forth in Section 2.01(a)(ix).

"Assumed Obligations" has the meaning set forth in Section 2.04(a).

"Auction" means the auction conducted by Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bidding Procedures Order" has the meaning set forth in Section 5.04(a).

"Books and Records" has the meaning set forth in Section 2.01(a)(x).

"Breakup Fee" has the meaning set forth in Section 5.04(a).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking and savings and loan institutions are authorized or required by law to be closed in the States of New York or California.

"Buyer" has the meaning set forth in the preamble.

"Buyer Disclosure Schedule" has the meaning set forth in the first paragraph of ARTICLE 4.

"Canizales" has the meaning set forth in the preamble.

"Cash Consideration" has the meaning set forth in Section 2.07(a).

"Chapter 5 Claims" has the meaning set forth in Section 2.07(a).

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.08.

"Closing Date" has the meaning set forth in Section 2.08.

"COBRA" means Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any Permit).

"Contract/Leases" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Sellers is a party.

"Deposits and Advances" has the meaning set forth in Section 2.01(a)(viii).

"DIP Budget" means the "Budget" as defined in the DIP Facility.

"DIP Facility" has the meaning set forth in the recitals.

"DIP Credit Documents" has the meaning set forth in the recitals.

"DIP Obligations" has the meaning set for in the recitals.

"Dollars" or "$" means dollars of the United States of America.

"Estimated Cure Cost" means, with respect to any Assumed Executory Contract or Assumed Real Property Lease, Sellers' best estimate, as of the date of filing of the exhibits pursuant to Section 5.04(b) of this Agreement, of the respective costs of cure required to be satisfied in order for Sellers to assume and assign such Assumed Executory Contract or Assumed Real Property Lease as set forth on Section 3.09 of the Sellers Disclosure Schedule.

"Environmental Law" means all applicable federal, state, local and foreign laws relating to pollution, human health, safety or protection of the environment, including, without limitation, law relating to releases or threatened releases of hazardous materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, disposal, cleanup, transport or handling of hazardous materials and all laws with regard to record keeping,

notification, disclosure and reporting requirements respecting hazardous materials and all similar laws.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.05.

"Expense Reimbursement" has the meaning set forth in Section 5.04(a).

"Fifth Avenue" has the meaning set forth in the preamble.

"Fifth Avenue Collateral" has the meaning set forth in the recitals.

"Fifth Avenue Indiana" has the meaning set forth in the preamble.

"Final Cure Costs" has the meaning set forth in Section 2.04(a)(ii).

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time and consistently applied and maintained throughout the periods indicated.

"General Assignment and Bill of Sale" has the meaning set forth in Section 2.09(a).

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Indiana" has the meaning set forth in the preamble.

"Intellectual Property Rights" means any intellectual property rights, including, without limitation, rights in or arising out of patents, patent applications, copyrights, copyright registrations, applications for copyright registrations, mask works, mask work registrations, applications for mask work registrations, trade secrets, trademarks, service marks, collective marks, certification marks, registrations therefor and applications for registrations therefor, trade names, and trade dress.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Knowledge of Sellers" means the knowledge of a particular fact or other matter, which Sellers shall be deemed to have if either of Michael Canizales or Meredith Quarnstrom is actually aware of such fact or other matter after making such due inquiry and exercising such due diligence as a prudent businessperson would have made or exercised in the management of his or her business affairs, including due inquiry of those officers, directors, key employees and

professional advisers (including attorneys, accountants and consultants) of such Person who would reasonably be expected to have actual knowledge of the matters in question.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority, or common law.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"LLC" has the meaning set forth in the preamble.

"Material Adverse Effect" means any event, condition, development or effect that individually or in the aggregate with all other events, changes, conditions, developments and effects, is or is reasonably likely to be materially adverse to the ability of Sellers to perform their obligations under this Agreement.

"Non-Assignable Asset" has the meaning set forth in Section 2.06.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Sellers in the usual and ordinary course in a manner substantially similar to the manner in which Sellers operated, consistent with past practice prior to the date hereof, subject to any obligations as a debtor under the Bankruptcy Code or any order of the Bankruptcy Court.

"Parent" has the meaning set forth in the preamble.

"Parties" means Buyer and Sellers and "Party" means Buyer or Sellers as the context requires.

"Permit" means any: (a) permit, license, approvals, certificates of occupancy, authorizations, registrations, plans, qualification, accreditation or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law; or (b) right under any contract with any Governmental Authority.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Petition Date" has the meaning set forth in the recitals.

"Prepetition Credit Documents" has the meaning set forth in the recitals.

"Prepetition Loan Agreement" has the meaning set forth in the recitals.

"Prepetition Note" has the meaning set forth in the recitals.

"Prepetition Senior Obligations" has the meaning set forth in the recitals.

"Proceeding" means any claim, charge, complaint, dispute, demand, action, investigation, inquiry, audit, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, arbitration, account, contribution, and/or other causes of action of whatever kind or character.

"Purchase Price" has the meaning set forth in Section 2.07.

