DUANE MORRIS LLP
Walter J. Greenhalgh (pro hac admission pending)
Joseph H. Lemkin
Patricia H. Heer
1540 Broadway, 14th Floor
New York, NY 10036-4086
(212) 692-1000
(212) 692-1020 (facsimile)

*Counsel for GVK Limited Partners*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SPA CHAKRA, INC., *et al.*, | : | Case No. 09-17260 (SMB) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

## OBJECTION OF GVK LIMITED PARTNERS TO DEBTORS' MOTION FOR AN ORDER: (i) APPROVING THE ASSET PURCHASE AGREEMENT; (ii) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS AN ENCUMBRANCES; (iii) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES; (iv) APPROVING AUCTION PROCEDURES RELATED THERETO; AND (v) GRANTING RELATED RELIEF

GVK Limited Partners ("GVK"), a creditor in the above captioned case, by and through

its attorneys, Duane Morris LLP, hereby objects (the "Objection") to the motion of Spa Chakra,

Inc. ("Spa Chakra") and the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), for an order pursuant to §§ 105(A), 363, 365, 503, and 1146(A) of title 11 of the

United States Code (the "Bankruptcy Code") and  Federal Rules of Bankruptcy Procedure 2002,

6004, 6006, 9008, and 9014 (the "Bankruptcy Rules"): (i) Approving the Asset Purchase

Agreement; (ii) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All

Liens, Claims and Encumbrances; (iii) Authorizing Assumption and Assignment of Certain

Executory Contracts and Leases; (iv) Approving Auction Procedures Related Thereto; and (v) Granting Related Relief (the "Motion"). In support of the Objection, GVK represents as follows:

## PRELIMINARY STATEMENT

1. The Debtors' Motion seeks approval of the sale of substantially all of the assets (the "Assets") of the Debtors to Hercules Technology II, L.P. ("Hercules"), the Debtors' pre-petition lender (the "Sale"), pursuant to the terms of an asset purchase agreement (the "APA") along with procedures for bidding and an ultimate auction if qualified bids are received (the "Proposed Procedures"). GVK objects to the Sale going forward on the proposed expedited basis given the limited financial information provided to any entity other than Hercules, including, upon information and belief, the Committee of Unsecured Creditors (the "Committee"), despite requests by GVK for such information. In addition, many aspects of the proposed procedures by which the Debtors intend to consider competing bids, and potentially conduct an auction, are flawed and should not be approved.

2. At minimum, as urged by GVK in its objection (the "DIP Financing Objection") to Debtors' motion seeking approval of post-petition financing (the "DIP Financing") which Objection is incorporated herein by reference, a detailed accounting of the Debtors' finances and a fair valuation of the Debtors' assets is required before the sale process takes its course.

3. Neither GVK, nor upon information and belief, any other pre-petition creditor of the Debtors was a party to the prepetition negotiations by the Debtors with Hercules and GVK was neither invited to, nor did it participate in, the negotiations with the Debtors and Hercules with respect to the Sale. GVK has no direct knowledge of the prepetition negotiations or the accuracy of the limited description of the negotiations with Hercules in the Motion.

4.      Instead of disclosing information that GVK requested over one month ago in its application pursuant to Bankruptcy Rule 2004 (the "Examination Application") or pursuant to GVK's pleas echoed in the DIP Financing Objection, the Debtors have continued to press the Sale to its prepetition lender without providing relevant financial information to anyone other than Hercules. Moving forward with the Sale before the Debtors provide any of the requested information to GVK or the Committee is in essence seeking approval of *sub rosa* plan, completely undermining the procedures for confirmation of a plan of reorganization under the Bankruptcy Code. Notably, the § 341(a) meeting of creditors has not event taken place yet.

5.      The proposed fast track sale procedures should not be authorized by the Court and the Debtors should proceed to reorganize through the ordinary course – a plan and disclosure statement process governed by the Bankruptcy Code, giving *all* creditors ample opportunity for inquiry and examination into the Debtors financial affairs. There is no genuine basis to support using a fast-track § 363 sale process in this case instead of a reorganization plan process. The Debtors' claims of extreme urgency are contrived and unsupportable. The Debtors' assertions of decreasing asset values is hardly a worthwhile cry, as the Debtors themselves are intentionally stalling the Sale process by refusing to provide anyone other than Hercules with necessary information. A plan process can amply address time concerns relating to the purported deterioration of the Debtors' assets while also preserving the important due process and creditor protections provided for in the Bankruptcy Code.

