**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan
Michael R. Dal Lago

Attorneys for Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re                           :         Chapter 11

                             :

SPA CHAKRA, INC., *et al.*,        :

                             :         Case No. 09-17260 (SMB)

                             :

                Debtors.     :         Jointly Administered

------------------------------------------------------------ x

**REPLY TO THE OBJECTIONS TO THE MOTION OF THE DEBTORS FOR AN
ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 365, 503, AND 1146(a) AND FED. R.
BANKR. P. 2002, 6004, 6006, 9008, AND 9014: (i) APPROVING THE ASSET PURCHASE
AGREEMENT; (ii) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE
DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (iii)
AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND LEASES; (iv) APPROVING AUCTION PROCEDURES
RELATED THERETO; AND (v) GRANTING RELATED RELIEF**

TO:    THE HONORABLE STUART M. BERNSTEIN
       UNITED STATES BANKRUPTCY JUDGE

      Spa Chakra, Inc., *et al.*, the above-captioned debtors and debtors-in-possession

("***Debtors***" or "***Company***") hereby submit this Reply to the Objections ("***Objections***") filed by

(a) The Official Committee of Unsecured Creditors ("***Committee***"), and (b) GVK Limited

Partners ("***GVK***" and collectively with the Committee, the "***Objectors***") for an order pursuant to

11 U.S.C. 105(A), 363, 365, 503, and 1146(A) and Fed. R. Bankr. P. 2002, 6004, 6006, 9008,

and 9014: (i) approving the Asset Purchase Agreement, (ii) authorizing the sale of certain assets

of the Debtors free and clear of all liens, claims and encumbrances; (iii) authorizing assumption

and assignment of certain executory contracts and leases; (iv) approving auction procedures related thereto; and (iv) granting related relief. In support of the Reply, the Debtors state as follows:

## A.    The Sale will Result in Value for the Estates

1.    The Objections must fail for several substantive reasons. To begin, the Objectors are contending that the Debtors' proposed pending sale ("**Sale**") of its assets to Hercules Technology II, L.P. ("**Hercules**") will leave the estates with no cash or assets to fund the orderly wind down of the Debtors, and will provide absolutely no return for the estates. Although it is true that there will be no cash coming into the estates vis-a-via the sale, there is a tremendous benefit that the estates will gain by virtue of the elimination liability.   As set forth below:

a.    Over $10,118,658 of claims will either be assumed by Hercules or otherwise eliminated if the sale occurs.

b.    This includes approximately $2,000,000[1] of the Debtors' liability to consumers on account of gift card purchases. APA Schedule 2.04 (a) (iv), ECF Docket # 79.

c.    This includes approximately $442,733[2] in cure costs for assumed vendor and trade contracts. Amended Notice Of Proposed Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection With Sale Of Assets, Exhibit A, ECF Docket # 133[3]. Thereby eliminating both prepetition debt and post petition administrative expenses.

d.    This includes approximately $1,429,541[4] in cure costs for assumed leases Amended Notice Of Proposed Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection With Sale Of Assets,

---

[1] This number is subject to change.  As of the filing of this Reply, negotiations are taking place which would result in an increase in this number.

[2] This figure is based on the Debtors' calculation, but should not act as an admission as the amount actually due.

[3] This document reflects the cure amounts that have been negotiated by Hercules and the counter-parties to the executory contracts.  Absent these negotiations, the amount would be that which is set forth above.

[4] See Footnote 2.

#2187048 v2 \020504 \0007

Exhibit B, ECF Docket # 133[5]. Thereby eliminating both prepetition debt and post petition administrative expenses.

e.     Approximately $3,236,384[6] in claims that would otherwise be asserted against the estates as general unsecured claims under Section 502(b)(6) of the Bankruptcy Code will be eliminated.

f.     The $650,000 secured debt owed to Sterling National Bank will also be assumed or satisfied.

g.     All amounts owed on account of postpetition wages and salary will also be paid or assumed, representing the elimination of approximately $360,000 in postpetition administrative claims.

h.     Over 200 jobs will be preserved and, consequently administrative and/or priority claims that would likely be asserted against the estate for postpetition and prepetition wages, expenses, severance, etc. if those 200 plus employees were terminated will be eliminated.[7]

i.     In addition, upon conversion the approximately $2,000,000 secured DIP Loan will become due and owing.

This elimination of liability is more fully set forth in the Debtors' Objection to the Motion for an Order Converting the Debtors Chapter 11 Case to a Case Pursuant to Chapter 7, (ECF 136) dated February 22, 2010 ("**Objection to the Motion to Convert**"). As noted in the Objection to the Motion to Convert, there will be an elimination of approximately $10,000,000 in debt if the sale were to proceed. This is undeniably an enormous benefit to the estate.

2.     Moreover in connection with the sale, Hercules will give the Debtors an option, for 75 days, to evaluate the value of two very significant potential claims that under the APA are technically being purchased by Hercules: (i) causes of action against Cornelia Fifth Avenue, Richard Aidekman and Ellen Sackoff, arising from their failure to repay a $2,400,0000 promissory note and for damages arising from fraud and breach of representation and warranties

---

[5] See Footnote 3.

[6] See Footnote 2.

[7] Not to mention, in light of prevailing macroeconomic circumstances, the devastating impact of such job losses on the lives of these employees and their families.

#2187048 v2 \020504 \0007

in connection with the Cornelia Acquisition, and (ii) causes of action against GVK for damages sustained by the Debtors arising out of the Cornelia Acquisition based upon various legal theories including, potentially civil RICO.

3.    Hercules has also agreed to provide up to $50,000 in funding to enable the Debtors to reach a determination or to provide a source for payment of expenses in the event the Debtors retain counsel on a contingency fee basis for these cases, ***providing*** the sale is consummated.

4.    This coupled with the approximate $666,341.40 in potential avoidance actions, can be used by the Debtors to formulate and confirm a plan. Thus, the Committee's dismissive assertions that a Plan cannot be confirmed are far too premature.

5.    The Committee, quite cavalierly, completely disregards these benefits to creditors of these estates by asking the Court for an Order that would result in their complete and total elimination. Its motivation for doing so is, candidly, unfathomable.

6.    Furthermore, Section 363 of the Bankruptcy Code does not set forth an express standard for determining whether a sale of property under section 363(b) should be approved; however, courts that have interpreted this section consistently apply an "articulated business judgment" standard. *See Stephen Indus., Inc. v. McClung,* 789 F.3d 386, 390 (6th Cir. 1986); *In re Continental Airlines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.,* 722 D.2d 1063 (2d Cir. 1983); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

7.    The Court of Appeals for the Second Circuit first enunciated this standard by stating: the rule we adopt required that a judge determining a Section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such application. *Lionel, 722 F.2d at 1070-71.*

8.      Section 363(b) does not require that the Court substitute its business judgment for that of the Debtor. *See, e.g. Ionosphere Clubs, 100 B.R. at 676* (court will not substitute a hostile witness's business judgment for a debtor's, unless testimony "established that the [debtor] had failed to articulate a sound business justification for its chosen course"). Rather, the Court should ascertain whether a debtor has articulated a valid business justification for the proposed transaction. This is consistent with "the broad authority to operate the business of the Debtor… [which] indicates congressional intent to limit Court involvement in business decisions by a Trustee…[so that] a Court may not interfere with a reasonable business decision made in good faith by a Trustee". *In re Airlift Int'l., Inc., 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).*

9.      The Debtors believe, in their reasonable business judgment, that it is in the best interests of their estates and creditors to sell the assets through an auction with Hercules acting as a stalking horse. With each passing day, there is a risk that the Debtors' customers will take their business elsewhere. Accordingly because one of the major sources of revenue is Gift Cards which people are hesitant to purchase from a company in bankruptcy, the value of the Debtors' Assets are rapidly deteriorating and an expedited auction and sale is necessary to preserve maximum realizable asset values for the benefit of the Debtors' estates and creditors. If the Court were to deny the Debtors the authorization to complete the sale, the loss of value would be devastating.

10.      It is beyond doubt that this sale must proceed.

**B.**     **GVK's Objection is Completely Without Merit**

11.     GVK's assertion that the Debtors proactively and intentionally undermined the value of their own business for the purpose of facilitating a sale to the proposed stalking horse bidder, Hercules, is a specious one that is demonstrably false in all respects.

12.     There is, and never has been, an "intention" to sell (or to facilitate a sale) to Hercules or any other creditor of the Debtors. The filing of the petitions under the Bankruptcy Code by the Debtors was a measure of last resort into which the Debtors were forced by the filing of a Chapter 7 involuntary proceeding orchestrated by GVK.

13.     GVK's statements that the financial information provided "does not comport with the price offered to Hercules for the assets of the Debtors" are grossly misleading, as they suggest that the statements and projections used in the fulsome marketing process that was conducted by Piper Jaffrey in 2008 and 2009 in order to achieve the financing or sale of the Debtors should have been closer to the actual results achieved (and, with respect to 2008, approved by the Debtors' auditors) for the same period, and because they were not, the difference suggests a "conspiracy" in which the Debtors "undermined the value of their business."

14.     This analysis is fatally flawed and amounts, in effect, to holding the Debtors accountable for the fact that their projected and unaudited results did not match their actual and audited results. As is well known, the generation of projections is by definition a prospective exercise that relies heavily on the making of assumptions that may or may not prove to be accurate. Further, 2008 and 2009 were (as is also well known) virtually unprecedented periods in the history of American business which overturned many of the most deeply held assumptions underlying conventional year-on-year business metrics. Finally, GVK is taking the Debtors to

task for complying with the direction of their auditors with respect to the 2008 fiscal year in the treatment of receivables, income and other line items. In short, GVK's argument is a pastiche of incompatible figures consisting of projections, audited numbers, and unaudited numbers which were "cherry-picked" to create the suggestion of "conspiring for an ownership takeover of the Debtors by Hercules" – a conspiracy which, it must be pointed out, would have had to go back a full two years to be credible.

15.     It is, frankly, beyond the realm of both reason and simple self-interest that the Debtors would have engaged for any period of time (or at all) in a "conspiracy" to (i) undervalue or devalue their own business, (ii) wipe out the equity value held by their numerous stockholders, and (iii) deliver their assets to their lender in what GVK is asserting is a "favorable sale," let alone for the two year period which GVK is suggesting. GVK's assertion is even less credible in light of the fact that during this entire time the Debtors were engaged in an active, vigorous marketing process to obtain funding or sell their assets and which included the retention of two investment banks. GVK itself points out, by reference to the various term sheets arising from this process, that these marketing efforts involved discussions which, if they had come to fruition, would have resulted in the full retirement of the debt owed to Hercules. In fact, the retirement of the Hercules debt was expressly contemplated in term sheets which were being negotiated as late as October 2009 – hardly a productive exercise if the Debtors' goal was to facilitate an "ownership takeover" by Hercules.

