UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                              :
                                                    :          Chapter 11
          SPA CHAKRA, et al.,                       :          Case No. 09-17260 (SMB)
                                                    :          Jointly Administered
                          Debtors.                  :
-------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING
## MOTION TO SELL ASSETS

**A P P E A R A N C E S :**

MORRISON COHEN LLP
Attorneys for Debtor
909 Third Avenue
New York, New York 10022

          Joseph T. Moldovan, Esq.
          Michael R. Dal Lago, Esq.
                  Of Counsel


RUSKIN MOSCOU FALTISCHEK P.C.
Attorneys for the Official Committee of Unsecured Creditors
East Tower, 15th Floor
RXR Plaza
Uniondale, New York 11556

          Michael S. Amato, Esq.
                  Of Counsel


WINSTON & STRAWN LLP
Attorneys for Hercules Technology II, L.P.
200 Park Avenue
New York, New York 10166

          John D. Fredericks, Esq.
          Brian Y. Lee, Esq.
          Jacqueline M. Patzelt-Russo, Esq.
                  Of Counsel

DUANE MORRIS LLP
Attorneys for GVK Limited Partners
1540 Broadway, 14th Floor
New York, New York 10036

   Walter J. Greenhalgh, Esq.
   Joseph H. Lemkin, Esq.
   Patricia H. Heer, Esq.
    Of Counsel


BINGHAM MCCUTCHEN LLP
Attorneys for Guerlain, S.A.
399 Park Avenue
New York, New York 10022

   Matthew I. Kliegman, Esq.
    Of Counsel


HOWARD & HOWARD ATTORNEYS PLLC
Attorneys for Circle Block Partners, LLC
One Technology Plaza
211 Fulton Street, Suite 600
Peoria, IL 61602-1350

   Mark Bogdanowicz, Esq.
    Of Counsel


UNITED STATES TRUSTEE
33 Whitehall Street – 21st Floor
New York, New York 10004


**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The debtors (collectively, "Spa Chakra" or the "Debtor") move pursuant to 11 U.S.C. §

363(b) to sell all or substantially all of their operating assets to Hercules Technology II, L.P.

("Hercules"), its pre-petition and post-petition secured lender. The sale motion has drawn

strenuous objections from the Official Committee of Unsecured Creditors (the "Committee") and

GVK Limited Partners ("GVK," and collectively with the Committee, the "Objectors").[1] The

---

[1]   On March 4, 2010, the Court received a letter from Mr. Richard H Aidekman, objecting to the sale.
According to the letter, Aidekman was affiliated with Cornelia Fifth Avenue Spa, which the Debtor acquired in

Court conducted a two-day evidentiary hearing, during which the deal was clarified and modified

in certain respects. For the reasons that follow, the motion is granted.

## BACKGROUND

At all relevant times, Spa Chakra operated luxury health and wellness spas in the United

States, Europe and Asia. On November 30, 2009, several creditors filed an involuntary chapter 7

petition against Spa Chakra Fifth Avenue, LLC ("Fifth Avenue") and the other Spa Chakra

debtors filed voluntary petitions on December 10, 2009. Since that approximate time, all of the

Spa Chakra debtors, including Fifth Avenue, have operated as debtors-in-possession under

chapter 11. The Committee appointed by the United States Trustee consists of Avalon Hotel

Owner, LLC, Cornelia Fifth Avenue LLC and June Jacobs Laboratories LLC.

As of the petition date, Spa Chakra had two secured creditors. Fifth Avenue owed

Sterling National Bank ("Sterling") approximately $610,000, secured by a first priority lien in all

of Fifth Avenue's assets. Spa Chakra also owed Hercules roughly $13.7 million, secured by a

second priority lien in the Fifth Avenue assets and a first priority lien in all of its other assets.

Hercules has also provided approximately $1.7 million in debtor in possession ("DIP")

financing, and the Debtor currently owes Hercules the aggregate sum of around $15.4 million.

---

February 2009 (the "Cornelia Transaction"). Although Aidekman is the chairman of the Committee, his letter stated that he did not think it was appropriate to "stand up" at the sale hearing because the Committee was represented by counsel. He now feels "obligated on behalf of the unsecured creditors to make my comments known." The letter introduced some evidence and made legal arguments pertaining to the issues tried by the Court during the two-day sale hearing discussed in the succeeding text.