"Purchase Price Allocation" has the meaning set forth in Section 9.04.

"Purchase Price Protection" means bid protection as approved by the Bankruptcy Court which shall require any competing initial bid from a third-party purchaser (other than the stalking horse bidder) to exceed the Purchase Price by an amount equal to the Breakup Fee and Expense Reimbursement plus an amount not less than $100,000.00 as shall be set forth in the Bidding Procedures Order.

"Receivables" has the meaning set forth in Section 2.01(a)(ii).

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated by this Agreement.

"Sale Motion" has the meaning set forth in Section 5.04(b).

"Sale Order" has the meaning set forth in the recitals.

"Schedules" means the schedules attached hereto (including the Sellers Disclosure Schedule and the Buyer Disclosure Schedule).

"Sellers" or "Seller" has the meaning set forth in the preamble.

"Sellers Claims" has the meaning set forth in Section 2.01(a)(xiii).

"Sellers Disclosure Schedule" has the meaning set forth in the first paragraph of ARTICLE 3.

"Sellers' Intellectual Property Assets" means all Intellectual Property Rights and Technology that are used in, or held for use in, the Business.

"Sterling" has the meaning set forth in the recitals.

"Sterling Loan Agreement" has the meaning set forth in the recitals.

"Sterling Obligations" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (a) all federal, state, local, county, foreign and other taxes, assessments or other government charges, fees, imposts or levies, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, backup withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, real property, personal property, inventory, unclaimed property, environmental or windfall profit tax, custom duty or other tax, or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, fine, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, (b) Liability for the payment of any amounts of the type described in clause (a) above relating to any other Person as a result of being party to any tax sharing, tax indemnity or tax allocation agreement with such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (c) Liability for the payment of any amounts of the type described in clause (a) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any written or electronic report, return, declaration, certificate, claim for refund or other information or statement filed or required to be filed relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Technology" means any algorithms, confidential or proprietary information or data, designs, discoveries, domain names, formulae, ideas, inventions, know-how, logos, methods, models, names, processes, research, software, techniques, technology, works of authorship, and general intangibles of like nature, whether patentable or unpatentable and whether or not reduced to practice.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated by this Agreement.

"Transferred Contractors" has the meaning set forth in Section 6.01.

"Transferred Employees" has the meaning set forth in Section 6.01.

"Ventures Equity Interest" has the meaning set forth in Section 2.09(m).

# EXHIBIT A

# FORM OF SALE ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re                                    :
                                         :      **Chapter 11**
**SPA CHAKRA, INC. , et. al.,**[1]       :
                                         :      **Case No. 09-17260 (SMB)**
                                         :
                      **Debtors.**       :      **(Jointly Administered)**

------------------------------------------------------------ x


**ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, 503, AND 1146(A) AND FED. R. BANKR. P. 2002, 6004, 6006, 9008, AND 9014: (i) APPROVING THE ASSET PURCHASE AGREEMENT; (ii) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (iii) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES. AND (iv) GRANTING RELATED RELIEF**

Upon consideration of the relief requested in Part II of the Debtors' motion dated December 26, 2009 (*"Motion"*)[2], pursuant to sections 105(a), 363, 365, 503, and 1146(a) of chapter 11, title 11 of the United States Code (*"Bankruptcy Code"*) and Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (*"Bankruptcy Rules"*), for an order authorizing and approving a sale of the Assets free and clear of liens, claims, and encumbrances upon the terms and conditions set forth in the Asset Purchase Agreement (*"APA"*), annexed to this Order as Exhibit "A," between the Debtors, on the one hand, and Hercules Technology II, L.P., a Delaware limited partnership, or an affiliate thereof (*"Buyer"* or *"Hercules"*), on the other hand, and the procedures established pursuant to the *Procedures Order* (hereinafter defined); and the Court having granted the relief requested in Part I of the Motion

---

[1] The Debtors are the following entities: Spa Chakra, Inc., a Delaware corporation; Spa Chakra, LLC, a Delaware limited liability company; Spa Chakra Indiana, LLC, an Indiana limited liability company; Spa Chakra Fifth Avenue, LLC, a Delaware limited liability company; and Spa Chakra Fifth Avenue Indiana, LLC, an Indiana limited liability company.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or APA, as applicable.

pursuant to that Order Approving Auction Procedures in Connection with the Debtors' Motion for (I) Authority to Sell Assets, and (II) Approval of the Auction Procedures Related Thereto, dated January __, 2010 ("*Procedures Order*") (ECF Docket # _), and, in accordance with the Procedures Order, the Debtors having noticed the Auction for February __, 2010 ("*Auction Date*"), and no Qualified Bids having been received prior to the Auction Date, and the Auction therefore not having been needed or held; and it appearing that Buyer's bid is the highest and best offer received by the Debtors for the Assets to be sold; and the Court having reviewed the Debtors' Supplement to Sale Motion that reported on the Debtors' implementation of the Procedures Order; and the Court having considered the relief requested in Part II of the Motion and there being no opposition to Part II of the Motion, and upon the record of the hearing on Part II of the Motion held on February __, 2010 ("*Sale Hearing*"), and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b), and (c) notice of the Motion having been duly served in accordance with applicable laws and rules; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and upon the record of the Sale Hearing, including, without limitation, the reasons set forth by the Court in the record as to why approval of the APA is in the best interests of the Debtors' estate; and after due deliberation and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[3]

A.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     As evidenced by the certificates of service and affidavits of publication filed with the Court and based on the representations of counsel at the Sale Hearing: (i) proper, timely, adequate, and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014; (ii) such notice was good, sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing or the entry of this Order shall be required.