6.      To the extent the Court is inclined to authorize the Debtors to proceed with an expedited sale process under §363 of the Bankruptcy Code, the Motion should be denied in its current form for several reasons. First and foremost, the Motion should be denied as proposed because the Debtors have failed to satisfy the business judgment test.

7.      Second, the Proposed Procedures provide no indication of the extent to which the Debtors have exposed and will expose the Assets to the market in order to ensure that the sale will bring the highest and best price for the Assets.  Moreover, the Proposed Procedures do not require that exhibits to the APA be provided until two (2) days before the deadline for submission of bids, and do not require that such information be given to all potential buyers who express an interest in purchasing the Assets.  These disclosures should be made well before any initial bid deadline.  Without: (i) appropriate marketing; (ii) detailed financial information being provided to potential buyers; and (iii) sufficient time for proposed purchasers to digest the relevant information, the proposed "sale" process will be an expedited foreclosure process used to benefit the Debtors' alleged secured creditors and principals who will continue to be involved with the Debtors' businesses.

8.      Third, the APA provides that the sale of the Assets must be to a single bidder (the "Single Sale").  A bidder should be entitled to bid both piecemeal or for all of the Assets.  The Single Sale requirement will likely chill bidding, minimize value to the estate and will simply facilitate an expedited foreclosure process for the benefit Hercules, at the expense of other creditors.  Notably, the Motion is silent regarding the benefit of, or the necessity for the Single Sale requirement.  Indeed, allowing for bids on a piece-meal basis may result in a benefit to the estates.  Many of the Debtors' spas are located at prominent hotels throughout the United States and abroad who may want to terminate their relationships with Spa Chakra.  While these hotels may be willing to bid on their own properties, they would not likely be interested in spas at other locations.  Affording the various hotels and other facilities to bid on their own properties may ultimately inure to the benefit of the estate.  A combination of such  piecemeal proposals may exceed the bulk bid of Hercules.

9.      Fourth, the "break-up fee" sought by the Debtors and Hercules is excessive.  The Debtor has requested approval of a break-up fee of three percent (3%) of the of the purchase price if Hercules is outbid.  Further, Hercules seeks reimbursement of its fees and expenses in an amount up to $200,000 if it is not the successful bidder. A break-up fee and expense reimbursement on these terms is excessive.

10.      Fifth, the Proposed Procedures require that all competing bids must exceed Hercules' bid by at least $540,000.00 – more than twice the proposed break-up fee amount, presuming a sale price of $8 million.  While it makes good sense for initial "overbids" to exceed a stalking horse price by the amount of a reasonable break-up fee, the requirement that overbids exceed the stalking horse price by more than twice the amount of the proposed break-up fee is unsupportable.  Moreover, the Proposed Procedures require that any subsequent bids be in increments of $100,000.00.  This is excessive and can only serve to chill bidding.  Accordingly, this provision should not be approved.

11.      Next, the Proposed Procedures provide for credit bidding by Hercules.  While a lenders' ability to credit bid is a matter of statute, neither the Debtors nor Hercules have demonstrated the validity of Hercules' liens.  *See* 11 U.S.C. § 363(k).

12.      For each of the foregoing reasons, and as more fully set forth below, GVK objects to the Motion on the terms proposed by the Debtors, and respectfully request that the Court deny the Motion, or at minimum modify the Proposed Procedures to provide for a transparent and productive auction process.

**BACKGROUND**

13.      On December 10, 2009 (the "Petition Date"), Spa Chakra along with certain of the related affiliates (collectively the "Debtors"), each filed petitions for relief under chapter 11

of the Bankruptcy Code, including the converted case of Spa Chakra Fifth Avenue, LLC ("Fifth Avenue," collectively, the "Chapter 11 Cases"). The Chapter 11 Cases are being jointly administered for procedural purposes.

14.     The Debtors assert that prior to the Petition Date, Fifth Avenue became indebted to Sterling National Bank ("Sterling") in the amount of $610,000.00, secured by a first-priority lien and security interest.

15.     In addition, the Debtors became indebted to Hercules in the amount of $13,707,046.72, purportedly secured by a first-priority lien and security interest, and subsequently in the amount of $57,000.00, also purportedly secured by a first-priority lien and security interest.

16.     On December 10, 2009, the Debtors filed a motion seeking an order authorizing the Debtors to use cash collateral of, and to obtain DIP Financing in the form of a secured loan up to $800,000 from Hercules at a rate of 17% with a default rate of 19%.