16.     GVK has also asserted that the fact that the Debtors received term sheets (not "bids," as GVK inaccurately refers to them) from prospective third party purchasers, investors and lenders somehow indicates that the actual value of the Debtors must have been in line with the values stated in these non-binding, initial documents. Incredibly, this is notwithstanding the

fact that none of these non-binding term sheets ever resulted in definitive documentation or any other kind of final transaction. As is well known (presumably particularly by GVK, which itself is an entity engaged in investment activity), term sheets do not in any way constitute definitive "bids", as GVK states, but (except in rare circumstances where they expressly so provide, which is not the case here) instead specifically constitute solely indications of current intention which are subject in their entirety to the completion of financial and legal due diligence, the negotiation of definitive documentation, and many other factors. While these term sheets certainly indicate that the Debtors were looking to sell control positions, consummate financing rounds, secure loans and were generally open to any commercially reasonable method of obtaining financing for operations, the very fact that none of these transactions came to fruition is also overwhelming and compelling evidence that the valuations set forth therein were tested by the market and were found wanting. Not a single prospective investor or purchaser elected to move forward upon completing their financial due diligence on the Debtors, indicating that third parties, motivated by nothing but enlightened self-interest and with nothing vested, did not find the initial valuations proposed by the Debtors plausible. In fact, by referencing the various term sheets at all, GVK fatally undermines its own implausible assertions – by pointing to valuations that were used in term sheets for deals that were not consummated, GVK instead only reaffirms that these prospective valuations were far in excess of reality, that the actual market valuation of the Debtors was much lower, and that once in bankruptcy the Debtors had no resort but to accept the Hercules bid.

17.     It must also be pointed out that the Hercules bid is closer to $11.5 million, not $8 million, as GVK incorrectly states, due to the millions of dollars of assumed liabilities of unsecured creditors that Hercules is agreeing to satisfy as part of its bid – liabilities which it

would have no obligation to even address if it were to merely foreclose upon the assets of the Debtors as is its right as the senior secured creditor. This bid is in excess of the high end of the range the Debtors' third party valuation firm has determined is applicable to the Debtors' assets.

18.     For these reasons, GVK's Objections fails and must be overruled.

## C.     The Committee Mischaracterizes the Sale as a Sub Rosa Plan

19.     The proposed Sale is not a *sub rosa* plan of reorganization as argued by the Committee.

20.     The relevant case law has clearly established that a sale of substantially all of the assets of a debtor prior to confirmation, or even prior to filing, of a plan of reorganization is permissible. *See In re Ionosphere Clubs, Inc.*, 184 B.R. at 653 ("[C]ourts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan."); *see also In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (proceeds of a sale placed in escrow pending distribution through plan); *Patent Cereals v. Finn,* 149 F.2d 711 (2nd Cir. 1945) (under corresponding predecessor Bankruptcy Act provisions, a sale of all of the debtor's assets may precede a plan of reorganization); *In re Naron Wagner Chartered,* 88 B.R. at 87 ("[A section 363 sale] may even be made, as here, prior to filing a plan of reorganization."); *In re WHET, Inc.*, 12 B.R. 743, 750 (Bankr. D. Mass. 1981) ("[T]he case law again is clear that there is nothing objectionable about a sale of all the assets outside of a chapter 11 plan . . . . A trustee may, in appropriate circumstances, first liquidate the assets of a debtor and then propose a plan for distributing the proceeds to creditors").

21.     The only possible alternative to the Sale herein is an immediate liquidation, which would yield far less for the estates, as well as the Objectors. In *In re Chrysler LLC, 405 B.R. 84, 2009 (Bankr. S.D.N.Y. 2009)* the court opined that it is not a *sub rosa* plan for "a debtor [to] sell

substantially all of its assets as a going concern and later submit a plan for liquidation providing for the distribution of the proceeds of the sale," if such proceeds both (i) exceed the value that could be received in a liquidation and (ii) go directly to the first priority lenders. As shown above, the proposed sale will result in a far greater recovery than would a liquidation. Additionally, the value from the transaction will be going to the first priority lender, Hercules. Thus, based on the test established by this Court, the sale is not a *sub rosa* plan, and, thus the Objections are incorrect.

**D.      The Purchase Price is Fair and Reasonable**

22.      The Committee also asserts that the Sale should not proceed because the Debtors have not established that the Sale price for the Assets is adequate. In making this argument, the Committee relies primarily on the testimony given by Mr. Canizales at the first sale hearing in January, and at his recent deposition. The facts, as we know them today, however, are much different than before. Presently, it is now unquestionable that the Hercules' purchase price is fair and adequate. In support of this, the Debtors point to the fact that a 30 day sale process has been conducted and is now completed. During such sale process, over 500 parties were contacted, 9 of which entered into non-disclosure agreements and conducted certain due diligence. Not surprisingly (at least to anyone else except the Committee and GVK), of those 500 parties contacted, not one counter bid for the Debtors' assets was received. Based on this fact alone, it is undeniable that the Hercules' purchase price comports with the market value of the assets and that the Committee's challenge to the value placed on the assets is, as a result of no counter-bids being received, unmistakably flawed. Quite simply, if the Committee's arguments had any merit whatsoever, the Debtors would have received at least one counter bid, if not more, for the assets.

23.     Moreover, the Debtors' recently retained valuation expert, Valuation Research Corporation ("VRC"), has prepared an analysis of the Debtors' assets. Based on an in-depth analysis of the Debtors' assets, VRC's conclusion clearly supports that the purchase price being offered by Hercules is fair and reasonable. Specifically, VRC has found that the enterprise value of the assets being sold is between $5.4 million and $7.7 million (and if breakage is not subtracted from after tax cash flows, the enterprise value of the assets being sold will be between $6.5 million and $9.0 million). After considering the assumed liabilities that Hercules will be making, these findings show that Hercules is actually offering a higher purchase price than what would otherwise be available even in a hypothetical market. A copy of VRC's report is annexed hereto as Exhibit C.

24.     All of this information has been known to the Committee for several days now. Yet, notwithstanding their receipt of VRC's findings – as well as knowing the results of the sale process – the Committee continues to assert that the sale price is inadequate. This is nothing more than the Committee's desperate attempt to disrupt the sale and this case, which has been its only agenda from day one. Notwithstanding the significant benefit to be rendered to consumers, counterparties to executory contracts, vendors, and landlords (among others), the Committee continues this pursuit against the Debtors. These actions beg the question of whose agenda the Committee is actually pursuing when so many general unsecured creditors will benefit greatly if the sale closes.

25.     The Committee simply refuses to recognize (to the detriment of all parties and the estates) that the process has spoken: no other bids were received for these assets. The purchase price submitted by Hercules is fair and reasonable. The Objector's arguments cannot survive.

**E.      The Bid Solicitation Period Was Adequate**

26.     The Committee also attempts to attack the Sale by asserting that that the length of time for the sale process to take place was inadequate. This tired argument has already been addressed by the Court when it approved the auction procedures. The Committee's argument fails for this reason, as well as the fact that no potential bidder sought or requested any additional time to review the assets. No other bids for the Assets were received.  Moreover, testimony at the sale hearing will reveal that it would make no difference if the bidding process was extended. The results would be the same.  Again, the process has spoken: there is not a breath of evidence suggesting that the timing of the bid solicitation period was inadequate.

**WHEREFORE,** the Debtors request that the Committee's Objection to the proposed Sale of Assets be overruled, along with such other relief as the Court deems appropriate.

Dated: New York, New York
        February 24, 2010

MORRISON COHEN LLP
Attorneys for Debtors and Debtors-in-Possession

By:     /s/ *Joseph T. Moldovan*
        Joseph T. Moldovan
        Michael R. Dal Lago
        909 Third Avenue
        New York, New 10022
        Telephone:  (212) 735-8600

**Exhibit A**
**ECF Docket # 133**

**Exhibit B**
**ECF Docket # 133**

# Exhibit C

# VRC

**Spa Chakra, Inc.**

363 Asset Valuation Analysis

February 18, 2010

The accompanying material was compiled on a confidential basis for use solely by Morrison Cohen LLP ("Morrison Cohen"), Spa Chakra, Inc. (the "Company" or "Spa Chakra") as of February 18, 2010. It is understood and agreed that this material will be provided to the Official Committee of Unsecured Creditors and its professional advisors. This material is not intended to provide the sole basis for evaluating any transaction or event, does not purport to contain all information that may be required and should not be considered a recommendation with respect to any transaction or event. This material was prepared for a specific use by specific persons as of a specific date and was not prepared with a view to public disclosure or to conform with any disclosure standards under securities laws or otherwise. This material must not be copied, reproduced, distributed or passed to others at any time without the prior written consent of VRC.

It should be understood that any estimates, valuations, forecasts or projections contained in the accompanying material were prepared or derived from information supplied by the Company and public sources without the assumption by VRC of responsibility for any independent verification thereof. Accordingly, no representation or warranty can be or is made by VRC as to the accuracy or achievability of any such estimates, forecasts or projections. Actual results may vary from such estimates, valuations, forecasts or projections and such variations may be material. Subsequent events may impact the analyses and conclusions set forth in the accompanying material and VRC does not assume any responsibility to update or revise the accompanying material for any actions or events subsequent to the specific date set forth herein.

VRC makes no representation as to the legal sufficiency for any purpose of any capitalized terms and associated definitions set forth in the accompanying material. Such definitions are used solely for setting forth the scope of the assignment.

**Spa Chakra, Inc.**

## Table of Contents

I. Executive Summary

II. Historical Financial Performance

III. Financial Forecast Discussion

IV. Financial Forecast

V. Valuation Analysis

VI. Industry Overview

I. Executive Summary

# Executive Summary: Assignment Overview

- Valuation Research Corporation ("VRC") has been retained by Morrison Cohen, LLP (Morrison Cohen") in connection with its representation of Spa Chakra, Inc. ("Spa Chakra" or the "Company") in Spa Chakra's Chapter 11 Bankruptcy Reorganization.

- VRC understands that as part of the Company's Chapter 11 bankruptcy reorganization, the Company is contemplating a sale of certain assets under Section 363 (the "363 Assets") of The Bankruptcy Code (the "Transaction") to an existing secured lender as part of a credit bid or to a higher bidder under the auction process provided for by The Procedures Order. In connection with the Transaction, Morrison Cohen has asked VRC to render its opinion (the "Opinion") as to the value of the Company's assets to be sold in the Transaction.

Executive Summary: Business
Description

Spa Chakra provides comprehensive health and wellness centers, including fitness centers, with complementary products and services in 13 locations in the cities in the United States, Europe, and Asia including: New York, New York, Indianapolis, Indiana, Chicago, Illinois, Marina del Rey, California, San Francisco, California, Versailles, France, Hong Kong, Seoul, Korea, Gstaad, Switzerland and Porto Cervo, Italy. In addition, the Company provides consulting and technical services including planning, design, execution, and support to ensure the success of each spa location.

Executive Summary: Valuation Summary

*VRC has concluded that the enterprise value of the 363 Assets is between $5.4 million and $7.7 million. If breakage is not subtracted from after-tax cash flows, the enterprise value of the 363 Assets is between $6.5 million and $9.0 million.*

- We performed a discounted cash flow analysis ("DCF") on a five year financial forecast (the "Financial Forecast") that developed from inputs that were provided by management to develop a base value of the 363 Assets. We then subtracted liabilities that would be assumed ("Assumed Liabilities") based upon input from management from our base value to estimate an enterprise value range for the 363 Assets. The Assumed Liabilities exclude gift card liabilities that are reflected already in the financial forecast.