I decline to consider the letter. The record was closed on March 1, 2010, after the Court received all the evidence, heard closing arguments and reserved decision. Furthermore, Aidekman could have questioned the witnesses in his capacity as a creditor and party-in-interest, and made appropriate legal arguments at the conclusion of the hearing. Had he done so, the Debtor could have elicited further testimony from the witnesses on redirect, or if necessary, called additional witnesses, and addressed Aidekman's legal arguments at that time. Finally, neither the letter nor the transmitting email indicates that the letter was sent to anyone else, and it has not been filed on the Court's electronic filing system.

Thus, the Hercules and Sterling claims, which together encumber all of the Debtor's assets, exceed $16 million.

The Debtor had been seeking a financial partner for nearly two years. In April 2008, Spa Chakra hired Piper Jaffrey ("Piper"), an investment bank, to raise $15 million. Piper prepared a private placement memorandum as well as financial and legal due diligence material for distribution to interested parties. (Transcript of hearing held Jan. 26, 2010 ("1/26 Tr."), at 20) (ECF Doc. # 125.)[2] In 2008, Piper contacted 76 potential investors, both strategic and financial, held 21 meetings, eight potential investors conducted due diligence and the Debtors received two term sheets. (Id. at 20-21.) Management temporarily abandoned these efforts in the fall of 2008 as a result of the economic recession.

In April 2009, the Debtor revived its efforts to raise equity. In addition to Piper, the Debtor retained a second investment bank, Wedbush Securities ("Wedbush"), to assist in the process. Piper contacted 69 potential investors, conducted an additional 17 meetings and received one term sheet. Wedbush conducted eight meetings with parties that had signed Non-Disclosure Agreements ("NDAs"), and received three term sheets. Spa Chakra did not, however, reach any deals.

During the latter part of 2009, Spa Chakra began to negotiate with Hercules about a possible acquisition of all or substantially all of the Debtor's assets. The parties intended to consummate the proposed transaction through a bankruptcy filing followed by a section 363 sale. Although the Fifth Avenue involuntary petition upset their timing, the Debtor and Hercules

---

[2]     The Court received an offer of proof without objection at the January 26, 2010 hearing to approve the bidding procedures. The Court announced at the sale hearing, again without objection, that it would rely on the evidence adduced at the bid procedures hearing in resolving the sale motion.

eventually entered into an asset purchase agreement ("APA") on January 15, 2010.[3] The parties'

agreement has changed somewhat since the APA was signed, and I recount the current terms.

Under the APA, as subsequently modified, Hercules will purchase all or substantially all

of the Debtors' operating assets.[4] The purchase price consists of the following components:

1. Hercules will pay $8 million in cash, although no cash will actually be paid. Instead, Hercules will credit bid, first its secured DIP financing claim and then its pre-petition secured claim.

2. Hercules will pay directly to non-debtor parties approximately $1.43 million in cure costs required for the Debtor to assume and assign its leases,[5] and $442,733 needed by the Debtor to assume and assign certain vendor contracts.

3. Hercules will assume and pay the Sterling debt in the principal sum of $610,000, although the current amount due may be greater.

4. Hercules will also honor outstanding gift cards totaling approximately $2 million, and assume an additional $360,000 in employee claims.

5. Hercules will fund a portion of the litigation expenses in the event that the Debtor proceeds with the litigation arising from the Cornelia Transaction. The proposed order indicated that Hercules would pay $50,000, although the Debtor represented at the trial that Hercules would provide $100,000. The difference is immaterial, and I will assume the higher amount.

The sale will confer other benefits as well. The assumption and assignment of the

unexpired leases and executory contracts will eliminate the possibility of rejection damage

claims by the non-debtor parties to the assumed agreements, reducing the amount of unsecured

debt. The same is true regarding the assumption of the gift card and employee liabilities. In

---

[3] The APA is attached as Exhibit F to the Supplement to the Sale Motion, filed February 25, 2010 (the "Sale Supplement") (ECF Doc. # 79.)

[4] The original deal included the transfer of two causes of action arising out of the "Cornelia Transaction," identified in footnote 1, supra. Those causes of action are now excluded from the sale, and will remain property of the estates.