C.     As demonstrated by (i) the testimony and/or other evidence proffered or adduced at the Sale Hearing, (ii) the representations of counsel made on the record at the Sale Hearing, and (iii) the record of this case and all prior proceedings in this case held before the Court, (a) the Sellers extensively marketed the Assets prior to the Petition Date, and (b) the Debtors have continued to market the Assets since the Petition Date and conducted the sale process in compliance with the Procedures Order.

D.     Buyer's bid for the purchase of the Assets, as memorialized in the APA, is the highest and best offer received for the Assets to be sold. The purchase price to be paid by Buyer pursuant to the APA is fair consideration and constitutes reasonably equivalent value for the

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

#2022420 v2 \020504 \0007

Assets, as determined by the Debtors' marketing process prior to and since the Petition Date and the Auction.

E.     Buyer is a purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, with respect to the Assets. The APA was negotiated, proposed and entered into by the parties in good faith, from arms'-length bargaining positions and without collusion and, therefore, Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Assets. Neither the Debtors nor Buyer have engaged in any conduct that would cause or permit the APA to be voided, or for the imposition of costs and damages, under section 363(n) of the Bankruptcy Code. The sale process and the Auction conducted by the Debtors was fair and reasonable and conducted in good faith, and the outcome of such Auction was not the result of collusive or other unlawful conduct on the part of Sellers, Buyer, or any third party.

F.     Buyer is not an "insider" of either of the Sellers, as that term is defined in 11 U.S.C. §101.

G.     The Debtors have articulated good business reasons for consummating the transactions provided for in the APA and for selling the Assets outside of a plan of reorganization, and it is a reasonable exercise of the Debtors' business judgment to consummate the transactions contemplated by the APA. The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' voting rights.

H.     The Debtors may sell the Assets to Buyer free and clear of all Liens and Claims (as hereinafter defined) in accordance with section 363(f) of the Bankruptcy Code and except as explicitly set forth in the APA. As a condition of purchasing the Assets, Buyer requires that the

Assets be sold free and clear of all Liens and Claims, except those explicitly and expressly assumed by Buyer in the APA. Except as otherwise explicitly set forth in the APA, the transfer of the Assets to Buyer does not and will not subject Buyer to any liability whatsoever with respect to the operation of the Debtor's business and/or the ownership of the Assets prior to the Closing.

I. The Debtors are the sole and lawful owners of the Assets. The transfer of the Assets to Buyer is or will be a legal, valid and effective transfer of the Assets, and will vest Buyer with all right, title and interest in and to the Assets, free and clear of all Liens and Claims pursuant to section 363(f) of the Bankruptcy Code and all other applicable laws, except with respect to those Liens and Claims explicitly and expressly assumed by Buyer in the APA.

J. The Debtors' pre-petition secured lender, Sterling, has consented to the sale of the Assets. Buyer has assumed the Sterling Loan as modified pursuant to a separate agreement between Buyer and Sterling and the Sterling Lien shall attach to the Assets purchased by Buyer pursuant to said agreement. Non-debtor parties[4], holding valid Liens or Claims in or with respect to the Assets who did not object, or who withdraw their objections, to the Motion are deemed to have consented to the sale of the Assets free and clear of their Liens or Claims in or with respect to the Assets pursuant to section 363(f)(2) of the Bankruptcy Code, and their Liens and Claims shall attach to the proceeds of the Assets with the same priority, valid force and effect as they existed with respect to the Assets before the Closing Date.

---

[4] The Obligations owed by the Debtors to Buyer, as post-petition lender, under the DIP Financing Documents, are being credited to the purchase price under the APA as additional consideration and, thus, are satisfied in connection with the consummation of the Sale of the Assets to Buyer.

K.     The Debtors are authorized to sell, transfer, convey and assign to Buyer all of Debtor's right, title, and interest (including common law rights) to and in all of the intangible property included in the Assets to the broadest extent permitted by law and the terms of the APA.

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

1.     All objections to the Motion and the relief requested in Part II therein that have not been withdrawn, waived or settled, and all reservations of rights included in such objections, are hereby overruled on the merits and denied, except as set forth herein.