17.     On December 15, 2009, the Court entered an Interim Order, which was subsequently extended from time to time, authorizing, among other things, the Debtors to use cash collateral and to enter into that certain DIP Credit Agreement (the "Credit Agreement") with Hercules for the DIP Financing on an interim basis (the "Post-Petition Debt"). Pursuant to the DIP Financing and Interim Order, Hercules was granted a first-priority perfected lien in all of the Debtors' property and assets subject only to the liens of Sterling and various carve-outs. On an interim basis, the Post-Petition Debt has been granted priority in accordance with provisions of Section 364(c) of the Bankruptcy Code over any and all administrative expense claims and unsecured claims against the Debtors (the "Superpriority Claim"). Hercules was also granted replacement liens to the extent of any diminution in the value of the pre-petition collateral.

Further, as a requirement to the interim DIP Financing, the Debtors stipulated as to the validity of pre-petition liens and obligations related to Hercules and Sterling. A final hearing regarding DIP financing is scheduled for February 26, 2010.

18.     The Debtors proposed DIP Financing is conditioned on the Sale to Hercules or to an alternative buyer approved by Hercules. Specifically, the DIP Financing would terminate in the event the Proposed Procedures and Sale are not approved and entered by the Court according to the expedited plan being forced upon the Debtors by Hercules.

19.      It was not until December 22, 2009 that the Committee was appointed to investigate the pre-petition financing of the Debtors, the DIP Financing, the Sale of the Debtors' Assets to Hercules or the Debtors' pre-petition finances, books and records and other transactions. To date, however, upon information and belief the Debtors have provided limited financial information to the Committee and nothing to other creditors or potentially interested purchasers, such as GVK.

20.     Apparently devoid of exercising its own business judgment but instead coerced by Hercules, the Sale is an attempted end-run around the requirements of the chapter 11 process, seeking approval of a *sub rosa* plan without following the required procedures for confirmation of a plan of reorganization under the Bankruptcy Code.

21.     Pursuant to the APA, the purchase price for the Sale is $8,000,000.00 minus (i) an amount equal to the Final Cure Costs; and (ii) an amount, equal to (1) the DIP Obligation[1] that are not credited against the Cash Consideration by Hercules to Debtors for the Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code; (2), upon the exhaustion of the DIP Obligations, the Prepetition Senior Obligations that have not been credited against the Cash

---

[1] All capitalized terms not otherwise defined in this Objection shall have the meanings ascribed to them in the Motion or APA.

Consideration by Hercules to Debtors for the Assets pursuant to Section 363(k) of the Bankruptcy Code; and (3) the assumption of the Assumed Obligations.  APA, § 2.07.

22.     The Assets to be purchased pursuant to the Sale are substantially all of the Debtors' assets, including: (i) all cash; (ii) accounts receivables; (iii) inventory; (iv) machinery and equipment; (v) personal property including office furnishings and furniture; (vi) intellectual property assets; (vii) computer software; (viii) deposits and advances; (ix) assumed executory contracts; (x) assumed real property non-residential leases; (xi) all books and records; (xii) permits; (xiii) all commercial torts and other claims; (ivx) goodwill generated by or associated with the Business; (xv) all issued and outstanding stock, membership interests, or other equity interests in the subsidiaries.  APA, § 2.01.

23.     The obligations to be assumed pursuant to the Sale include (i) the liabilities and obligations arising on or after the Closing Date under assumed executory contracts and assumed real property leases; (ii) the costs of cure required to be satisfied in order for the Debtors to assume and assign each assumed executory contract and assumed real property lease (collectively, the "Final Cure Costs"); (iii) the liabilities and obligations of the Debtors under permits to the extent such permits are transferable by the Debtors and are included in the Acquired Assets; (iv) the gift card liabilities and obligations of the Debtors as set forth on Schedule 2.04(a)(iv); (v) the liabilities and obligations of the Debtors under the Sterling Loan Agreement; and (vi) the liabilities and obligations of the Debtors as set forth on Schedule 2.04(a)(vi).

24.     In addition, Hercules is entitled to a break-up fee equal to three percent (3%) of the purchase price, plus a reimbursement of all reasonable, and actual out-of-pocket and third-

party costs and expenses in connection with Hercules' due diligence investigation of the Debtors up to a maximum of $200,000.

25. According to the Proposed Procedures, the Debtors propose to mail the notice of sale of the Assets to all potential purchasers identified by the Debtors and to publish a copy of the auction either in the USA Today or the Wall Street Journal, New York Edition.

26. Further, the Proposed Procedures provide that Assets are to be sold to a single bidder, in a single sale and that all bidders shall have signed an agreement no less favorable than the APA, as determined in the Debtors' discretion, in consultation with the Creditors' Committee.