  - We discounted the cash flows in the Financial Forecast using venture capital discount rates to estimate a value for the 363 Assets. We discount rates that ranged from 40% to 60%.

- We concluded that a DCF analysis provided the best indication of value for the 363 Assets. Some of the key factors that led us to this conclusion were: (i) the 363 Assets are severely distressed operating assets whose financial performance must be turned around and (ii) significant risks exist in being able to achieve the financial forecast, including the 2010 projected results given that the 363 Assets' current financial performance and macroeconomic outlook.

- As a result of the high level of uncertainty with being able to achieve the financial forecast, we have not relied upon either the comparable companies or comparable transactions approaches to value the 363 Assets.

($ in thousands)

| Assumes breakage is deducted | Low | Mid | High |
|---|---|---|---|
| Discounted Cash Flow Method[1] | 6,869 | 7,975 | 9,081 |
| Less: Liabilities to be Assumed[2] | 1,419 | 1,419 | 1,419 |
| **Concluded Enterprise Value** | **$5,450** | **$6,556** | **$7,662** |

($ in thousands)

| Assumes breakage is not deducted | Low | Mid | High |
|---|---|---|---|
| Discounted Cash Flow Method[1] | 7,892 | 9,160 | 10,429 |
| Less: Liabilities to be Assumed[2] | 1,419 | 1,419 | 1,419 |
| **Concluded Enterprise Value** | **$6,472** | **$7,741** | **$9,009** |

(1) The discounted cash flow analysis was developed under the assumption that the 363 Assets were a going concern and not in bankruptcy.
(2) These liabilities exclude gift certificates that are being assumed in connection with the 363 sale. The assumption of the gift certificate liabilities and their redemption are reflected in the discounted cash flow analysis. The remaining liabilities are assumed to be a part of the 363 sale. VRC understands that the amount of Assumed Liabilities will not be less than $1.4 million. A list of the assumed liabilities is to be filed with the Bankruptcy Court.
(3) Management has indicated to VRC that it needs approximately $2.5 million of cash to execute its plan. Approximately $1.4 million of these proceeds would be used to settle the assumed liabilities.

# Historical Financial Performance

## Historical Financial Performance Discussion

As part of our engagement, we have reviewed the Company's financial performance in 2008 and 2009. Although the current store profile of the 363 Assets differs from the Company's store profiles in 2008 and 2009, the results clearly show that the Company's continuing operations faced substantial challenges and continued to generate substantial losses on a cash basis.

- 2008 financial results
  - ➢ $3.3 million of losses on continuing operations and $3.2 million of losses on discontinued operations
  - ➢ Troubled operations and unsuccessful expansion strategy

- 2009 financial results
  - ➢ 2009 results were negatively impacted by the acquisition of Cornelia Day Spa ("Cornelia") and poor financial performance at existing stores.

    – Cornelia, which was acquired in 2009 had substantially more gift card liabilities than was disclosed at the time of acquisition

## Company Overview: Audited 2008 Financials

The Company generated significant losses in 2008.

| Income Statement | FY2008 |
|---|---|
| Spa Services | 12,523,902 |
| Retail | 1,628,497 |
| Fitness | 2,655,633 |
| Consulting | 3,051,689 |
| Other | 162,837 |
| **Total Revenue** | **$20,022,558** |
| | |
| Cost of Good Sold | 1,364,362 |
| | |
| **Gross Profit** | **$18,658,196** |
| *% of Revenue* | *93.2%* |
| | |
| Selling, general and administrative | 21,221,892 |
| | |
| **EBIT** | **($2,563,696)** |
| *% of Revenue* | *-12.8%* |
| | |
| Other Income (Expense) | (686,803) |
| | |
| Income (Loss) Before Income Tax | (3,250,499) |
| Income Taxes | (60,974) |
| Income (Loss) from Continuing Operations | (3,311,473) |
| Discontinued Operations | (5,246,110) |
| **Net Income (Loss)** | **($8,557,583)** |

| Assets | FY2008 |
|---|---|
| Cash | 3,112,033 |
| Certificates of Deposit | 200,000 |
| Accounts Receivables | 1,384,043 |
| Inventory | 753,765 |
| Prepaid Expenses | 956,138 |
| Due from Employees | 31,949 |
| **Total Current Assets** | **$6,437,928** |
| | |
| Property and Equipment, Net | 4,691,415 |
| Deposits | 120,646 |
| Intangibles | 11,922,703 |
| | |
| **Total Assets** | **$23,172,692** |

| Liabilities and Stockholders' Equity | FY2008 |
|---|---|
| Line of Credit | 200,000 |
| Current Portion of Debt | 5,000,000 |
| Accounts Payable | 3,057,770 |
| Accrued Expenses | 1,828,401 |
| Tenant Improvement Contribution Payable | 1,080,474 |
| Deferred Income | 2,948,714 |
| **Total Current Assets** | **$14,115,359** |
| | |
| Due to Equity Partners | 438,802 |
| Non-Current Portion of Debt | 5,000,000 |
| Stockholders' Equity | 3,618,531 |
| | |
| **Total Assets** | **$23,172,692** |

Source: The Company

# Company Overview: 2009
## Domestic Profit & Loss Statement

The Company's domestic operations generated negative Cash EBITDA in 2009.

| | Domestic Total | Indianapolis | Avalon | Miami | Short Hills | Bal Harbour | San Francisco | Waldorf Astoria Boutique | Las Vegas | Palmer House | Waldorf Astoria | Call Center | 5th Ave | Marina Del Rey | U.S. Corporate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | $24,375,573 | $704,602 | $519,907 | $119,746 | $5,632,946 | $420,104 | $1,291,941 | $298,367 | $680,770 | $1,476,690 | $3,298,975 | $126,996 | $6,797,374 | $220,766 | $2,986,390 |
| Cost of Goods Sold | 1,674,873 | 49,948 | 39,354 | 11,607 | 338,830 | 32,706 | 88,387 | 72,796 | 52,033 | 83,546 | 242,280 | | 359,657 | 14,940 | 288,791 |
| Gross Margin | $22,700,701 | $654,655 | $480,553 | $108,139 | $5,194,116 | $387,398 | $1,203,554 | $225,571 | $628,738 | $1,393,144 | $3,056,696 | $126,996 | $6,437,717 | $205,826 | $2,697,600 |
| *% of Revenue* | *93.1%* | *92.9%* | *92.4%* | *90.3%* | *93.9%* | *92.2%* | *93.2%* | *75.6%* | *91.0%* | *94.3%* | *92.7%* | *100.0%* | *94.7%* | *93.2%* | *90.3%* |
| Payroll & Related Expenses | 10,409,306 | 266,196 | 273,890 | 85,205 | 2,216,938 | 223,282 | 443,058 | 232,633 | 230,903 | 603,119 | 904,723 | 353,691 | 2,311,071 | 89,512 | 2,164,175 |
| Occupancy Expenses | 1,405,192 | 72,360 | 124,855 | 47,159 | 4,108 | 41,235 | 192,569 | 761 | 65,846 | 147,189 | 385,702 | 13,511 | 257,760 | 14,159 | 38,637 |
| Marketing Expenses | 2,038,536 | 90,476 | 65,899 | 38,696 | 299,582 | 101,477 | 57,560 | 19,331 | 28,171 | 364,902 | 452,498 | 40,895 | 364,674 | 26,075 | 188,973 |
| General & Administrative Expenses | 6,226,774 | 74,621 | 82,896 | 43,188 | 494,881 | 55,049 | 105,074 | 27,221 | 52,495 | 98,173 | 183,969 | | 714,481 | 25,180 | 4,228,662 |
| Total Expenses | $20,099,928 | 506,524 | 547,599 | 214,246 | 2,974,509 | 421,014 | 798,501 | 279,166 | 377,515 | 1,213,383 | 1,926,893 | 408,089 | 3,647,986 | 163,927 | 6,620,447 |
| Total Rental & Incentive Expenses | 1,199,076 | 124,661 | 0 | 74,454 | 0 | (137,420) | 106,014 | | 53,736 | 169,257 | | 143,962 | 420,000 | 18,700 | 225,712 |
| EBIT | $1,401,797 | $23,470 | ($67,047) | ($180,561) | $2,219,606 | $103,804 | $239,039 | ($53,615) | $97,487 | $10,504 | $1,129,802 | ($425,064) | $2,369,731 | $23,200 | ($4,148,559) |
| *% of Revenue* | *5.8%* | *3.3%* | *-12.9%* | *-150.8%* | *40.1%* | *24.7%* | *23.1%* | *-18.0%* | *16.8%* | *0.7%* | *34.2%* | *-334.7%* | *34.9%* | *10.5%* | *-138.9%* |
| Gross Revenue | $24,375,573 | $704,602 | $519,907 | $119,746 | $5,632,946 | $420,104 | $1,291,941 | $298,367 | $680,770 | $1,476,690 | $3,298,975 | $126,996 | $6,797,374 | $220,766 | $2,986,390 |
| GC Breakage | 714,418 | 5,557 | 6,011 | 799 | 271,087 | 2,915 | 86,604 | 761 | 23,707 | 26,394 | 121,226 | 49,718 | 117,557 | 2,071 | 0 |
| Acquisition Breakage | 2,717,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,717,000 | 0 | 0 |
| Revenue from comps | 1,989,469 | 84,177 | 61,181 | 23,032 | 268,998 | 88,106 | 51,261 | 16,111 | 30,761 | 361,524 | 436,929 | 0 | 359,484 | 24,610 | 183,294 |
| Net Revenue | $18,954,686 | $614,868 | $452,715 | $95,915 | $4,992,860 | $329,083 | $1,154,076 | $281,494 | $526,303 | $1,088,772 | $2,740,819 | $77,278 | $3,603,322 | $194,086 | $2,803,096 |
| GAAP EBITDA | $2,074,085 | $35,236 | ($56,222) | ($167,313) | $2,271,979 | $120,192 | $302,114 | ($46,951) | $100,172 | $30,582 | $1,164,795 | ($425,064) | $2,739,646 | $23,214 | ($4,018,294) |
| Gift Vouchers Issued for Cash | 1,835,328 | 14,275 | 15,441 | 2,053 | 696,418 | 7,490 | 222,484 | 1,955 | 60,904 | 67,805 | 311,429 | 127,725 | 302,029 | 5,319 | 0 |
| Gift Vouchers Redeemed | 2,865,379 | 22,209 | 24,023 | 3,195 | 1,083,478 | 11,653 | 346,138 | 3,042 | 94,754 | 105,491 | 484,517 | 198,712 | 469,892 | 8,276 | 0 |
| GC Breakage | 714,418 | 5,557 | 6,011 | 799 | 271,087 | 2,015 | 86,604 | 761 | 23,707 | 26,394 | 121,226 | 49,718 | 117,557 | 2,071 | 0 |
| Acquisition Breakage | 2,717,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,717,000 | 0 | 0 |
| In Kind Breakage | 832,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 832,000 |
| Cash EBITDA | ($3,209,384) | $21,745 | ($70,816) | ($169,254) | $1,613,832 | $113,114 | $91,866 | ($48,798) | $42,615 | ($33,497) | $870,480 | ($546,770) | ($262,785) | $18,187 | ($4,860,294) |

Source: The Company

Note: Breakage reflects the historical percentage of gift cards that are not expected to be redeemed (27% Domestic and 8% International).