[5] The APA suggests that the cure costs will be deducted from the cash component of the purchase price. (See APA § 2.07(a) ("The purchase price . . . shall consist of [$8 million] "minus . . . an amount equal to the Final Cure Costs") (emphasis added). Counsel for the Debtor and Hercules represented during the sale hearing that the cure costs would not be deducted from the purchase price.

addition, Hercules intends to hire most or all of the debtor's current 200 employees, including its chief executive officer, Michael Canizales, preserving these jobs. Hercules has also agreed to provide the former employees' services as necessary, free of charge to the Debtor, to assist in the winding up of the Debtor's affairs.

Spa Chakra filed the sale motion on January 15, 2010, the same day that the APA was signed, and sought a hearing to approve bidding procedures on shortened notice. The Objectors raised strong objections to the sale, including the short time frame, the absence of evidence that the Debtor had exposed its assets to the market and the lack of any cash in the deal for the estate.[6] The Court conducted an evidentiary hearing on January 26, 2010, and approved a modified version of the bid procedures.

The Court nevertheless expressed several reservations about the timing of the sale and the selling efforts that preceded the APA. In addition, the Court observed that the Debtor had provided very little financial information, and it was difficult to determine if the $8 million purchase price reflected a fair value for the Debtor's assets. The Court allowed the auction to proceed, per the Debtor's request, on February 24, 2010, but warned that the Debtor should adduce more evidence of the marketing efforts and the valuation of the assets at the sale hearing.

No other party made a competing bid at the auction, and the Court began the sale hearing on February 25, 2010 (which concluded on March 1, 2010), to determine whether the section 363 sale to Hercules should be approved. Mark Samson, a managing director of Getzler Henrich & Associates LLC ("Getzler"), the Debtor's financial advisor, testified regarding the marketing efforts. Samson came on board post-petition, and was not involved in the Debtor's pre-petition

---

[6]  Certain landlords and other non-debtor contract parties also filed objections, but these have apparently been resolved.

marketing efforts. After Getzler was retained, he initiated contact with 166 entities that had previously been contacted by Piper or Wedbush. This involved sending a letter, on December 30, 2009, advising these entities that Spa Chakra was in chapter 11, and anticipated that a sale process would follow that week or the next week. He asked the recipients to contact the Debtor's general counsel, Rebecca Siegel Baron, Esq., if they were interested in receiving information.

After the January 26th bid procedures hearing, the marketing efforts continued. Spa Chakra and/or Getzler advertised the sale and sent hundreds of emails in an effort to elicit additional bidders. Among other things, Getzler developed a "teaser" that it emailed to 130 targets. (See Debtor's Exhibit ("DX") F.) The teaser consisted of one page that included an overview of the Debtor and the proposed transaction, profit and loss information for 2008 and 2009, and contact information. The email also transmitted the auction procedures and a proposed non-disclosure agreement. Ultimately, ten or eleven parties signed NDAs, and at least four looked at the data assembled by debtors and their professionals. None, however, made a competing offer.

Mose Rucker, a managing director of Value Research Corporation ("VRC"), testified regarding the value of the assets being offered for sale to Hercules. Relying on a discounted cash flow analysis, he testified that the Debtor's assets were worth between $5.4 million and $9.0 million, depending on the assumptions regarding the discount rates (between 40% and 60%) and the inclusion or exclusion of "breakage."[7] VRC based its opinion on the 2009 financial

---

[7] "Breakage" refers to the volume of gift certificates that have been issued but will never be redeemed. Gift certificates issued for cash that are never honored reflect pure income without any corresponding expense.

information and five year projections provided by the Debtor's management.  VRC did not audit or test management's numbers.

## DISCUSSION

Section 363(b) of the Bankruptcy Code authorizes a chapter 11 debtor to use, sell, or lease estate property outside the ordinary course of business.  11 U.S.C. § 363(b).  A section 363 asset sale can provide an efficient means of selling the estate's assets as a going concern at the optimal price.  See Florida. Dep't of Revenue  v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2342 (2008) (Breyer, J., dissenting) ("[T]here are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value.") (internal quotation marks omitted).  In addition, the sale of a going concern often fulfills the "fundamental purpose of reorganization" by allowing the new owners to continue to operate the debtor's business and employ the debtor's former employees.  See N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

Because a section 363 sale is not subject to the requirements of disclosure and voting that attend the plan confirmation process, its use is circumscribed.  "[A] judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  The Lionel court explained that the bankruptcy judge should consider the salient factors, including but not limited to "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the

filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value." Id. In addition, the court should consider whether the parties opposing the sale have produced any evidence that the sale is not justified. Id.