2.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized to sell and transfer the Assets to Buyer pursuant to and in accordance with the terms and conditions of the APA and to take all other actions necessary to effectuate the terms thereof and to consummate the transactions contemplated therein and the transactions contemplated in the [Transactional Agreements], including, without limitation, such actions necessary to execute and deliver all documents referenced in and/or contemplated under the APA, without any further authorization of the Court. Title to the Assets shall pass to Buyer at Closing pursuant to section 363(f) of the Bankruptcy Code and all other applicable laws, free and clear of any and all liens (including, but not limited to, mechanics', materialmen's, and other consensual and non-consensual liens and statutory liens), security interests, encumbrances, and claims (including, but not limited to, any "claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, recoupment, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery,

interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date and prior to the Closing Date, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "*Liens and Claims*"), with any and all Liens and Claims to attach only to the proceeds of sale with the same priority, validity, force, and effect as they existed with respect to the Assets immediately before the Closing Date.

3. The sale and transfer of the Assets to Buyer pursuant to the APA constitutes a legal, valid, and effective transfer and shall vest Buyer with all right, title, and interest of the Debtors in and to the Assets.

4. This Order and the APA shall be binding upon, and shall inure to the benefit of, the Debtors, Buyer, and their respective successors and assigns, including, without limitation, any chapter 7 or chapter 11 trustee hereinafter appointed in this or any other proceeding commenced under the Bankruptcy Code by or against the Debtors.

5. This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the APA and to resolve any issue or dispute concerning the interpretation, implementation or enforcement of this Order and the APA, or the rights and duties of the parties hereunder or thereunder, including, without limitation, any issue or dispute concerning the transfer of the Assets free and clear of Liens and Claims.

6.     Upon the Debtors' receipt of the consideration specified in Section 2.07 of the APA at the Closing, each of the creditors of the Debtor is authorized and directed to execute such documents and take all other actions as may be necessary to release its Liens and Claims against or in the Assets, if any, as such Liens and Claims may have been recorded or may otherwise exist.

7.     Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Order for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Assets conveyed to Buyer including, without limitation, to accept this Order in lieu of any other document or instrument for purposes of making any recording or filing necessary or desirable, in Buyer's discretion, to effectuate, record or provide notice of the transfer of Sellers' intellectual property assets to Buyer pursuant to the APA.

8.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens and Claims against or in the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens and Claims that the person or entity has with respect to the Assets, the Debtors and Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

9.     The provisions of this Order shall be self-executing, and neither the Debtors, Buyer, nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents, or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; provided, however, that this paragraph

shall not excuse such parties from performing any and all of their respective obligations under the APA. Without in any way limiting the foregoing, Buyer is empowered to execute and file releases, termination statements, assignments, consents, cancellations, or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the sale contemplated by the APA.

10.     Buyer is not liable for the Debtors' debts and obligations unless specifically provided for in the APA or pursuant to this Order. Except as otherwise provided in the APA, all persons and entities (and their respective successors and assigns) including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors holding Liens and Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in or with respect to the Debtors and/or the Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Assets to Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' Liens and Claims against the Assets, Buyer and/or its affiliates, designees, assignees, successors, properties, or assets. Neither Buyer nor the Debtors is required to comply with any "bulk sales" or similar laws relating to the transfer of the Assets.

11.     All entities who are presently, or who as of the Closing may be, in possession of some or all of the Assets hereby are directed to surrender possession of the Assets to Buyer as of the Closing.

12.     Excluded Assets are not property of the Buyer. To the extent a creditor of the Debtors holds a Lien in any Excluded Asset, (i) such lien is unaffected by this Order, and (ii)

such creditor continues to hold a Lien in the applicable Excluded Asset(s) subject to the same extent, priority, and validity (if any), and defenses of the estate in any such Excluded Asset. If there are any Excluded Assets and/or proceeds thereof that come into the possession of the Buyer, (a) the Buyer shall hold such Excluded Asset and/or the proceeds thereof in trust for the benefit of the Debtors and such applicable secured creditor, and (b) the Buyer shall promptly deliver such Excluded Asset and/or the proceeds thereof to the Debtors (or, if required by a separate order of the Bankruptcy Court, to such applicable secured creditor).

13.     Nothing contained in any chapter 11 plan confirmed in this case or order confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

14.     Buyer shall be entitled to the protection of Section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal. The purchase by Buyer of the Assets is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code and, therefore, Buyer is entitled to the protection of section 363(m) of the Bankruptcy Code. Accordingly, the reversal, modification or appeal of the authorization provided herein to consummate the APA and the sale of the Assets shall not affect the validity of the sale to Buyer, unless such authorization is duly stayed pending such appeal before the Closing.

15.     The sale approved by this Order is not subject to avoidance or the imposition of costs and damages pursuant to Section 363(n) of the Bankruptcy Code. The consideration set forth in Section 2.07 of the APA to be provided by Buyer in exchange for the Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

16.    The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court; provided, that any such modification, amendment or supplement does not have an adverse effect on the Debtors' estate.

17.    On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Assets or a bill of sale transferring good and marketable title in such Assets to Buyer.

18.    The automatic stay pursuant to 11 U.S.C. § 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of this Court, to (i) allow Buyer to deliver any notice provided for in the APA and (ii) allow Buyer to take any and all actions permitted under the APA in accordance with the terms and conditions thereof.