27. According to the Proposed Procedures, the Debtors will file within five (5) business days before the Sale hearing scheduled for February 25, 2010, a list of executory contracts and unexpired leases to be assumed and their proposed cure amounts on, *inter alia*, counterparties to the agreements and parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

28. Pursuant to the Proposed Procedures, a competing  bid for the Assets must be at least the net amount of at least the consideration which the Debtors value at approximately $8 million in the aggregate, plus an additional $540,000 (an amount equal to the Break-Up Fee, Expense Reimbursement, and Purchase Price Protection approved by the Court), plus assumed liabilities of at least $2.7 million.

29. All bids must be submitted by February 22, 2010; the auction is to take place on February 24, 2010; and the sale hearing on February 25, 2010.

30. Bidders may improve their bids at the Auction in increments of at least $100,000.

## OBJECTION

### A.    The Sale Does Not Satisfy The Business Judgment Test

31.    Prior to confirmation of a plan of reorganization, a debtor-in-possession may sell assets of its estate outside the ordinary course of business pursuant to § 363(b)(1) of the Bankruptcy Code.  *See* 11 U.S.C. § 363(b)(1).  In determining whether to approve such a sale, a sale must represent an exercise of a debtor's sound business judgment.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("the rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); s*ee Fulton State Bank v. Shipper (In re Shipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (sales are an exercise of a fiduciary duty that requires an articulated business justification); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986). A debtor has a duty to maximize the value obtained from a sale.  *Psychrometirc Systems*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007); *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985) (sale must result in the estate obtaining the best price possible under the circumstances).

32.    The Debtors fail to adequately demonstrate how the sound business purpose test is met where, as here, unsecured creditors are likely to be harmed by the proposed transaction.  In the context of reviewing the appropriateness of asset sales that occur before the confirmation of a plan of reorganization, the "sound business purpose" test consists of four elements.  Under the test, a debtor-in-possession has the burden of proving that "(1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable."  *WBQ Partnership v. Virginia Dep't of Medical*

*Assistance Servs. (In re WBQ Partnership)*, 189 B.R. 97, 102 (Bankr. D. Va. 1995) (citing *In re Delaware & Hudson Rwy. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr. N.D. Ohio 1994); and *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991)).

33.     In the Motion, however, the Debtors devote only one paragraph to addressing the numerous elements of the "sound business purpose" test. Motion, ¶66. The conclusory and self-serving statements that are contained merely state that the proposed sale of assets would provide cash to the Debtors' estates. The Debtors do not address, let alone justify, how a sale potentially harmful to unsecured creditors possibly satisfies these tests. This showing is simply insufficient to meet the four prongs of the "sound business purpose" test.

34.     With respect to the issue of good faith, in light of the fact that the Motion and the DIP Financing Motion, taken together, amount to a complete foreclosure on the Debtors' assets in favor of the Debtors' pre- and post-petition secured lender, conducted under the protection of the Bankruptcy Code for no other apparent reason other than to minimize successor liability risk and to provide the secured creditor with a windfall (i.e., the difference between liquidation value, which the lender bargained for, and the going concern value for which the assets are being sold, which belongs to the Debtors' estates and its creditors). The Debtors have failed to demonstrate why a sale that transfers going concern value from unsecured creditors to the Debtors' purported secured creditor is consistent with the Debtors' good faith obligations and the fiduciary duty owed by the Debtors, their professionals, and their respective officers and directors.

35.     Noticeably absent from the Motion is any discussion as to what impact the Sale of the Assets as a single transaction will have on the value of the Assets as a whole. Certainly, at a minimum, the Debtors must demonstrate that the proposed Single Sale will enhance, and not

erode the value of the Assets in order to satisfy the business judgment standard. The Motion is completely devoid of such analysis and, for that matter, any facts as to why the sale makes sense from a business perspective.

36.     As set forth in the DIP Financing Objection, the proposed purchase price appears incredulous given information recently (approximately June, 2009) supplied by the Debtors' principal. It is GVK's understanding that the equity of Spa Chakra was $14 million in December 2006, $16 million in December 2007, $15 million in December 2008, and projected to be $20 million for 2009. As also noted in the DIP Financing Objection, the equity balance of Spa Chakra for the period ending May 2009 was asserted to be $19.7 million. Finally, pursuant to a conversation on or about November 11, 2009, between George Kolber of GVK and Spa Chakra President, Michael Canazales, GVK understood that the EBITDA (earnings before interest, taxes, depreciation and amortization) of Spa Chakra for the nine (9) months up to September 2009 equaled $7.5 million. In addition, recent information supplied to GVK suggested a $72 million value of the Debtors' business.