Company Overview: 2009
International Profit & Loss Statement

The Company's international operations remained stable and generated $1.3 million of Cash EBITDA in 2009.

| | International Total | Hong Kong | Korea | Je Ju | Sardegna | Versailles | Shanghai (50%) | Shanghai Rep | Gstaad | Alfarden (50%) | Sydney | Hayman | Hospitality |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | $6,692,262 | $334,096 | $1,738,551 | $551,270 | $363,266 | $1,861,203 | $1 | $20 | $545,138 | $315,986 | $897,131 | $85,598 | $0 |
| Cost of Goods Sold | 515,130 | 39,392 | 182,022 | 53,827 | 18,674 | 129,748 | 0 | 0 | 29,259 | 22,719 | 29,512 | 9,978 | 0 |
| Gross Margin | $6,177,132 | $294,704 | $1,556,529 | $497,443 | $344,592 | $1,731,466 | $1 | $20 | $515,879 | $293,267 | $867,620 | $75,621 | $0 |
| % of Revenue | 92.3% | 88.2% | 89.5% | 90.2% | 94.9% | 93.0% | 100.0% | 100.0% | 94.6% | 92.8% | 96.7% | 88.3% | nm |
| Payroll & Related Expenses | 2,338,020 | 133,673 | 444,027 | 127,586 | 45,400 | 1,004,746 | | 43,453 | 176,674 | 92,248 | 121,945 | 61,837 | 86,432 |
| Occupancy Expenses | 489,063 | 37,359 | 55,239 | 38,609 | 16,739 | 173,901 | | 429 | 19,251 | 98,590 | 41,951 | 4,014 | 2,981 |
| Marketing Expenses | 398,448 | 84,194 | 134,697 | 35,387 | 781 | 101,999 | | 58 | 12,701 | 5,242 | 21,929 | 1,459 | |
| General & Administrative Expenses | 580,398 | 10,384 | 132,790 | 60,998 | 51,624 | 115,326 | (19,447) | 15,042 | 28,060 | 84,024 | 19,910 | 5,330 | 76,358 |
| Total Expenses | $3,805,929 | $265,610 | $766,753 | $262,580 | $114,544 | $1,395,972 | ($19,447) | $58,983 | $236,686 | $280,104 | $205,735 | $72,640 | $165,771 |
| Total Rental & Incentive Expenses | 551,472 | 12,797 | 244,214 | 117,745 | 22,405 | 168,526 | 0 | 0 | 81,459 | (165,882) | 73,259 | 16,949 | 0 |
| EBIT | $1,819,732 | $16,297 | $545,563 | $117,119 | $207,642 | $166,958 | $19,448 | ($58,962) | $197,735 | $199,045 | $588,627 | ($13,968) | ($165,771) |
| % of Revenue | 27.2% | 4.9% | 31.4% | 21.2% | 57.2% | 9.0% | nm | nm | 36.3% | 63.0% | 65.6% | -16.3% | nm |
| Gross Revenue | $6,692,262 | $334,096 | $1,738,551 | $551,270 | $363,266 | $1,861,203 | $1 | $20 | $545,138 | $315,986 | $897,131 | $85,598 | $0 |
| GC Breakage | 220,582 | 8,734 | 25,844 | 322 | 0 | 42,285 | 0 | 0 | 121 | 2,917 | 140,308 | 51 | 0 |
| Acquisition Breakage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| In Kind Breakage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Revenue from comps | 344,109 | 79,304 | 109,338 | 30,823 | | 96,532 | 0 | 0 | 11,306 | 0 | 15,915 | 891 | 0 |
| Net Revenue | $6,127,571 | $246,058 | $1,603,368 | $520,125 | $363,266 | $1,722,387 | $1 | $20 | $533,711 | $313,069 | $740,908 | $84,656 | $0 |
| GAAP EBITDA | $1,897,504 | $16,497 | $549,627 | $121,252 | $234,838 | $178,983 | $20,120 | ($57,832) | $209,619 | $210,249 | $592,093 | ($12,532) | ($165,410) |
| Gift Vouchers Issued for Cash | 566,672 | 22,437 | 66,394 | 828 | 0 | 108,628 | 0 | 0 | 311 | 7,493 | 360,450 | 132 | 0 |
| Gift Vouchers Redeemed | 881,621 | 34,907 | 103,295 | 1,288 | 0 | 169,003 | 0 | 0 | 483 | 11,657 | 560,784 | 205 | 0 |
| GC Breakage | 220,582 | 8,734 | 25,844 | 322 | 0 | 42,285 | 0 | 0 | 121 | 2,917 | 140,308 | 51 | 0 |
| Acquisition Breakage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| In Kind Breakage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash EBITDA | $1,361,973 | ($4,707) | $486,882 | $120,470 | $234,838 | $76,324 | $20,120 | ($57,832) | $209,326 | $203,168 | $251,451 | ($12,657) | ($165,410) |

Source: The Company
Note: Breakage reflects the historical percentage of gift cards that are not expected to be redeemed (27% Domestic and 8% International).

# Financial Forecast Discussion

# Financial Forecast Overview

*Five year financial forecasts were developed with input from management.*

▪ The 2010 budget that was developed by management was used as the base for the financial forecasts

▪ 2011 through 2014 forecasts were developed on a property by property basis with growth assumptions that were provided by management.

*As part of our due diligence process, we developed substantial doubt and concern that the results in the Financial Forecasts were reasonable. Some of the factors that raised our concern were:*

▪ Management did not appear to display confidence that the 2010 forecast was attainable;

▪ Substantial growth over the 2009 results would be needed to attain the 2010 forecast (see page 16);

▪ The Company's operating financial performance has been substantially below budget during the Chapter 11 proceedings (see page 17);

▪ The Company's year-to-date performance through February 14 (domestic revenue of approximately $1.5 million and 23.4% behind budget of approximately $2.0 million) seems to suggest that it will be difficult for it to achieve its financial targets for the current year. Based on the revenue of approximately $1.0 million generated in January, the current run-rate would result in fiscal year 2010 revenues of $12.0 million, or 45% below the current forecast.

▪ Management's estimate of needing approximately $1.0 million of cash to achieve the 2010 results does appear to be reasonable given that the Company had $364 thousand of negative cash flow from operations for the ten week period ending February 24, 2010.

(1)  Breakage reflects the historical percentage of gift cards that are not expected to be redeemed (27% Domestic and 8% International).

## Financial Forecast Overview
(continued)

- Based on management's current forecast, the revenue and EBITDA growth rates for each respective location appear to be unachievable. Although most analysts expect economic growth in 2010, it is expected to be anemic as the recovery is expected to be gradual. The luxury goods and services industry, which includes luxury spas, is cyclical and should trend with the general economy.

- The Fifth Avenue location faced a significant setback in 2009 when one of its primary hair stylists left. The loss of the hairstylist resulted in a significant loss of revenues and qualitatively speaking a significant blow to employees' morale. Furthermore, this and the Waldorf Astoria location may experience a larger than anticipated redemption of gift certificates from the closed Short Hills location, which could reduce their earnings.

- During the Company's bankruptcy proceedings, it has experienced high staff turnover and low employee morale at many of its locations, which may impact the pace at which its locations can growth their business. The bankruptcy proceedings have also impacted the Company's reputation, which resulted in in lower volume.

- It is important to note however, that certain lines of business for the Company (e.g. online, wholesale) have not been active during the bankruptcy period and therefore the anticipated ramp up in business can partially be attributed to this.

# Spa Chakra, Inc.

## Financial Forecast Overview
(continued)

- In order to attain the 2010 projected results substantial growth over 2009 results are required.

**Domestic Revenue Comparison** *($ in millions)*



**International Revenue Comparison** *($ in millions)*



**Domestic GAAP EBITDA Comparison**
*($ in thousands)*



Source: The Company

**International GAAP EBITDA Comparison**
*($ in thousands)*



## Financial Forecast Overview
### (10 week period ending 2/14/10 - Actual vs Budget)

- The total collections were 49% lower than budget for the ten week period ended February 14, 2010. Total disbursements were $911 thousand lower than budget; however, these lower disbursements were primarily timing related rather than actual cost savings.

| | BUDGET | ACTUAL | VARIANCE | Variance (%) |
|---|---|---|---|---|
| | For 10 weeks ending 2/14/10 | | | |
| US Spa, including GC Redeemed | 1,973,610 | 1,511,674 | (461,936) | -23% |
| Gift Cards Redeemed | (505,000) | (424,802) | 80,198 | -16% |
| Gift Cards Sold | 880,000 | 305,885 | (574,135) | -65% |
| American Express Hold Back | - | (51,630) | (51,630) | |
| Consulting | 177,000 | 204,980 | 27,980 | 16% |
| Online / Other | 576,000 | 105,421 | (470,579) | -82% |
| Collections - US Operations | 3,101,610 | 1,651,911 | (1,449,699) | -47% |
| Net International Collections | 227,000 | 36,960 | (190,040) | -84% |
| Total Collections | 3,328,610 | 1,688,871 | (1,639,739) | -49% |
| US Operating Disbursements | | | | |
| Materials Purchasing | (219,467) | (81,654) | 137,813 | -63% |
| Occupancy | (180,293) | (148,174) | 32,119 | -18% |
| Payroll - Locations (Gross) | (1,155,000) | (1,356,716) | (201,716) | 17% |
| Payroll Related - Locations | (232,499) | (116,220) | 116,279 | -50% |
| Marketing | (79,000) | (9,860) | 69,140 | -88% |
| G&A - Locations | (131,708) | (79,666) | 52,042 | -40% |
| Rent | (737,839) | (348,832) | 389,007 | -53% |
| Sales Tax | (277,384) | - | 277,384 | -100% |
| Miscellaneous | (42,750) | (3,700) | 39,050 | -91% |
| Total US Operating Disbursements | (3,055,940) | (2,144,821) | 911,119 | -30% |
| Total Corporate Disbursements | (555,077) | (364,265) | 190,812 | -34% |
| Total Restructuring | (850,500) | (766,133) | 84,367 | -10% |
| Total Disbursements | (4,461,517) | (3,275,219) | 1,186,297 | -27% |
| Net Operating Cash Flow | (282,407) | (820,215) | (537,809) | |

| | BUDGET | ACTUAL | VARIANCE |
|---|---|---|---|
| | | For January 2010 | |
| GAAP EBITDA | ($62,000) | ($54,000) | $8,000 |
| Plus: Gift Vouchers Issued | 128,000 | 130,026 | 2,026 |
| Less: Gift Vouchers Redeemed | 167,000 | 295,588 | 128,588 |
| Less: Regular Breakage | 35,000 | 19,544 | (15,455) |
| Less: In Kind Breakage | 15,000 | 15,000 | 0 |
| Less: Acquisition Breakage [1] | 14,000 | 14,000 | 0 |
| Cash EBITDA | ($165,000) | ($268,106) | ($103,106) |

Source: The Company
(1) Excludes acquisition breakage related to the Cornelia hangover.