Here, several salient factors weigh against approving the sale to Hercules. The case is only three months old, the sale proposes to transfer all of the Debtor's operating assets, and the sale forecloses anything but a liquidating plan. In fact, the estates are not receiving any cash (except for the litigation fund), and at this juncture, it appears unlikely that Spa Chakra will be able to confirm any plan.

The evidence also fails to support a finding that Spa Chakra engaged in meaningful marketing efforts to sell its assets to anyone other than Hercules prior to December 30, 2009. Although not expressly mentioned by the Lionel court, robust marketing leading to one or more bids provides convincing evidence that the highest offer reflects the market value of the assets. The sale motion discussed at some length the efforts in 2008 and 2009 to raise equity, but did not mention any attempt to sell the assets. The proffer received at the bid procedures hearing did allude in general terms to the marketing of the assets, but it lacked detail, and failed to identify any specific marketing efforts. (See 1/26 Tr. 19–20.) The efforts by Getzler, which commenced on December 30, 2009, were satisfactory under the circumstances, but the compressed time schedule made it unlikely that they would yield much if any interest from competing bidders. Finally, Debtor did not establish a formal data room for due diligence until February 1, 2010, and according to the Objectors, the data room was missing key financial documents, at least until

9

February 19, 2010 when the Debtor added the 2009 cash flow information and 2009 balance sheet.

In fact, the Objectors contend that the entire pre-sale marketing and sale process reflected an intentional effort by Debtor's management to steer the sale to Hercules, who planned to employ them, and dissuade other potential bidders. The Objectors identified two principal faults aside from the compressed schedule. First, the Debtor "low-balled" its 2009 income, which it reported in the teaser sent on January 29, 2010, by taking a $3 million reserve against bad debts and creating a corresponding expense. Second, and as just noted, the Debtor failed to assemble a complete data room, and supplemented certain material information at the last minute.

The first point lacks merit. The Objectors aimed their criticisms at the sufficiency of disclosure in the teaser, not at the propriety of the $3 million bad debt expense. Canizales, in this regard, testified that in 2008, management, in consultation with the auditors, had created a $1.4 million bad debt reserve for certain receivables relating to intellectual property use and consulting agreements that Spa Chakra had entered into with third parties. These third parties planned to construct or were actually constructing spas. The reserve reflected the risk that they might not complete the underlying construction projects or pay the corresponding fees to Spa Chakra. Spa Chakra has not yet been audited for 2009, but Canizales testified that he followed the same criteria as in 2008, and created an additional bad debt reserve of $3 million.

The Objectors did not suggest that it was wrong, as an accounting matter, to create the bad debt reserve in either 2008 or 2009.[8] Instead, they (but primarily GVK) argued that the

---

[8]     It appears GVK offered to buy the $3 million of bad debts for $100,000 plus a 5% interest in the proceeds of any recovery. No evidence was offered to gauge the value of the 5% participating interest, and to the extent that GVK's offer is evidence of value, it confirms that the value of these receivables was minimal.

teaser should have indicated that the 2009 net income figure ($3,936,000) reflected (i.e., was net

of) the $3 million bad debt expense.  But all financial statements are based on assumptions and

subjective judgments that affect the bottom line.  While generally accepted accounting principles

("GAAP") may require the disclosure of some or all of these assumptions and judgments, the

teaser was not a document that had to comply with GAAP.  At bottom, the information was

accurate, and anyone interested in investing at least $10 million to purchase the Debtor's

operating assets would want to see more information.[9]

The Objectors criticisms relating to the data room have some merit, but they do not

support the finding that the Debtor's management conspired with Hercules to prevent competing

bids.  Rather, the problems with the data room were symptomatic of the entire compressed sale

process.  Nevertheless, although it took too long to set up the data room and stock it with

sufficient information, the information was still available from the Debtor outside of the data

room.  The Debtor had been trying to raise money since April 2008.  Baron testified credibly that

she had assembled or participated in assembling legal and financial due diligence materials

dating back to these earlier efforts to raise equity.  She had maintained the information in folders

on her computer, and this information became the basis for the data room.  In addition, the

Debtor updated the existing data in some cases to reflect recent financial results that were not

previously available.