19.    The failure to specifically include any particular provision of the APA in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the APA and each and every provision, term and condition thereof be authorized and approved in their entirety.

20.    As provided by Bankruptcy Rules 6004(g), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and the sale approved by this Order may close immediately upon entry of this Order, notwithstanding any otherwise applicable waiting periods.

21.    The sale of the Assets to Buyer in accordance with the APA is a sale in contemplation of a plan and, accordingly, is a transfer pursuant to 11 U.S.C. §1146(a), which shall not be taxed under any law imposing a stamp tax, recording tax transfer tax, or other similar

tax; provided, that a chapter 11 plan for the Debtor be confirmed within 180 days of the date hereof, subject to extensions for cause. Any taxes covered by this paragraph shall be held in an interest bearing escrow account until (a) the confirmation of a chapter 11 plan for the Debtor or (b) the failure to confirm a chapter 11 plan for the Debtor within the time provided in this paragraph, at which time such funds shall be released to the Debtors' estate, for distribution pursuant to the chapter 11 plan, or, failing plan confirmation, to the relevant taxing authority.

22.     All of the rights of the estate and the Official Committee of Unsecured Creditors on behalf of the Debtor's estate with respect to the allocation and distribution of the sale proceeds, but not the transfer of assets to Buyer free and clear of all Liens and Claims, are expressly reserved and preserved.

23.     The provisions of this Order are non-severable and mutually dependent.

24.     This Order is the "*Approval Order*" described in the APA.

25.     A true copy of this Order (exclusive of exhibits) shall be served on all parties-in-interest by regular, first class mail within seven (7) days of the date hereof.

26.     The requirement pursuant to Local Bankruptcy Rule 9013-1(b) for the filing of a separate memorandum of law in conjunction with the Motion is hereby waived.

27.     The Parties are hereby directed to close immediately upon entry of this Order.

Dated: New York, New York
      February ___, 2010


**STUART M. BERNSTEIN, CHIEF UNITED
STATES BANKRUPTCY JUDGE**

# EXHIBIT B

## FORM OF GENERAL ASSIGNMENT AND BILL OF SALE[1]

This General Assignment and Bill of Sale (this "General Assignment and Bill of Sale") is being delivered pursuant to that certain Asset Purchase Agreement, dated as of January [__], 2010 (the "Asset Purchase Agreement") by and between _____, a _____ ("Assignor") and _____, a _____ ("Assignee").

A.    Assignor and Assignee have entered into the Asset Purchase Agreement, assigning, among other things, all right, title and interest in and to the Acquired Assets from Assignor to Assignee.

B.    Any capitalized term used but not otherwise defined in this General Assignment and Bill of Sale has the meaning ascribed to such term in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the good and valuable consideration set forth in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all Liens (other than Liens securing the Sterling Obligations) and Claims, effective as of [_____], 2010, all of Assignor's right, title and interest in and to all of the Acquired Assets.

Assignor agrees (a) to furnish upon request to Assignee such further information, (b) to execute and deliver to Assignee such other documents, and (c) to do such other acts and things, all as Assignee may reasonably request for the purpose of carrying out the intent of this General Assignment and Bill of Sale and the transactions contemplated by this General Assignment and Bill of Sale.

To the extent any terms and provisions of this General Assignment and Bill of Sale are in any way inconsistent with or in conflict with any term, condition or provision of the Asset Purchase Agreement, the Asset Purchase Agreement shall govern and control.

---

[1] In the event that Buyer designates one or more of its Affiliates to acquire the Acquired Assets pursuant to the Asset Purchase Agreement, this Form shall be modified by Seller to the extent required to reflect such designation.

sf-2550401

IN WITNESS WHEREOF, Assignor has caused this General Assignment and Bill of Sale to be executed by its duly authorized representative as of the date first above written.

**ASSIGNOR:**

By: _____
Name:
Title:

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT[2]

This Assignment and Assumption Agreement (this "Assignment and Assumption") is made and entered into as of [＿＿＿＿＿], 2010, by and among ＿＿＿＿＿, a ＿＿＿＿＿ ("Assignor"), and ＿＿＿＿＿, a ＿＿＿＿＿ ("Assignee").

## RECITALS

A.    Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of January [＿], 2008 (the "Asset Purchase Agreement"), pursuant to which Assignee has agreed to purchase from Assignor the Acquired Assets.

B.    Upon the terms and subject to the conditions of the Asset Purchase Agreement, Assignor has agreed to assign the Acquired Assets to Assignee, and Assignee has agreed to assume from Assignor the Assumed Obligations.

C.    Any capitalized term used but not otherwise defined in this Assignment and Assumption has the meaning ascribed to such term in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the good and valuable consideration set forth in the Asset Purchase Agreement and the premises and the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.    Assignment and Assumption.  Assignor hereby assigns to Assignee, and Assignee hereby assumes from Assignor and shall thereafter be responsible for the payment, performance or discharge of the Assumed Obligations.  Notwithstanding anything to the contrary in this Assignment and Assumption, except for the Assumed Obligations, Assignee shall not assume and shall not be in any way liable or responsible for (whether directly, indirectly, contingently or otherwise) any Excluded Liabilities, and the parties hereto agree that all such Excluded Liabilities shall remain the sole responsibility of Assignor.

2.    Conflict with Terms of the Asset Purchase Agreement.  To the extent any terms and provisions of this Assignment and Assumption are in any way inconsistent with or in conflict with any term, condition or provision of the Asset Purchase Agreement, the Asset Purchase Agreement shall govern and control.

3.    Further Assurances.  Assignor and Assignee each agrees (a) to furnish upon request to each other party hereto such further information, (b) to execute and deliver to each other party hereto such other documents, and (c) to do such other acts and things, all as the other

---

[2] In the event that Buyer designates one or more of its Affiliates to acquire the Acquired Assets and/or assume the Assumed Obligations pursuant to the Asset Purchase Agreement, this Form shall be modified by Buyer and Sellers to the extent required to reflect such designation.

Exhibit C-1

sf-2550401

party hereto may reasonably request for the purpose of carrying out the intent of this Assignment and Assumption and the transactions contemplated by this Assignment and Assumption.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNOR:**

By:
Name:
Title:

**ASSIGNEE:**

By:
Name:
Title:

Exhibit C-2

sf-2550401

# EXHIBIT D

## FORM OF TRADEMARK ASSIGNMENT[3]

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## TRADEMARK ASSIGNMENT

This Trademark Assignment (this "Trademark Assignment") is being delivered pursuant to that certain Asset Purchase Agreement, dated as of January __, 2010 (the "Asset Purchase Agreement") by and between _____, a _____ ("Assignor") and _____, a _____ ("Assignee").

A.     Assignor owns certain trademarks and/or service marks, and applications and/or registrations for such marks, as listed in Attachment A attached hereto and incorporated herein by this reference (the "Marks").

B.     Assignor and Assignee have entered into the Asset Purchase Agreement, assigning, among other things, all right, title and interest in and to the Marks from Assignor to Assignee.

C.     Any capitalized term used but not otherwise defined in this Trademark Assignment has the meaning ascribed to such term in the Asset Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration as set forth in the Asset Purchase Agreement, the receipt and sufficiency of which hereby is acknowledged, Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all Liens (other than Liens securing the Sterling Obligations) and Claims, Assignor's entire right, title and interest in and to the Marks, and to the applications and/or registrations for the Marks, together with the goodwill of the business symbolized by the Marks, including the right to sue and recover for any past infringement thereof.

IN WITNESS WHEREOF, Assignor has caused this Trademark Assignment to be executed by its duly authorized representative as of the date first above written.

**ASSIGNOR:**

_____

By:
Name:
Title:

---

[3] In the event that Buyer designates one or more of its Affiliates to acquire the Acquired Assets pursuant to the Asset Purchase Agreement, this Form shall be modified by Seller to the extent required to reflect such designation.

**ATTACHMENT A TO TRADEMARK ASSIGNMENT**

## FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT[4]

## DOMAIN NAMES ASSIGNMENT AGREEMENT

This Domain Names Assignment Agreement (this "Domain Names Assignment Agreement") is made as of [_____], 2010, by and between _____, a _____ ("Assignor") and _____, a _____ ("Assignee").

## RECITALS

A.    Assignor is the sole owner of all right, title and interest in and to the domain names set forth on Schedule 1 hereto (collectively, the "Domain Names") as part of the entire business or portion thereof to which the Domain Names pertain.

B.    Assignor has duly registered the Domain Names with [NAME OF REGISTAR] (the "Registrar").

C.    Assignor and Assignee have entered into that certain Asset Purchase Agreement, dated as of January [__], 2010 (the "Asset Purchase Agreement"), assigning, among other things, all right, title and interest in and to the Domain Names from Assignor to Assignee.

D.    Any capitalized term used but not otherwise defined in this Domain Names Assignment Agreement has the meaning ascribed to such term in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

1.    Assignment.  Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all Liens (other than Liens securing the Sterling Obligations) and Claims, and as contemplated by the Asset Purchase Agreement, all of Assignor's right, title and interest throughout the world in and to the Domain Names.

2.    Transfer of Domain Names and Rights.  Assignor has prepared and submitted or will promptly prepare and submit to the appropriate individuals or entities all forms and other documents requested by Assignee to transfer the Domain Names and Rights to Assignee. Further, Assignor will take all other actions requested by Assignee to transfer the Domain Names and Rights to Assignee.

3.    Further Assurances.  Assignor agrees (a) to furnish upon request to Assignee such further information, (b) to execute and deliver to Assignee such other documents, and (c) to do such other acts and things, all as Assignee may reasonably request for the purpose of carrying

---

[4] In the event that Buyer designates one or more of its Affiliates to acquire the Acquired Assets pursuant to the Asset Purchase Agreement, this Form shall be modified by Buyer and Seller to the extent required to reflect such designation.

out the intent of this Domain Names Assignment Agreement and the transactions contemplated by this Domain Names Assignment Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Domain Names Assignment Agreement to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNOR:**

By:_____
Name:
Title:

**ASSIGNEE:**

By:_____
Name:
Title:

**FORM OF FIRPTA CERTIFICATE**

**FIRPTA NOTIFICATION LETTER**
**CERTIFICATE OF NON-FOREIGN STATUS**

1.     Section 1445 of the U.S. Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, a _____ ("Seller"), the undersigned hereby certifies under penalties of perjury the following on behalf of Seller:

(a)     Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder) or a nonresident alien for U.S. income tax purposes;

(b)     Seller's U.S. employer identification number is _____; and

(c)     Seller's office address is _____.

2.     Seller understands that this Certification may be disclosed to the U.S. Internal Revenue Service by the transferee and hereby consents to such disclosure, and Seller understands that any false statement contained herein could be punished by fine, imprisonment, or both.

3.     Under penalties of perjury I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Seller.

[_____]

By: _____
Name:
Title:
Dated:

# EXHIBIT G

# FORM OF BIDDING PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
In re                                               :
                                                    :    **Chapter 11**
SPA CHAKRA, INC. , *et. al.*,[1]                    :
                                                    :    **Case No. 09-17260 (SMB)**
                                                    :
                        **Debtors.**                :    **(Jointly Administered)**
-------------------------------------------------------- x

### ORDER APPROVING AUCTION PROCEDURES IN CONNECTION WITH THE DEBTORS' MOTION FOR (I) AUTHORITY TO SELL ASSETS, AND (II) APPROVAL OF THE AUCTION PROCEDURES RELATED THERETO

Upon consideration of the relief requested in Part I of the Debtors' motion dated December 26, 2009 ("**Motion**")[2], pursuant to sections 105, 363, and 365 of chapter 11, title 11 of the United States Code ("**Bankruptcy Code**") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), for an order: (i) authorizing and approving the Auction Procedures annexed hereto as Exhibit A in connection with the proposed sale of the Assets[3] to the Buyer or a qualified bidder submitting a higher and better offer; (ii) authorizing and approving the Auction and Hearing Notice, in the form annexed hereto as Exhibit B; (iii) authorizing and approving the terms of the APA annexed to the Motion as Exhibit A, including, without limitation, the Break-Up Fee payable to Buyer upon the terms and conditions set forth therein; and (iv) establishing the dates, time and place of the Auction and the Sale Hearing; and the Court having considered the Motion and opposition to the Motion, if any; and the Court having further considered the arguments of counsel at the hearing on the Motion, if

---

[1] The Debtors are the following entities: Spa Chakra, Inc., a Delaware corporation; Spa Chakra, LLC, a Delaware limited liability company; Spa Chakra Indiana, LLC, an Indiana limited liability company; Spa Chakra Fifth Avenue, LLC, a Delaware limited liability company; and Spa Chakra Fifth Avenue Indiana, LLC, an Indiana limited liability company.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] The Assets are comprised of the "Assets" and the "Additional Assets" under the APA.

#2022419 v2 \020504 \0007

any; and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b), and (c) due and proper notice of the Motion has been given to all appropriate parties in accordance with applicable law, rules and procedures; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the Break-Up Fee, as provided for under the APA, (i) is the product of an arms'- length, good faith negotiation between the Debtor and Buyer, (ii) is designed to encourage the Debtor's receipt of higher and better offers for the Assets, and (iii) is for a reasonable amount in relation to the proposed purchase price for the Assets; and the Court having considered any and all objections to the Auction Procedures and other relief which are the subject of this Order; and the Court having determined that the relief sought in Part I of the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**:

1.      The Auction Procedures annexed hereto as Exhibit A are hereby authorized and approved in all respects.

2.      The form and sufficiency of the Auction and Hearing Notice annexed to the Motion as Exhibit B is hereby approved.

3.      The Debtors are hereby authorized and directed to pay a Break-Up Fee equal to three percent of the purchase price payable under the APA and Expense Reimbursement in the event that the Debtors enter into an Alternative Transaction.

4.      The sale of the Assets to the Buyer under the APA shall be subject to higher and better offers. The Debtors are authorized to solicit higher and better offers for the Assets and to

conduct the Auction, in accordance with this Order and the Auction Procedures, for the purpose of entertaining an Alternative Transaction. Actual Bidders who have complied with the Bidding Procedures may improve their bids at the Auction, in increments of at least $100,000.

5. All objections to Part I of the Motion, to the extent not withdrawn or resolved, are hereby overruled.

6. Objections, if any, to the relief requested in Part II of the Motion and any filed supplements thereto, including objections to a sale of the Assets, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served upon: (a) Debtor's counsel, Morrison Cohen, LLP, 909 Third Avenue, New York, NY 10022, Attn: Joseph T. Moldovan, Esq., Tel. 212-735-8600, Fax: 917-522-3103; (b) John Fredericks, Esq., Winston & Strawn LLP, 101 California Street, Suite 3900, San Francisco, California 94111, counsel for Lender, (c) Michael S. Amato, Esq., Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556-1425, proposed counsel for the Committee, and (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (collectively, "*Notice Parties*"), so as to be actually received by 4:00 p.m. New York City Time on January ___, 2010 ("*Objection Deadline*").

7. The Court shall conduct the Sale Hearing on February ___, 2010, at ___:00 _.m. New York City Time to consider the relief requested in Part II of the Motion (as defined in the Motion) to confirm and approve the sale of the Assets pursuant to sections 105, 363, 365, and 1146 of the Bankruptcy Code.

8. This Court shall retain exclusive jurisdiction to: (i) the interpret, implement, and enforce the terms and provisions of this Order; (ii) enter Orders in aid or furtherance of this

Order; and (iii) adjudicate any and all remaining issues concerning the Debtors' right and authority to assume and assign executory contracts and unexpired leases and sell the Assets, including to approve the sale of the Assets at the Sale Hearing.

9.     The requirement pursuant to Local Bankruptcy Rule 9013-1(b) for the filing of a separate memorandum of law in conjunction with the Motion is hereby waived.

Dated: January __, 2010

_____
UNITED STATES BANKRUPTCY JUDGE

## SCHEDULE 2.01(a)(ix)

## LIST OF ASSUMED EXECUTORY CONTRACTS

*[To be filed prior to the Sale Hearing in accordance with the Bidding Procedures Order]*

**SCHEDULE 2.01(a)(x)**

**LIST OF ASSUMED REAL PROPERTY LEASES**


*[To be filed prior to the Sale Hearing in accordance with the Bidding Procedures Order]*

# SCHEDULE 2.01(a)(xii)

# LIST OF PERMITS

| Type of Permit | Agency | License/Permit Number | Location |
|---|---|---|---|
| Food Service Establishment | City of New York, Department of Health and Mental Hygiene | H25 131670 FB | Fifth Avenue, New York |
| Certificate of Authority | NY State Department of Taxation and Finance | 264193154 | Fifth Avenue, New York |
| Appearance Enhancement License | NY State Division of Licensing Services | 215P1325316 | Fifth Avenue, New York |
| Bathing Establishment | City of NY, Department of Health and Mental Hygiene | H41 1309869 PR | Fifth Avenue, New York |
| Massage Establishment | City of Chicago | 1922219 | Palmer House, Chicago |
| Business License | City of Chicago | 1922218 | Palmer House, Chicago |
| Certificate of Registration | Illinois Business Authorization, Department of Revenue | 016-0001-1-001 | Palmer House, Chicago |
| Registered Retail Merchant Certificate | Indiana Department of Revenue | 0123966191 | Indianapolis |
| Manicuring Salon License | Indiana Professional Licensing Agency Cosmetology Board | MS30700974 | Indianapolis |
| Esthetic Salon License | Indiana Professional Licensing Agency Cosmetology Board | EH30700975 | Indianapolis |
| Permit to Operate and Certificate of Sanitary Inspection | Department of Public Health, Environmental Health Section | M-02467 | San Francisco |
| Establishment License | Board of Barbering and Cosmetology | 222665 | San Francisco |
| Bathing Establishment | City of NY, Department of Health and Mental Hygiene | 41412917 | Waldorf, New York |
| Appearance Enhancement License | Department of State, Division of Licensing Services | 21SP1311185, control# 939780 | Waldorf, New York |

Schedule

## SCHEDULE 2.01(a)(xvi)

## SUBSIDIARIES

| No. | Name | Percentage Owned | Owned by |
|---|---|---|---|
| | | | |
| 1. | Spa Chakra Switzerland AG | 100% | Spa Chakra, Inc. |
| 2. | Spa Chakra SARL | 100% | Spa Chakra, Inc. |
| 3. | Spa Chakra Italia SRL | 100% | Spa Chakra, Inc. |
| 4. | Spa Chakra, LLC (Hong Kong) | 100% | Spa Chakra, Inc. |
| 5. | Spa Chakra, Inc. Shanghai Representative Office | 100% | Spa Chakra, Inc. |
| 6. | Spa Chakra Korea, Inc. | 100% | Spa Chakra, Inc. |
| 7. | Spa Chakra Management Pty Ltd. | 100% | Spa Chakra, LLC |

Schedule

# SCHEDULE 2.03(h)

## OTHER EXCLUDED ASSETS

The Acquired Assets shall not include Sellers' right, interest, and title in, to, and under the following:

| No. | Description |
| --- | --- |
| | |
| 1. | Lease Agreement dated June 2, 2009, between Elcom Hotel and Spa, LLC and Spa Chakra, LLC |
| 2. | Lease Agreement dated March 1, 2006, between Avalon Hotel Owner, LLC and Spa Chakra Indiana, LLC |
| 3. | Lease Agreement dated August 15, 2007, between Short Hills Hilton, LLC and Spa Chakra, LLC |
| 4. | Collective Bargaining Agreement between United/Here New York New Jersey Regional Joint Board Local 96 and Hilton Short Hills |

Schedule