37.     Before commencing an expedited sale process, the Debtors should explain the basis for selling substantially all of their assets, for such nominal consideration. The Debtors have made little showing that the Assets are being sold for a purchase price that is fair and reasonable.

38.     Further with respect to the issue of whether the purchase price to be paid for the Debtors' assets is fair and reasonable, there is no indication of how the Assets were marketed and for how long. No information was provided as to what comparable business and assets may be selling for in the market or how publishing a copy of the auction in only one publication will

result in a higher price being obtained at the auction. The Debtors simply do not articulate how the Sale is in the best interests of their estates and creditors.

39. Further, the Committee was organized and appointed approximately four weeks ago and has had little time to adequately review the significant issues raised by the Sale of the Debtors' Assets or to discuss such issues with the Debtors or the Debtors' secured creditors, let alone be provided with and digest related information.

40. The Motion provides absolutely no information why the proposed Sale to Hercules represents an exercise of the Debtors' sound business judgment. Accordingly, GVK objects to the relief sought by the Debtors pursuant to the Motion as the Motion fails to satisfy the standards for allowance under §363. As noted above, the Proposed Procedures also are deficient, and the Court should not approve them. The Debtors have failed to articulate a valid business purpose behind the Sale and the Motion should be denied.

**B.** **The Proposed Procedures Do Not Provide For Sufficient Notice And Lack Sufficient Information Regarding Valuation**

41. The Motion does not indicate the extent to which the Debtors have exposed the Assets to the market to ensure that the sale of such Assets will bring the highest and best price for the Assets. Further, while the Debtors indicate that they will advertise the sale of the Assets "in either USA Today or Wall Street Journal, New York Edition," the Motion provides no indication as to how many times the advertisements will appear, making it difficult to analyze what type of market the Debtors have made for the Assets.

42. Notably, in April 2008, the Debtors sourced and coordinated an equity raise with the assistance of Piper Jaffray and Wedbush Securities. Apparently, Piper contacted approximately seventy-six (76) potential investors in 2008 which resulted in 21 meetings.

Having had the assistance of at least two investment banks in identifying potential investors, the Debtors should re-visit some of the sources previously identified as potential investors/ purchasers, instead of relying on a general publication to produce sufficient interested bidders for a meaningful and bidding process. Moreover, the due diligence information made available by Piper should be brought up to date by the Debtors and supplied to interested parties and creditors, such as GVK. Without such a focused marketing process, the bidding and auction will be nothing more than a co-operative foreclosure sale. A marketing program focused on trade publications and direct solicitation of previously interested parties should be a bare minimum requirement.

43.     Finally, the Debtors have not disclosed information regarding a valuation for the Debtors' businesses, which makes it impossible to analyze how the proposed purchase price of $8 million compares to market value. This information should be readily available to the Debtors and supplied to interested parties and creditors such as GVK.

44.     The Motion is also silent as to the value of the Assets at the time of the equity raise. The Debtors recently valued the business at $72 million. The Debtors should be required to explain the drastic difference between a recent valuation and the current proposed price. Indeed, even if the Assets were sold for $30 million, unsecured creditors would likely be paid in full.

45.     In addition, the Motion is silent regarding any benefits of the proposed Sale to Hercules to current shareholders, directors and/or management.

46.     In light of the Debtors' failure to provide any information regarding their marketing efforts with respect to the Assets, the advertisement of the sale of the Assets, or the estimated valuation of the Assets, GVK and all other creditors or potentially interested

purchasers are left without meaningful information to evaluate the terms of the Sale. It should also be noted that creditors have little, if any, information regarding the Debtors' ongoing operations. The Debtors have not yet filed monthly operating reports and have not yet appeared for a § 341(a) meeting of creditors.

47. Further, it should be noted that the Debtors filed the Motion on an emergent basis, providing the Committee and creditors with little time to review and react. Given: (i) the fast track nature of the Motion; (ii) the proposed fast-track nature of the sale; (iii) the proposed disposition of substantially all of the Debtors' assets; and (iv), with the lack of information cited above, GVK submits that the Motion should denied.

## C. Bidders Should Not Be Forced To Agree To The Single Sale

48. The APA requires that the Assets be sold to a single bidder in a single sale.

49. It cannot be credibly argued that such a provision will encourage bidding merely because Hercules has, for its own particular reasons, agreed to it. To the contrary, a single sale requirement will chill bidding. In fact, no effort has been made to determine whether selling the Assets in a single sale would maximize the sale price. The Debtors are affiliated with sixteen (16) different spa locations, strongly indicating that a piecemeal alternative may be available, which the single sale requirement forecloses without any justification. Indeed, GVK believes that a number of the lessors / licensors where the Debtors operations are located may be willing to pay a premium to extract them from relationships with the Debtors. The single sale requirement may not necessarily provide additional value to the estate.

50. Accordingly, GVK respectfully requests that any bidding procedures must consider piecemeal offers which in their entirety may exceed $8 million, and which may be determined the "best and highest" offer.

## D.     The Sale Terms Are Too Vague

51.     Pursuant to Fed. R. Bankr. P. 2002(c), the notice of a proposed sale is sufficient "if it generally describes the property."  Fed. R. Bankr. P. 2002(c).  The proposed sale is vague as to precisely which Debtor's assets are being sold.

52.     The APA with Hercules provides that the purchase price is $8,000,000, minus the Final Cure Amount, plus assumption of the Assumed Obligations [Final Cure Amount].  APA, §§ 2.04; 2.07.   It would appear then that the initial purchase price to be paid by Hercules is only $8,000,000, as the addition and subtraction of the Final Cure Amount results in a wash.  For competing bidders, however, a bid for the Assets appears to be markedly different: the sum of the consideration potentially payable under the APA, which the Debtors value at approximately $8 million in the aggregate plus, inter alia, assumed liabilities [Final Cure Amounts] of at least $2.7 million.  Accordingly, it is unclear whether Hercules must pay an additional $2.7 million as part of the purchase price or only competing bidders.

53.     Second, the Assets to be acquired as part of the Sale include assumed executory contracts.  APA, §2.01(ix).  The obligations to be assumed as part of the Sale include liabilities and obligations as set forth on a schedule and Final Cure Costs.  Neither the Motion nor the APA attach schedules or exhibits of, or even attempt to describe the extent of, the (i) assumed executory contracts, (ii) liabilities and obligations to be assumed, or (iii) the Final Cure Costs. The Debtors propose to file a list of the executory contracts to be assumed at least five days before the sale hearing.  Moreover, the Debtors propose to provide such lists only to the parties that are counterparties to executory contracts, parties holding an interest in the assets, the United States Trustee, and parties in interest who have requested a notice pursuant to Rule 2002.

54.     There is no indicia as to how many executory agreements are to be assumed or even if they can be assumed. Indeed, pursuant to 11 U.S.C. § 365(c), a debtor may not assume or assign an executory contract if applicable law excuses the counterparty from rendering performance to an assignee of such contract. *See* 11 U.S.C. § 365(c)(1)(A) and (B). *See also e.g.*, *TAP Publ'ns, Inc. v. Chinese Yellow Pages [New York], Inc.*, 925 F. Supp. 212, 218 (S.D.N.Y. 1996) (recognizing that a non-exclusive trade mark license is personal to the assignee and therefore, not freely assignable to a third party); *Allied Corp. v. Frola*, Civ. No. 87-462, 1992 WL 281114 (D.N.J. Oct. 6, 1992) (Wolin, J.) (holding that insurance policies are not assignable without the consent of the insurers); *Touchet v. Guidry,* 550 So. 2d 308, 313 (La. App. 3d Cir. 1989). There is no information set forth in the Motion as to whether all of the executory contracts to be assumed may in fact be assigned without the express consent of the counterparties or the counterparties' position.

55.     Therefore, potentially interested bidders, other than Hercules who has had access to such information for several months, have no way to determine whether an executory agreement will be assigned to it. Moreover, nowhere do the proposed procedures require the Debtors to provide this information to interested bidders even in the limited time available under the Debtors Proposed Procedures. Even if the Proposed Procedures required the Debtors to send the information to interested bidders, it is impossible for any potentially interested bidder to make a determination whether to bid on the Assets with such information disclosed only 2 days before submitting a bid.

56.     The descriptions of the Purchase Price, competing bids, the extent of the Assets and assumed obligations are incomplete and misleading. To evaluate each would require expending substantial time and effort to determine what is being sold and for what price. There

does not appear to be any valuation which would clearly define each of the Assets, further hindering the investigation of the Assets related to each of the spa location. Essential to the process of determining an appropriate counterbid is understanding the terms of the Sale and the expected cash-flow. This critical information and related documents are not readily available for review by interested parties, rendering the terms of the Sale, and the interests to be sold, incomplete. Again, the procedures proposed in the Motion will hinder competitive bidding and result solely in a cooperative foreclosure in favor of Hercules.

E.      **The Break-Up Fee Is Excessive And Should Not Be Approved**

57.     GVK recognizes that generally speaking, break-up fees are acceptable and approved by bankruptcy courts as part of section 363 sales. As the Debtors correctly note in the Motion, the prospect of a break-up fee can incentivize a bidder to prepare an asset purchase agreement, conduct due diligence and act as the stalking horse bidder. A break-up fee is designed to help a stalking horse bidder defray its costs in the event that another purchaser ultimately prevails at auction. Generally speaking, the amount of a proposed break-up fee is tied to the amount of fees and expenses that the stalking horse bidder has incurred in connection with its bid.

58.     Here, the APA contains a break-up fee of 3% in the event that the Debtors choose to accept an offer from a bidder other than Hercules. Neither the Motion nor the APA contain any clarity about how this fee will be calculated. It is not clear whether the fee contemplates 3% of $8,000,000 or of $10.7 million (which includes the Final Cure Amount). Moreover, Hercules is also entitled to receive a reimbursement of costs and expenses up to a maximum amount of $200,000. Accordingly, the break-up fee is not tied to Hercules' costs but instead an attempt to discourage competing bidders.

**F.**     <u>The Overbid Protections Should Not Be Approved</u>

59.    GVK further recognizes that overbid protections are common and acceptable in section 363 sales. Indeed, overbid protections embody the common-sense principle that, if a break-up fee is to be paid to the stalking horse bidder, the winning bid must be greater than the stalking horse bid by at least as much as the break-up fee in order for there to be a net benefit to the estate.

60.    Here, however, the overbid protections are not designed with these simple concepts in mind. The Debtors have asked the Court to approve an initial overbid amount of $540,000.00. The proposed purchase price is $8,000,000.00 and the proposed break-up fee is three percent (3%) of the ultimate purchase price. Three percent (3%) of $8,000,000.00 is $240,000.00. The proposed initial overbid is twice that amount. At that high level, it is evident that the proposed overbid amount will chill bidding.

61.    In addition, once the initial overbid amount has been achieved, there is a net benefit to the estate because the break-up fee has been compensated for by virtue of the overbid. Once that "net benefit" threshold has been met, however, there is no reason for any additional overbids to be in increments of $100,000.00. Although the Debtors may reasonably request that the Court establish a subsequent minimum overbid amount, in this case, the amount sought is not reasonable or supported on the record.

62.    For the foregoing reasons, GVK respectfully request that to the extent the Court approves an initial overbid amount, it be equal to any expense reimbursement or break-up fee which is approved, rather than $540,000.00. Moreover, GVK respectfully requests that the Court require that subsequent overbid amounts be only $50,000.00 greater than the prior bid.

**G.**     **Hercules Should Not Be Permitted to Credit Bid**

63.     While secured lenders are generally permitted to credit bid at the Sale, there is no indication of the validity of Hercules' liens. Section 363(k) of the Bankruptcy Code governs the rights of secured creditors to credit bid for assets subject to their liens. *See* 11 U.S.C. § 363(k). The statute provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

64.     The Motion makes no mention or demonstrates the validity, priority and extent of Hercules' pre-petition liens.

65.     In relation to the post-petition liens arising out of DIP Financing, the Debtors provide no information regarding the financial condition of each of the entities to illustrate why each of the separate entities had to be a borrower under the DIP Financing. Instead, the DIP Financing granted Hercules super-priority liens on the assets of each of the separate entities on an interim basis, even though those entities may not need such DIP Financing. The proposed DIP Financing was a de facto attempt to substantively consolidate the cases specifically so that Hercules could now attempt to credit bid for all the Assets in a single sale.

**H.**     **The Sale Provisions Indicate an Impermissible *Sub Rosa* Plan of Reorganization**

66.     The sale of substantially all of the Assets to Hercules, or to an alternative buyer upon the approval of Hercules, effectuates what is recognized as an impermissible *sub rosa* plan of reorganization.

67.     The debtor should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing terms *sub rosa* in connection with a sale of assets. *PBGC v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983). The Court in *Braniff* held that where a proposed sale:

> attempts to specify the terms whereby a reorganization plan is to be adopted the parties and the district court must scale the hurdles erected in Chapter 11… Were this transaction approved and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect or occasion for future reorganization.

*Braniff*, 700 F.2d at 940.

68.     Where it is clear that the terms of a section 363 sale would preempt or dictate the terms of a chapter 11 plan, the proposed sale is beyond the scope of section 363 and should not be approved under that section. *In re Westpoint Steven Inc.*, 333 B.R. 30 (Bankr. S.D.N.Y. 2005). A debtor cannot be permitted to sell substantially all of its assets outside the ordinary course of business under section 363 of the Bankruptcy Code absent an articulated business judgment. *In re Global Crossing Ltd.*, 295 B.R. 726 (Bankr. S.D.N.Y. 2003). There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business). *Committee of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see In re Encore Healthcare Associates*, 312 B.R. 52, 54-57 (Bank. E.D.Pa. 2004) (denying proposed sale of the debtor's assets because the sole purpose of the sale was to liquidate assets for the benefit of the secured creditor and because the sale advanced no purpose of a chapter 11 proceeding).

69.     The Debtors here have failed to articulate a credible "business justification" for the Sale. The relief sought by the Debtors in the Motion effectively constitutes the entirety of the plan of reorganization in this case. The Debtors have failed to adhere to any of the statutory

requirements regarding the proposal and confirmation of a plan of reorganization: there has been no appropriate notice, no disclosure and no plan confirmation process. Indeed the Motion and sale process are all being pushed on an emergent basis with limited information, if any, being provided to interested parties. In short, all of the safeguards that the Bankruptcy Code requires to ensure that the plan proposal and confirmation processes will be fair to all interested parties have been ignored in favor of a hasty exit from this case that will benefit only the interests of Hercules. This is certainly not the purpose underlying chapter 11 of the Bankruptcy Code.

70. The relief sought by the Debtors, when combined with the relief sought by the Debtors pursuant to their DIP Financing Motion, constitutes a virtual foreclosure on the totality of the Debtors' assets for the benefit of the Debtors' purported secured creditors under the guise of a chapter 11 proceeding and. Accordingly, this case is not appropriately before this Court . *See, e.g., In re Lorraine Street Assocs.*, 198 B.R. 16 (E.D.N.Y. 1996) (dismissing bankruptcy case and noting in connection with the dismissal that the case was a "state foreclosure action disguised as an involuntary Chapter 11 bankruptcy case").

71. The Bankruptcy Code does not require the court to sanction rapid resolution of a case upon any terms that can be obtained and it certainly does not evidence a policy of cloaking a state foreclosure action in federal law simply to benefit a debtor's secured creditors, at the expense of prepetition creditors. In this Case, the prepetition unsecured creditors may fare better outside of the bankruptcy process, using the rights and remedies accruing to them under state law. The relief requested by the Debtors in the Motion, when combined with the relief requested in the DIP Financing Motion, would effectively strip the Debtors' unsecured creditors of their rights. As noted earlier, the proposed transactions provide Hercules with a windfall significantly in excess of its bargained for rights to liquidate its collateral by transferring to it the entirety of

the going concern value that properly belongs to these bankruptcy estates and their unsecured creditors.

72.     If the proposal brought by the Debtors represents the best terms that can be obtained for the assets of the Debtors' estates under chapter 11 of the Bankruptcy Code, then GVK respectfully suggest that perhaps these cases should be dismissed or converted to chapter 7 proceedings.  There is simply no legal or equitable basis to use the Bankruptcy Code as a vehicle to liquidate a bankruptcy estate solely for the benefit of a debtor's secured creditors without requiring the proposal of a plan of reorganization or any of the other safeguards provided in the Bankruptcy Code.

73.     Accordingly, GVK objects to the Debtors' Motion as the Motion fails to comply with the requirements of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, the Court should deny the Debtors' Motion.

In the alternative, GVK respectfully requests that this Court order that: (i) the single sale requirement be stricken; (ii) the break-up fee shall be limited to the Purchaser's actual fees and expenses subject to submission of invoices and capped at $200,000.00; (iii) the initial overbid amount will be $200,000.00 and all subsequent overbids shall be in additional increments of at least $50,000.00; (iv) notice of the auction be published in industry publications each week for a one month period; (v) financial and related information be made available to GVK as well as other interested creditors and potential bidders; and (vi) for such other and further relief as the Court deems just and proper.

GVK reserves its right to supplement this Objection after it has had a more meaningful opportunity to review documents and information that the Debtor has failed to produced in connection with the Sale.

Dated: January 25, 2010.
       New York, New York

                     **DUANE MORRIS LLP**

                  By: */s/ Joseph H. Lemkin*
                        Joseph H. Lemkin
                        Walter J. Greenhalgh
                        Patricia H. Heer
                        1540 Broadway, 14th Floor
                        New York, NY 10036-4086
                        (212) 692-1000
                        (212) 692-1020 (facsimile)