■ For illustrative purposes, we have provided a DIP budget that was provided to VRC. For the 10 week period ended February 14, 2010, the Company's operations were expected to burn $400,000 of cash. This may be an indication that management may have understated its cash needs for the operation of the 363 Assets.

| Week Ending | 12/13/09 | 12/20/09 | 12/27/09 | 01/03/10 | 01/10/10 | 01/17/10 | 01/24/10 | 01/31/10 | 02/07/10 | 02/14/10 | Total Weeks 1 - 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **US Collections** | | | | | | | | | | | |
| US Spa, including GC Redeemed | 229,951 | 235,039 | 165,886 | 216,739 | 149,986 | 165,366 | 165,000 | 165,000 | 165,000 | 165,000 | 1,816,967 |
| Gift Cards Redeemed | (38,459) | (47,832) | (50,843) | (52,793) | (51,877) | (56,457) | (50,000) | (50,000) | (50,000) | (50,000) | (498,261) |
| Gift Cards Sold | - | - | 203,635 | 27,508 | 15,674 | 12,765 | 20,000 | 20,000 | 50,000 | 50,000 | 399,382 |
| American Express Hold Back | - | (48,185) | (1,251) | (47) | (25) | - | - | - | - | - | (49,509) |
| Room Charges / Spa Cash Receivable | (46,615) | (40,903) | (85,497) | 13,572 | 1,383 | 22,026 | 12,500 | 12,500 | 12,500 | 12,500 | (86,034) |
| Net Gift Cards | 11,788 | 32,926 | - | - | - | - | - | - | - | - | 44,714 |
| Consulting | 174,980 | - | - | - | - | - | - | - | - | - | 174,980 |
| Online / Other | 21,678 | - | 61,843 | - | 21,900 | - | - | 25,000 | 25,000 | 25,000 | 180,421 |
| Collections - US Operations | 353,324 | 131,045 | 293,773 | 204,979 | 131,041 | 143,700 | 147,500 | 172,500 | 202,500 | 202,500 | 1,982,861 |
| | | | | | | | | | | | |
| Net International Collections | - | (20,000) | (10,000) | 24,980 | - | - | 10,000 | 10,000 | 10,000 | 10,000 | 34,980 |
| | | | | | | | | | | | |
| Total Collections | 353,324 | 111,045 | 283,773 | 229,959 | 131,041 | 143,700 | 157,500 | 182,500 | 212,500 | 212,500 | 2,017,841 |
| | | | | | | | | | | | |
| **US Operating Disbursements** | | | | | | | | | | | |
| Materials Purchasing | (438) | (6,188) | (10,367) | (13,037) | (15,035) | (13,135) | (20,243) | (10,243) | (30,647) | (18,539) | (137,434) |
| Occupancy | - | (19,596) | (12,711) | (35,022) | (13,359) | (2,879) | (15,243) | (17,243) | (29,403) | (21,789) | (167,652) |
| Payroll - Locations (Gross) | (212,344) | (147,381) | (214,529) | (123,686) | (108,925) | (100,042) | (100,000) | (100,000) | (100,000) | (100,000) | (1,307,207) |
| Payroll Related - Locations | (23,353) | (45,809) | (2,317) | (1,000) | (4,622) | (503) | (38,500) | (6,000) | (8,500) | - | (131,604) |
| Marketing | - | (860) | - | - | (9,000) | - | (20,000) | (1,000) | (21,000) | (1,000) | (52,860) |
| G&A - Locations | (6,423) | (31,568) | (570) | (16,521) | (4,412) | - | (8,150) | (8,150) | (18,939) | (15,139) | (109,872) |
| Rent | - | - | - | (35,087) | (5,645) | - | - | (200,000) | (159,000) | (59,000) | (458,732) |
| Sales Tax | - | - | - | - | - | - | - | (64,500) | (13,139) | (8,239) | (85,878) |
| Miscellaneous / Petty Cash | - | - | - | - | - | - | (3,750) | (3,750) | (3,750) | (3,750) | (15,000) |
| Total US Operating Disbursements | (242,558) | (251,371) | (240,494) | (224,352) | (161,000) | (116,918) | (205,886) | (410,886) | (384,378) | (227,456) | (2,465,300) |
| | | | | | | | | | | | |
| Total Corporate Disbursements | (24,801) | (2,250) | (26,937) | (34,876) | (12,694) | (87,301) | (63,500) | (44,968) | (57,971) | (45,466) | (400,765) |
| | | | | | | | | | | | |
| Total Restructuring | - | (3,500) | (6,947) | (41,534) | (40,000) | (39,540) | (30,000) | (20,000) | (395,500) | (235,000) | (812,022) |
| | | | | | | | | | | | |
| Total Disbursements | (267,359) | (257,121) | (274,378) | (300,763) | (213,694) | (243,760) | (299,386) | (475,854) | (837,849) | (507,922) | (3,678,087) |
| | | | | | | | | | | | |
| Net Operating Cash Flow | 85,965 | (142,577) | 16,342 | (29,269) | (42,653) | (60,520) | (111,886) | (273,354) | (229,849) | (60,422) | (848,224) |
| | | | | | | | | | | | |
| **Opening Balance** | 134,307 | 220,272 | 74,195 | 183,590 | 112,786 | 30,133 | 77,876 | 62,876 | (38,500) | (663,849) | |
| Collections | 353,324 | 111,045 | 283,773 | 229,959 | 131,041 | 143,700 | 157,500 | 182,500 | 212,500 | 212,500 | 2,017,841 |
| Disbursements | (267,359) | (257,121) | (274,378) | (300,763) | (213,694) | (243,760) | (299,386) | (475,854) | (837,849) | (507,922) | (3,678,087) |
| Cash Infusions / Withdrawals | - | - | 100,000 | - | - | 147,803 | 126,886 | 191,978 | - | - | 566,667 |
| Book Cash Reconciliation | - | - | - | - | - | - | - | - | - | - | - |
| Closing Balance | 220,272 | 74,195 | 183,590 | 112,786 | 30,133 | 77,876 | 62,876 | (38,500) | (663,849) | (959,272) | (959,272) |

Source: The Company

Financial Forecast

## 5-Year Financial Forecast Assumptions

The financial forecast for 2010 was developed by the Company's management. The forecast assumptions below represent the 4-year period between 2011 and 2014. These assumptions were based on inputs provided by the Company's management.

| U.S. Revenue Growth | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey |
|---|---|---|---|---|---|---|---|
| 2011 | 3.0% | 0.0% | 5.0% | 3.0% | 5.0% | 3.0% | 3.0% |
| 2012 | 3.0% | 1.5% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| 2013 | 3.0% | 1.5% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| 2014 | 3.0% | 1.5% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |

| International Revenue | Hong Kong | Seoul | Jeju | Gstaad | Sardigna | Versailles |
|---|---|---|---|---|---|---|
| 2011 | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| 2012 | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| 2013 | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| 2014 | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |

**FY2011 - FY2014 Forecast Assumptions**

| | |
|---|---|
| Breakage Growth | 3% |
| TSA Consulting Growth | 3% |
| Corporate Payroll | 3% |
| Costs as a % of revenues are based on 2010 forecast | |

# Projected 5-Year Financials

| | Summary – 5-Year Forecast | | | | |
|---|---|---|---|---|---|
| | **FY2010** | **FY2011** | **FY2012** | **FY2013** | **FY2014** |
| **Revenues** | **$22,237,160** | **$23,115,398** | **$23,802,860** | **$24,510,856** | **$25,240,001** |
| *Growth %* | | *3.9%* | *3.0%* | *3.0%* | *3.0%* |
| Payroll | 7,588,800 | 7,893,024 | 8,128,195 | 8,370,396 | 8,619,839 |
| COGS | 1,627,512 | 1,683,378 | 1,730,879 | 1,779,761 | 1,830,063 |
| Rent | 3,263,190 | 3,263,190 | 3,263,190 | 3,263,190 | 3,263,190 |
| Marketing | 152,596 | 159,180 | 163,895 | 168,751 | 173,752 |
| Occupancy | 1,750,500 | 1,815,740 | 1,869,612 | 1,925,091 | 1,982,226 |
| G&A (Includes Depreciation) | 1,925,128 | 2,002,962 | 2,062,391 | 2,123,593 | 2,186,620 |
| Total Expenses | $16,307,726 | $16,817,472 | $17,218,161 | $17,630,781 | $18,055,689 |
| *% of Revenues* | *72.3%* | *72.8%* | *72.3%* | *71.9%* | *71.5%* |
| **EBIT** | **$5,929,435** | **$6,297,926** | **$6,584,699** | **$6,880,075** | **$7,184,311** |
| *Growth %* | | *6.2%* | *4.6%* | *4.5%* | *4.4%* |
| *% of Revenues* | *26.7%* | *27.2%* | *27.7%* | *28.1%* | *28.5%* |
| Breakage[1] | 433,220 | 451,995 | 471,621 | 492,140 | 513,593 |
| Depreciation | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 |
| TSA Consulting (Net of Expenses) | 1,275,000 | 1,313,250 | 1,352,648 | 1,393,227 | 1,435,024 |
| **Operating & Corporate Income** | **$8,437,655** | **$8,863,170** | **$9,208,968** | **$9,565,442** | **$9,932,928** |
| Corporate Payroll (Includes Call Center) | 1,666,900 | 1,716,907 | 1,768,414 | 1,821,467 | 1,876,111 |
| Call Center Rent | 132,000 | 132,000 | 132,000 | 132,000 | 132,000 |
| Corporate T&E / G&A | 984,000 | 984,000 | 984,000 | 984,000 | 984,000 |
| Corporate G&A | 144,000 | 144,000 | 144,000 | 144,000 | 144,000 |
| Corporate Expenses Including Call Center | 2,926,900 | 2,976,907 | 3,028,414 | 3,081,467 | 3,136,111 |
| **GAAP EBITDA** | **$5,510,755** | **$5,886,263** | **$6,180,554** | **$6,483,976** | **$6,796,818** |
| *Growth %* | | *6.8%* | *5.0%* | *4.9%* | *4.8%* |
| *% of Revenues* | *24.8%* | *25.5%* | *26.0%* | *26.5%* | *26.9%* |
| GAAP EBITDA | 5,510,755 | 5,886,263 | 6,180,554 | 6,483,976 | 6,796,818 |
| Less: Breakage | (433,220) | (451,995) | (471,621) | (492,140) | (513,593) |
| **Cash EBITDA** | **$5,077,535** | **$5,434,269** | **$5,708,932** | **$5,991,835** | **$6,283,224** |
| *Growth %* | | *7.0%* | *5.1%* | *5.0%* | *4.9%* |
| *% of Revenues* | *22.8%* | *23.5%* | *24.0%* | *24.4%* | *24.9%* |

(1) Breakage reflects the historical percentage of gift cards that are not expected to be redeemed.

| | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey | Hong Kong | Korea | Jeju | Gstaad | Sardigna | Versailles Trianon | Group Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | **$1,684,788** | **$399,984** | **$4,359,116** | **$1,850,784** | **$6,797,000** | **$685,984** | **$895,128** | **$377,780** | **$1,990,352** | **$569,831** | **$415,805** | **$250,000** | **$1,960,608** | **$22,237,160** |
| Payroll | 650,000 | 108,000 | 1,196,000 | 624,000 | 2,794,000 | 248,000 | 300,000 | 118,800 | 425,000 | 100,000 | 135,000 | 50,000 | 840,000 | 7,588,800 |
| COGS | 108,800 | 199,992 | 304,000 | 90,400 | 348,000 | 55,200 | 68,000 | 31,680 | 168,960 | 47,520 | 36,960 | 20,000 | 148,000 | 1,627,512 |
| Rent | 99,996 | 0 | 696,000 | 319,200 | 1,260,000 | 150,000 | 89,513 | 47,981 | 240,000 | 110,000 | 45,000 | 37,500 | 168,000 | 3,263,190 |
| Marketing | 14,856 | 4,000 | 38,311 | 18,508 | 67,970 | 0 | 8,951 | 0 | 0 | 0 | 0 | 0 | 0 | 152,596 |
| Occupancy | 165,640 | 40,000 | 446,240 | 150,000 | 250,000 | 70,000 | 99,640 | 39,600 | 221,280 | 59,400 | 46,200 | 12,500 | 150,000 | 1,750,500 |
| G&A (Includes Depreciation) | 35,000 | 44,000 | 320,000 | 120,000 | 750,000 | 111,804 | 109,604 | 43,560 | 120,000 | 65,340 | 50,820 | 10,000 | 145,000 | 1,925,128 |
| Total Operating Expenses | $1,074,292 | $395,992 | $3,000,551 | $1,322,108 | $5,469,970 | $635,004 | $675,708 | $281,621 | $1,175,240 | $382,260 | $313,980 | $130,000 | $1,451,000 | $16,307,726 |
| **EBIT** | **610,496** | **3,992** | **1,358,565** | **528,676** | **1,327,030** | **50,980** | **219,420** | **96,159** | **815,112** | **187,571** | **101,825** | **120,000** | **509,608** | **5,929,435** |
| *% of Revenues* | *41.1%* | *1.0%* | *35.3%* | *28.6%* | *19.5%* | *7.4%* | *24.5%* | *25.5%* | *41.0%* | *32.9%* | *24.5%* | *48.0%* | *26.0%* | *27.6%* |
| On Line Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Breakage Based On Gift Card Sales | 35,100 | 0 | 86,400 | 29,700 | 202,500 | 16,200 | 16,200 | 3,840 | 11,520 | 10,560 | 0 | 0 | 21,200 | 433,220 |
| Acquisition (Cornelia Hangover) | | | | | 600,000 | | | | | | | | | 600,000 |
| TSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,275,000 |
| Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800,000 |
| **Operating & Corporate Income** | **$645,596** | **$3,992** | **$1,444,965** | **$558,376** | **$2,129,530** | **$67,180** | **$235,620** | **$99,999** | **$826,632** | **$198,131** | **$101,825** | **$120,000** | **$530,808** | **$9,037,655** |
| Corporate Payroll | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,666,900 |
| Call Center Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 132,000 |
| Corporate T&E / TSA / G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984,000 |
| Corporate G&A (Outsourcing) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corporate Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 144,000 |
| Corporate Expenses Including Call Center | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,926,901 |
| **Pre-tax Income/(Loss)** | | | | | | | | | | | | | | **$6,110,754** |
| **Taxes** | | | | | | | | | | | | | | **$2,444,301** |
| **Net Income** | | | | | | | | | | | | | | **$3,666,452** |

Note: Assumed tax rate of 40%.

# Company Overview:
# Fiscal Year 2011
# Profit & Loss Statement

# Spa Chakra, Inc.

| | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey | Hong Kong | Korea | Jeju | Gstaad | Santigna | Versailles Trianon | Group Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | $1,735,332 | $399,984 | $4,577,072 | $1,906,308 | $7,136,850 | $706,564 | $921,982 | $389,113 | $2,050,063 | $586,926 | $428,279 | $257,500 | $2,019,426 | $23,115,398 |
| | | | | | | | | | | | | | | |
| Payroll | 669,500 | 108,000 | 1,255,800 | 642,720 | 2,933,700 | 255,440 | 309,000 | 122,364 | 437,750 | 103,000 | 139,050 | 51,500 | 865,200 | 7,893,024 |
| COGS | 112,064 | 199,992 | 319,200 | 93,112 | 365,400 | 56,856 | 70,040 | 32,630 | 174,029 | 48,946 | 38,069 | 20,600 | 152,440 | 1,683,378 |
| Rent | 99,996 | 0 | 696,000 | 319,200 | 1,260,000 | 150,000 | 89,513 | 47,981 | 240,000 | 110,000 | 45,000 | 37,500 | 168,000 | 3,263,190 |
| Marketing | 15,302 | 4,000 | 40,227 | 19,063 | 71,369 | 0 | 9,220 | 0 | 0 | 0 | 0 | 0 | 0 | 159,180 |
| Occupancy | 170,609 | 40,000 | 468,552 | 154,500 | 262,500 | 72,100 | 102,629 | 40,788 | 227,918 | 61,182 | 47,586 | 12,875 | 154,500 | 1,815,740 |
| G&A (Includes Depreciation) | 36,050 | 44,000 | 336,000 | 123,600 | 787,500 | 115,158 | 112,892 | 44,867 | 123,600 | 67,300 | 52,345 | 10,300 | 149,350 | 2,002,962 |
| Total Operating Expenses | $1,103,521 | $395,992 | $3,115,779 | $1,352,195 | $5,680,469 | $649,554 | $693,294 | $288,630 | $1,203,297 | $390,428 | $322,049 | $132,775 | $1,489,490 | $16,817,472 |
| | | | | | | | | | | | | | | |
| **EBIT** | 631,811 | 3,992 | 1,461,293 | 554,112 | 1,456,382 | 57,009 | 228,688 | 100,483 | 846,765 | 196,498 | 106,230 | 124,725 | 529,936 | 6,297,926 |
| *% of Revenues* | *42.5%* | *1.0%* | *31.1%* | *29.9%* | *21.4%* | *8.3%* | *25.5%* | *26.6%* | *42.5%* | *34.5%* | *25.5%* | *49.9%* | *27.0%* | *29.3%* |
| | | | | | | | | | | | | | | |
| On Line Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Breakage Based On Gift Card Sales | 36,153 | 0 | 90,720 | 30,591 | 212,625 | 16,686 | 16,686 | 3,955 | 11,866 | 10,877 | 0 | 0 | 21,836 | 451,995 |
| Acquisition (Cornelia Hangover) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,313,250 |
| | | | | | | | | | | | | | | 800,000 |
| Operating + Corporate Income | $667,964 | $3,992 | $1,552,013 | $584,703 | $1,669,007 | $73,695 | $245,374 | $104,439 | $858,631 | $207,375 | $106,230 | $124,725 | $551,772 | $8,863,170 |
| | | | | | | | | | | | | | | |
| Corporate Payroll | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,716,907 |
| Call Center Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 132,000 |
| Corporate T&E / TSA / G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984,000 |
| Corporate G&A (Outsourcing) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 144,000 |
| Corporate Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corporate Expenses Including Call Center | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,976,908 |
| | | | | | | | | | | | | | | |
| Income/(Loss) | | | | | | | | | | | | | | $5,886,262 |
| Taxes | | | | | | | | | | | | | | $2,354,505 |
| Net Income | | | | | | | | | | | | | | $3,531,757 |

Note: Assumed tax rate of 40%.

# Company Overview:
## Fiscal Year 2012
## Profit & Loss Statement

# Spa Chakra, Inc.

| | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey | Hong Kong | Korea | Jeju | Gstaad | Sardigna | Versailles Trianon | Group Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | **$1,787,392** | **$405,984** | **$4,714,384** | **$1,963,497** | **$7,350,956** | **$727,760** | **$949,641** | **$400,787** | **$2,111,564** | **$604,534** | **$441,128** | **$265,225** | **$2,080,009** | **$23,802,860** |
| Payroll | 689,585 | 109,620 | 1,293,474 | 662,002 | 3,021,711 | 263,103 | 318,270 | 126,035 | 450,883 | 106,090 | 143,222 | 53,045 | 891,156 | 8,128,195 |
| COGS | 115,426 | 202,992 | 328,776 | 95,905 | 376,362 | 58,562 | 72,141 | 33,609 | 179,250 | 50,414 | 39,211 | 21,218 | 157,013 | 1,730,879 |
| Rent | 99,996 | 0 | 696,000 | 319,200 | 1,260,000 | 150,000 | 89,513 | 47,981 | 240,000 | 110,000 | 45,000 | 37,500 | 168,000 | 3,263,190 |
| Marketing | 15,761 | 4,060 | 41,434 | 19,635 | 73,510 | 0 | 9,496 | 0 | 0 | 0 | 0 | 0 | 0 | 163,895 |
| Occupancy | 175,727 | 40,600 | 482,609 | 159,135 | 270,375 | 74,263 | 105,708 | 42,012 | 234,756 | 63,017 | 49,014 | 13,261 | 159,135 | 1,869,612 |
| G&A (Includes Depreciation) | 37,132 | 44,660 | 346,080 | 127,308 | 811,125 | 118,613 | 116,279 | 46,215 | 127,308 | 69,319 | 53,915 | 10,609 | 153,831 | 2,062,391 |
| Total Operating Expenses | $1,133,626 | $401,932 | $3,188,372 | $1,383,185 | $5,813,083 | $664,541 | $711,407 | $295,849 | $1,232,196 | $398,841 | $330,361 | $135,633 | $1,529,135 | $17,218,161 |
| **EBIT** | **653,765** | **4,052** | **1,526,012** | **580,312** | **1,537,873** | **63,220** | **238,234** | **104,937** | **879,368** | **205,693** | **110,767** | **129,592** | **550,874** | **6,584,699** |
| *% of Revenues* | *44.0%* | *1.0%* | *39.8%* | *31.4%* | *22.6%* | *9.2%* | *26.6%* | *27.8%* | *44.2%* | *36.1%* | *26.6%* | *51.8%* | *28.1%* | *30.6%* |
| On Line Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Breakage Based On Gift Card Sales | 37,238 | 0 | 95,256 | 31,509 | 223,256 | 17,187 | 17,187 | 4,074 | 12,222 | 11,203 | 0 | 0 | 22,491 | 471,621 |
| Acquisition (Cornelia Hangover) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,352,648 |
| Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800,000 |
| **Operating + Corporate Income** | **$691,003** | **$4,052** | **$1,621,268** | **$611,821** | **$1,761,129** | **$80,406** | **$255,421** | **$109,011** | **$891,590** | **$216,897** | **$110,767** | **$129,592** | **$573,365** | **$9,208,968** |
| Corporate Payroll | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,768,414 |
| Call Center Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 132,000 |
| Corporate T&E / TSA / G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984,000 |
| Corporate G&A (Outsourcing) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 144,000 |
| Corporate Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corporate Expenses Including Call Center | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,028,415 |
| Income(Loss) | | | | | | | | | | | | | | $6,180,553 |
| Taxes | | | | | | | | | | | | | | $2,472,221 |
| Net Income | | | | | | | | | | | | | | $3,708,332 |

Note: Assumed tax rate of 40%.

# Company Overview:
## Fiscal Year 2013
## Profit & Loss Statement

# Spa Chakra, Inc.

| | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey | Hong Kong | Korea | Jeju | Gstaad | Sandima | Versailles Trianon | Group Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | **$1,841,013** | **$412,074** | **$4,855,815** | **$2,022,402** | **$7,571,484** | **$749,593** | **$978,131** | **$412,810** | **$2,174,911** | **$622,670** | **$454,361** | **$273,182** | **$2,142,409** | **$24,510,856** |
| Payroll | 710,273 | 111,264 | 1,332,278 | 681,862 | 3,112,262 | 270,996 | 327,818 | 129,816 | 464,409 | 109,273 | 147,518 | 54,636 | 917,891 | 8,370,396 |
| COGS | 118,889 | 206,037 | 338,639 | 98,783 | 387,653 | 60,319 | 74,305 | 34,618 | 184,627 | 51,926 | 40,387 | 21,855 | 161,724 | 1,779,761 |
| Rent | 99,996 | | 696,000 | 319,200 | 1,260,000 | 150,000 | 89,513 | 47,981 | 240,000 | 110,000 | 45,000 | 37,500 | 168,000 | 3,263,190 |
| Marketing | 16,233 | 4,121 | 42,677 | 20,224 | 75,715 | 0 | 9,781 | 0 | 0 | 0 | 0 | 0 | 0 | 168,751 |
| Occupancy | 180,999 | 41,209 | 497,087 | 163,909 | 278,486 | 76,491 | 108,879 | 43,272 | 241,799 | 64,908 | 50,484 | 13,659 | 163,909 | 1,925,091 |
| G&A (Includes Depreciation) | 38,245 | 45,330 | 356,462 | 131,127 | 835,459 | 122,171 | 119,767 | 47,599 | 131,127 | 71,399 | 55,532 | 10,927 | 158,445 | 2,123,593 |
| **Total Operating Expenses** | **$1,164,635** | **$407,961** | **$3,263,143** | **$1,415,104** | **$5,949,675** | **$679,977** | **$730,064** | **$303,286** | **$1,261,962** | **$407,506** | **$338,922** | **$138,577** | **$1,569,969** | **$17,630,781** |
| **EBIT** | **676,378** | **4,113** | **1,592,672** | **607,297** | **1,621,809** | **69,616** | **248,066** | **109,525** | **912,949** | **215,164** | **115,440** | **134,605** | **572,441** | **6,880,075** |
| *% of Revenues* | *45.5%* | *1.0%* | *41.6%* | *32.8%* | *23.9%* | *10.1%* | *27.7%* | *29.0%* | *45.9%* | *37.8%* | *27.8%* | *53.8%* | *29.2%* | *32.0%* |
| On Line Sales | 0 | | | | | | | | | | | | | 0 |
| Brokerage Based On Gift Card Sales | 38,355 | | 100,019 | 32,454 | 234,419 | 17,702 | 17,702 | 4,196 | 12,588 | 11,539 | | | 23,166 | 492,140 |
| Acquisition (Comedia Hangover) | | | | | | | | | | | | | | 0 |
| TSA | | | | | | | | | | | | | | 1,393,227 |
| Depreciation | | | | | | | | | | | | | | 800,000 |
| **Operating + Corporate Income** | **$714,733** | **$4,113** | **$1,692,691** | **$639,751** | **$1,856,228** | **$87,318** | **$265,769** | **$113,721** | **$925,538** | **$226,703** | **$115,440** | **$134,605** | **$595,606** | **$9,565,442** |
| Corporate Payroll | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,821,467 |
| Call Center Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 132,000 |
| Corporate T&E / TSA / G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984,000 |
| Corporate G&A (Outsourcing) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 144,000 |
| Corporate Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Corporate Expenses Including Call Center** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$3,081,468** |
| Income/(Loss) | | | | | | | | | | | | | | $6,483,975 |
| Taxes | | | | | | | | | | | | | | $2,593,590 |
| Net Income | | | | | | | | | | | | | | $3,890,385 |

Note: Assumed tax rate of 40%.

# Company Overview:
## Fiscal Year 2014
## Profit & Loss Statement

# Spa Chakra, Inc.

| | San Francisco | Waldorf Astoria Boutique | Waldorf Astoria | Chicago Palmer House | Fifth Avenue | Indianapolis | Marina Del Rey | Hong Kong | Korea | Jeju | Gstaad | Sardigna | Versailles Trianon | Group Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | $1,896,244 | $418,255 | $5,001,490 | $2,083,074 | $7,798,629 | $772,081 | $1,007,474 | $425,195 | $2,240,159 | $641,350 | $467,992 | $281,377 | $2,206,682 | $25,240,001 |
| Payroll | 731,581 | 112,933 | 1,372,247 | 702,317 | 3,205,733 | 279,126 | 337,653 | 133,710 | 478,341 | 112,551 | 151,944 | 56,275 | 945,427 | 8,619,839 |
| COGS | 122,455 | 209,127 | 348,798 | 101,746 | 399,282 | 62,128 | 76,535 | 35,656 | 190,166 | 53,484 | 41,599 | 22,510 | 166,575 | 1,830,063 |
| Rent | 99,996 | 0 | 696,000 | 319,200 | 1,260,000 | 150,000 | 89,513 | 47,981 | 240,000 | 110,000 | 45,000 | 37,500 | 168,000 | 3,263,190 |
| Marketing | 16,720 | 4,183 | 43,957 | 20,831 | 77,986 | 0 | 10,075 | 0 | 0 | 0 | 0 | 0 | 0 | 173,752 |
| Occupancy | 186,429 | 41,827 | 511,999 | 168,826 | 286,841 | 78,786 | 112,146 | 44,570 | 249,053 | 66,855 | 51,999 | 14,069 | 168,826 | 1,982,226 |
| G&A (Includes Depreciation) | 39,393 | 46,010 | 367,156 | 135,061 | 860,523 | 125,836 | 123,360 | 49,027 | 135,061 | 73,541 | 57,198 | 11,255 | 163,199 | 2,186,620 |
| Total Operating Expenses | $1,196,575 | $414,080 | $3,340,158 | $1,447,982 | $6,090,365 | $695,876 | $749,281 | $310,945 | $1,292,621 | $416,431 | $347,739 | $141,610 | $1,612,028 | $18,055,689 |
| **EBIT** | 699,669 | 4,175 | 1,661,332 | 635,092 | 1,708,263 | 76,205 | 258,194 | 114,250 | 947,538 | 224,919 | 120,253 | 139,768 | 594,654 | 7,184,311 |
| *% of Revenues* | *47.1%* | *1.0%* | *43.4%* | *34.3%* | *25.1%* | *11.1%* | *28.8%* | *30.2%* | *47.6%* | *39.3%* | *28.0%* | *55.9%* | *30.3%* | *33.4%* |
| On Line Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Breakage Based On Gift Card Sales | 39,505 | 0 | 105,020 | 33,428 | 246,140 | 18,233 | 18,233 | 4,322 | 12,966 | 11,885 | 0 | 0 | 23,861 | 513,593 |
| Acquisition (Cornelia Hangover) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,435,024 |
| Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800,000 |
| Operating + Corporate Income | $739,174 | $4,175 | $1,766,352 | $668,520 | $1,954,403 | $94,438 | $276,427 | $118,572 | $960,504 | $236,805 | $120,253 | $139,768 | $618,515 | $9,932,928 |
| Corporate Payroll | $0 | $0 | $0 | $0 | $0 | | | | | | | | | 1,876,111 |
| Call Center Rent | 0 | 0 | 0 | 0 | 0 | | | | | | | | | 132,000 |
| Corporate T&E / TSA / G&A | 0 | 0 | 0 | 0 | 0 | | | | | | | | | 984,000 |
| Corporate G&A (Outsourcing) | 0 | 0 | 0 | 0 | 0 | | | | | | | | | 144,000 |
| Corporate Rent | 0 | 0 | 0 | 0 | 0 | | | | | | | | | |
| Corporate Expenses Including Call Center | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,136,112 |
| Income/(Loss) | | | | | | | | | | | | | | $6,796,817 |
| Taxes | | | | | | | | | | | | | | $2,718,727 |
| Net Income | | | | | | | | | | | | | | $4,078,090 |

Note: Assumed tax rate of 40%.

Valuation Analysis

# Discounted Cash Flow Analysis Assumptions

## Discount Rate

The selected discount rate range of 40% - 60% was based on the observed range of discount rates used for venture capital ("VC") investments. Due to the fact that Spa Chakra's financial forecast appears to be aggressive in relation to the current economic climate and the fact that the Company is in bankruptcy we determined that VC discount rates are appropriate. A discussion of the Company's financial forecast can be found on pages 14 and 15.

| Stage of Development | Stage Description | QED Research[1] | Fin. Entrep. Ventures[2] | Scherlis & Sahlman[3] |
|---|---|---|---|---|
| Start-up or Seed | Early product development. Incomplete management team. Limited history. | 50-70% | 50-100% | 50-70% |
| First | Product development continues. Business challenges understood. | 40-60% | 40-60% | 40-60% |
| Second | Product development complete, management team is likely in place. | 35-50% | 30-40% | 30-50% |
| Third | Rapid sales growth, may have achieved profitability. | 30-50% | na | na |
| Fourth | Sales growth and profit margins have reduced much of the investment risk. | 30-40% | 20-30% | na |
| Bridge / Mezzanine / IPO | Exit, via IPO or sale, and timing are likely known. | 25-35% | 20-30% | 20-35% |

| | Low | | High |
|---|---|---|---|
| Range of Rates | 30.0% | to | 60.0% |

## Terminal Growth Rate

The terminal growth rate was selected based on our discussions with management and an analysis of the Company's forecast and financial performance. The selected terminal growth rate of 3.0% - commensurate with gross domestic product ("GDP") growth – is reasonable given its conservative nature.

(1) Plummer, James L., QED Report on Venture Capital Financial Analysis (Palo Alto: QED Research, Inc., 1987)
(2) Sahlman, William A. and Howard H. Stevenson, Amar V. Bhide, James McNeill Stancill, Jeffry A. Timmons, Dale A. Sander, Financing Entrepreneurial Ventures, Business Fundamentals Series (Boston:Harvard Business School Publishing, 1998).
(3) Scherlis, Daniel R. and William A. Sahlman, A Method for Valuing High-Risk, Long Term, Investments: The Venture Capital Method (Boston: Harvard Business School Publishing, 1987)

# Discounted Cash Flow Analysis
## Assumptions (continued)

**Discount Rate**

In selecting an appropriate discount rate we also looked to returns required by hedge funds that invest in distressed and high yield investments. The one year return for distressed and high yield investments were 23.5% and 47.5%, respectively. It is important to note that these returns represent a return on a portfolio of investments and required rates of return on an individual investment may be higher.

| | Distressed (USD) | Credit Suisse/Tremont Hedge Fund Index | Event Driven (USD) | S&P 500 (USD) | Credit Suisse High Yield II Index (USD) | Dow Jones World Index (USD) |
|---|---|---|---|---|---|---|
| 1 Month | 2.0% | 0.2% | 1.4% | -3.6% | 1.3% | -4.2% |
| 3 Months | 6.8% | 3.2% | 6.0% | 4.2% | 5.7% | 1.7% |
| 6 Months | 13.5% | 8.1% | 11.9% | 9.9% | 15.8% | 8.2% |
| **1 Year** | **23.5%** | **17.5%** | **21.1%** | **33.1%** | **47.5%** | **38.2%** |
| 2 Year Cumulative | -0.2% | -2.4% | 3.0% | -18.3% | 17.2% | -21.5% |
| 3 Year Cumulative | 4.5% | 6.8% | 11.4% | -20.2% | 17.0% | -22.5% |
| 3 Year Avg Annual | 1.5% | 2.2% | 3.7% | -7.2% | 5.4% | -8.2% |
| 5 Year Cumulative | 36.6% | 33.0% | 43.1% | 0.9% | 35.5% | 3.8% |
| 5 Year Avg Annual | 6.4% | 5.9% | 7.4% | 0.2% | 6.3% | 0.8% |
| Since Inception | 458.0% | 317.0% | 382.9% | 211.8% | 206.7% | 95.8% |

Source: Credit Suisse

# Discounted Cash Flow Analysis

Utilizing Spa Chakra's forecast, we have constructed a discounted cash flow analysis ("DCF") to derive an enterprise value. To determine the terminal value we utilized the Gordon Growth method. The key assumptions in this analysis are the discount rate and the long-term growth rate. We have performed a sensitivity analysis around these inputs.

| | STUB | Fiscal Years Ended, December 31 | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 |
| *Revenue* | $19,177.8 | $23,115.4 | $23,802.9 | $24,510.9 | $25,240.0 |
| *% growth* | -- | 150.2% | 3.0% | 3.0% | 3.0% |
| *Adjusted EBITDA* | $4,752.6 | $5,886.3 | $6,180.6 | $6,484.0 | $6,796.8 |
| *% growth* | -- | 178.1% | 5.0% | 4.9% | 4.8% |
| *% margin* | 24.8% | 25.5% | 26.0% | 26.5% | 26.9% |
| *Adjusted EBITDA* | $4,752.6 | $5,886.3 | $6,180.6 | $6,484.0 | $6,796.8 |
| Depreciation & Amortization | $689.9 | $800.0 | $800.0 | $800.0 | $800.0 |
| *Pre-Tax Income* | $4,062.7 | $5,086.3 | $5,380.6 | $5,684.0 | $5,996.8 |
| Cash Taxes | ($1,625.1) | ($2,034.5) | ($2,152.2) | ($2,273.6) | ($2,398.7) |
| *After-tax Income* | $2,437.6 | $3,051.8 | $3,228.3 | $3,410.4 | $3,598.1 |
| Depreciation & Amortization | $689.9 | $800.0 | $800.0 | $800.0 | $800.0 |
| Breakage[1] | ($373.6) | ($452.0) | ($471.6) | ($492.1) | ($513.6) |
| Capital Expenditures | ($310.5) | ($360.0) | ($360.0) | ($360.0) | ($360.0) |
| *Enterprise Cash Flow (ECF)* | $2,443.4 | $3,039.8 | $3,196.7 | $3,358.2 | $3,524.5 |

| Discount | PV of ECF + | PV of Terminal Value = | | | Enterprise Value | | | Discount | |
|---|---|---|---|---|---|---|---|---|---|
| Rate | | 2.5% | 3.0% | 3.5% | 2.5% | 3.0% | 3.5% | | Rate |
| 40.0% | $7,374.6 | $1,642.9 | $1,673.2 | $1,704.4 | $9,017.5 | $9,047.8 | $9,079.0 | | 40.0% |
| 50.0% | $6,487.8 | $1,297.0 | $1,317.2 | $1,337.8 | $7,784.8 | $7,805.0 | $7,825.6 | | 50.0% |
| 60.0% | $5,795.7 | $1,071.4 | $1,086.1 | $1,101.0 | $6,867.1 | $6,881.8 | $6,896.7 | | 60.0% |
| *Enterprise Value Range* | | | | | Low | -- | High | | |
| | | | | | $6,867.1 | -- | $9,079.0 | | |

(1) Breakage reflects the historical percentage of gift cards that are not expected to be redeemed.

We have presented a discounted cash flow analysis below that assumes breakage is not deducted.

| | STUB | Fiscal Years Ended, December 31 | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 |
| *Revenue* | $19,056.1 | $23,115.4 | $23,802.9 | $24,510.9 | $25,240.0 |
| *% growth* | -- | 150.2% | 3.0% | 3.0% | 3.0% |
| *Adjusted EBITDA* | $4,722.4 | $5,886.3 | $6,180.6 | $6,484.0 | $6,796.8 |
| *% growth* | -- | 178.1% | 5.0% | 4.9% | 4.8% |
| *% margin* | 24.8% | 25.5% | 26.0% | 26.5% | 26.9% |
| Adjusted EBITDA | $4,722.4 | $5,886.3 | $6,180.6 | $6,484.0 | $6,796.8 |
| Depreciation & Amortization | $685.6 | $800.0 | $800.0 | $800.0 | $800.0 |
| Pre-Tax Income | $4,036.9 | $5,086.3 | $5,380.6 | $5,684.0 | $5,996.8 |
| Cash Taxes | ($1,614.7) | ($2,034.5) | ($2,152.2) | ($2,273.6) | ($2,398.7) |
| After-tax Income | $2,422.2 | $3,051.8 | $3,228.3 | $3,410.4 | $3,598.1 |
| Depreciation & Amortization | $685.6 | $800.0 | $800.0 | $800.0 | $800.0 |
| Capital Expenditures | ($308.5) | ($360.0) | ($360.0) | ($360.0) | ($360.0) |
| Enterprise Cash Flow (ECF) | $2,799.2 | $3,491.8 | $3,668.3 | $3,850.4 | $4,038.1 |

| Discount Rate | PV of ECF + | PV of Terminal Value = | | | Enterprise Value | | |
|---|---|---|---|---|---|---|---|
| | | 2.5% | 3.0% | 3.5% | 2.5% | 3.0% | 3.5% |
| 40.0% | $8,471.6 | $1,886.5 | $1,921.3 | $1,957.1 | $10,358.1 | $10,392.9 | $10,428.6 |
| 50.0% | $7,454.9 | $1,489.3 | $1,512.5 | $1,536.2 | $8,944.3 | $8,967.4 | $8,991.1 |
| 60.0% | $6,661.4 | $1,230.3 | $1,247.1 | $1,264.3 | $7,891.7 | $7,908.5 | $7,925.7 |

| Discount Rate |
|---|
| 40.0% |
| 50.0% |
| 60.0% |

| | Low | | High | |
|---|---|---|---|---|
| Enterprise Value Range | $7,891.7 | -- | $10,428.6 | -- |

Industry Overview

While the economy is showing signs of recovery, most analysts agree that luxury travel and services will not see a discernible turnaround until 2011. Gross domestic product ("GDP") historically has been an important indicator for luxury performance, and there is no compelling evidence that a paradigm shift has decoupled GDP growth from improvement in the industry.

Q3 2009 GDP grew by an annualized 2.2% after four consecutive quarters of decline, and Q4 growth surprised on the upside at 5.7%. While a part of the 5.7% gain was inventory-induced, 2.2% was driven by real, final, sustainable sales growth. Further, consensus estimates put first-quarter GDP growth at 3.7%. To put these numbers in perspective, the economy shrank 2.4% in 2009—its worst year since 1946.

Many conservative economists forecast 2% annualized GDP growth during each of the next four quarters. Rising GDP leads to profit growth, business investment, job creation, consumer spending and business travel. The luxury industry will benefit, as it always does, with some lag to an improving economy.

- **Profit growth:** Bank profits are coming in on the upside of expectations, resulting in both accelerated TARP repayments (to be diverted to community banks to spur lending) and the Treasury's slashing $200 billion from estimated bailout package losses.

- **Business investment:** Q4 2009 equipment and software spending was up 13.3% while overall business fixed investments were up 2.9 percent on an annualized basis—the first increase in that category in five quarters.

- **Job creation:** Unemployment showed a surprising drop to 9.7% in January from 10.0% in December. Manufacturers also added 11,000 jobs (the first increase in that measurement since November 2007), the length of the average workweek and hourly wages improved, and 52,000 temporary workers were added to the economy—all leading indicators of the sustained, net job growth we should start to see by late spring.

- **Consumer spending:** Fourth quarter consumer spending was up 2.0% after rising 2.8% in the third quarter. Household net worth (US$53.4 trillion) has recovered US$5 trillion of the US$16 trillion lost at the depth of the recession. In addition, the turnaround in consumer credit is here as further tightening of lending standards for mortgages and credit cards has now passed.

Source: Smith Travel Research

## Industry Overview

The luxury spa industry's performance and that of the Company in particular is linked to the hotel industry as most luxury spas occupy space in marquee hotels around the world. In the first month of 2010, Smith Travel Research ("STR") is predicting hotel occupancy will remain flat in 2010 and finish the year at 55.1%. This is after an 8.7% drop in 2009. A consequence of low occupancy is continued lower room rates. STR predicts the average rate of a hotel room will decrease another 3.3% this year.

A luxury hotel typically requires five or more years to go from planning to opening. In 2010 we will see a large number of luxury hotels opening in the U.S. that looked like solid investments when they were initially planned way back in the boom of 2005. Demand is expected to pick up in 2010, led by the luxury and upper-upscale hotel market and business and leisure travelers. Unfortunately, demand is expected to increase at the same percentage as new hotel rooms being added in 2010, 1.8% in the U.S.

U.S. hotel industry is projected to end 2010 with decreases in two of the three key performance measurements, according to STR's monthly forecast update. The high-end business travelers will drive the shape of recovery. There has been some recovery at the high end of the market during the last couple of months. The outlook indicates that the industry's performance will turn positive in 2011. STR projects increases in all three key performance metrics during 2011: Occupancy is projected to increase 2.2% to 56.3%; ADR is forecasted to rise 2.0 to US$96.28; and RevPAR is expected to grow 4.2% to US$54.18. Supply in 2011 is projected to be up 1.0% and demand is expected to increase 3.2%.

Source: Smith Travel Research