---

[9]    The objecting parties made a similar argument regarding the disclosure of the 2008 loss in the sum of
$8,557,000.  They did not quarrel with the figure, but maintained that it was inflated by a one-time charge in the sum
of $5,246,110 relating to the discontinuance of operations at two non-U.S. spas.  (See GVK Exhibit 1, at 20.)  The
Objectors contended that this disclosure also should have appeared in the teaser.  The correctness of the deduction is
not in issue, and I reject this argument for the same reason.

Although the market efforts were less than robust, I reject the notion that they were motivated by bad faith, or that the sale process was skewed in favor of Hercules. Having heard the testimony of Samson, Canizales and Baron, I find that the Debtor's management and other agents acted honestly, and with the goal of maximizing the assets available to the creditors and the estates.

Furthermore, despite the deficiencies in the marketing efforts, other salient factors strongly support the Debtor's decision to sell its assets to Hercules. First, the purchase price exceeds the value of the operating assets. Rucker testified that the assets were worth between $5.4 million and $9.0 million, and there was no evidence at the hearing to suggest that the assets were worth any more. Hercules is credit bidding $8 million, paying $100,000 to fund litigation, and assuming the Sterling debt ($610,000), and the cure costs owed in connection with the assigned leases ($1.43 million) and vendor contracts ($442,733). These sums total in excess of $10.5 million.[10] Using Rucker's higher estimate, the purchase price still exceeds the market value of the assets by $1.5 million.

Second, although the marketing efforts were deficient, I doubt that greater marketing would have produced a higher bidder or any cash proceeds. The marketing did not chill the bidding; Hercules' secured claim did. Hercules had the right to credit bid over $15 million, well above any estimate of the market value of the assets. Unless a potential buyer was willing to top

---

[10]     I have included these assumed costs in the purchase price because the Debtor would have to satisfy them in order to transfer the operating assets to Hercules free and clear. There is no difference between Hercules assuming and paying these debts, or alternatively, paying the same amount of cash to the Debtor as part of the purchase price and having the Debtor pay these creditors directly.

On the other hand, I have excluded the assumed debts relating to the gift card and employee claims from the purchase price. The Debtor would not have to pay these costs in order to transfer the assets. Instead, Hercules has chosen to assume them in the exercise of its business judgment. Moreover, if Hercules instead paid the money to the Debtor, the proceeds might be distributed differently. Nevertheless, the assumption of these debts by Hercules confers a benefit on the estates by reducing the aggregate amount of the claims.

that amount, there was little reason to expend much time, effort and money pursuing the assets. Furthermore, even if another party interposed a bid believing that Hercules might drop out of the auction, Hercules would still be entitled to the first $15 million in proceeds before anything trickled down to the other creditors.[11]

Third, the Debtor cannot continue to operate without financing, which Hercules is not willing to extend indefinitely. The Debtor lost over $8.5 million in 2008, and the 2008 Audit Report included a going-concern qualification. (GVK Exhibit 1, at 2) (Significant operating losses, negative working capital and debt repayment defaults "raise substantial doubt about its ability to continue as a going concern.") In 2009, the Debtor's management reported unaudited net income of almost $4 million, but Rucker testified that the Debtor suffered negative overall EBIDTA cash flow. The Debtor also closed ten stores since the beginning of 2009, and things have worsened during the approximate ten weeks that the Debtor has been in chapter 11. It has consistently failed to achieve management's forecasts; the U.S. collections are off by 47%, and the international collections are off by 84%. Furthermore, the cash disbursements have been nearly $400,000, or $40,000 per week, over budget.

Finally, the Objectors have not offered any compelling evidence why the sale is not justified. It is unfortunate that the sale will not yield cash for the estate except for the $100,000 litigation fund. This, however, is a function of Hercules' large secured claim. The sale to a new buyer is the inevitable consequence of the Debtor's inability to operate its assets profitably, and is preferable to the termination of the Debtor's business, the discharge of its employees and the liquidation of the few assets that it could actually sell. Accordingly, I conclude that the Debtor

---

[11]     Sterling has the first lien on the Fifth Avenue lien, and would have the right to credit bid that amount for those assets. Hercules is essentially cashing out Sterling so that it can credit bid for all of the assets.

has provided a sound business justification for the sale to Hercules, that the price represents fair consideration for its assets, and that the consummation of the transaction is in the best interests of the creditors and the estates.  I have considered the Objectors' remaining arguments and conclude that they lack merit.

        Settle order.

Dated:  New York, New York
         March 5, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge